969 P.2d 1209

Roger ROXAS and The Golden Budha Corporation, a foreign corporation, Plaintiffs–Appellees/Cross–Appellants,

v.

Ferdinand E. MARCOS and Imelda Marcos, Defendants–Appellants/Cross–Appellees.

No. 20606.

Supreme Court of Hawai'i.

Nov. 17, 1998.

Reconsideration Denied Jan. 28, 1999.

Lex Smith, Bert T. Kobayashi, Jr. (of Kobayashi, Sugita & Goda), on the briefs, for defendant-appellant/cross-appellee.

On the briefs: Imelda Marcos, and Stephen R. Johnson (Law Office of Linn & Neville of Oklahoma City, OK), appearing Pro Hac Vice.

On the briefs: Ward D. Jones and Alexander T. MacLaren (of Chuck Jones and MacLaren) for plaintiffs-appellees/cross-appellants.

On the briefs: The Estate of Roger Roxas and The Golden Budha Corporation, and Daniel C. Cathcart (Law Office of Magana, Cathcart & McCarthy of Los Angeles, CA),appearing Pro Hac Vice.

Before MOON, C.J., LEVINSON and NAKAYAMA, JJ., TOWN, Circuit Court Judge, in place of KLEIN, J., Recused, and WEIL, Circuit Court Judge, in place of RAMIL, J., Recused.

LEVINSON, J.

The defendant-appellant/cross-appellee Imelda Marcos (Imelda), in her alleged capacity as personal representative of the Estate (the Marcos Estate) of former Philippine President Ferdinand E. Marcos (Ferdinand), appeals from that portion of the amended judgment of the first circuit court entered in favor of the plaintiffs-appellees/cross-appellants the Estate of Rogelio (aka Roger) Domingo Roxas (the Roxas Estate) and the Golden Budha Corporation (GBC) (collectively, the plaintiffs-appellees) and against the Marcos Estate. The plaintiffs-appellees cross-appeal from: (1) that portion of the amended judgment (a) entered in favor of Imelda, in her individual capacity, and against the plaintiffs-appellees and (b) ordering the Marcos Estate to pay damages for conversion in the amount of $22,001,405,000.00; (2) the circuit court's order granting in part and denying in part the plaintiffs-appellees' motion for an award of prejudgment interest; and (3) the circuit court's order granting in part and denying in part the plaintiffs-appellees' motion to alter the judgment.

Imelda argues that the circuit court erred in: (1) amending the judgment to substitute Imelda as the personal representative of the Marcos Estate and entering judgment against her in that capacity; (2) denying Imelda's motions for directed verdict and judgment notwithstanding the verdict, argued on the grounds that (a) the Roxas Estate's claims against the Marcos Estate were barred by (i) the statute of limitations, (ii) the "act of state" doctrine, (iii) the "head of state" doctrine, and (iv) lack of personal jurisdiction, and (b) there was insufficient evidence to support the Roxas Estate's claims for (i) conversion, (ii) false imprisonment, and (iii) damages; (3) failing to give preclusive effect to the opinion of a Philippines trial court regarding the authenticity of the "golden" buddha; and (4) admitting hearsay evidence under the "co-conspirators exception" of Hawai‘i Rules of Evidence (HRE) Rule 803(a)(2)(C) (1993).[1]

Imelda's points of error (2)(a)(i), (2)(a)(ii), (2)(a)(iii), (2)(a)(iv), (2)(b)(i), (2)(b)(ii), (3), and (4) are without merit. With regard to her first point of error, we hold that Imelda's purported "substitution" as "personal representative" of the Marcos Estate was ineffective to bind the Marcos Estate but that her conduct during these proceedings judicially estops her from denying personal liability to the extent of her interest, as an heir, in the Marcos Estate. We further hold that Imelda is correct that the evidence, adduced at trial, of the value of the thousands of gold bars allegedly contained in unopened boxes dis-

---

1. HRE Rule 803 provides in relevant part that "[t]he following [is] not excluded by the hearsay rule, even though the declarant is available as a witness: ... A statement that was offered against a party and was uttered by ... a co-conspirator of the party during the course and in furtherance of the conspiracy."

covered by Roxas and converted by Ferdinand was too speculative to support an award of damages. Accordingly, we reverse that portion of the circuit court's amended judgment concerning damages for conversion.

In their cross-appeal, the plaintiffs-appellees argue that the circuit court erred in: (1) ruling, as a matter of law, that conversion of property is a condition precedent to the imposition of a constructive trust and the commission of a fraudulent conveyance with respect to the property; (2) instructing the jury that the proper measure of damages for the conversion of the gold bars and the golden buddha was the value of the bars at the time of conversion rather than the highest value of the gold between the time of the conversion and the time of trial; and (3) failing to award prejudgment interest to the Roxas Estate and awarding inadequate prejudgment interest to GBC.

With regard to the plaintiffs-appellees' first point of error, we agree that conversion is not, pursuant to Philippine law, a condition precedent to liability based on a theory of constructive trust and that the circuit court erred in so ruling. Accordingly, we vacate the portion of the amended judgment entered in Imelda's favor on GBC's claim based on constructive trust and remand for further proceedings before the circuit court sitting in equity. On the other hand, we hold that the circuit court correctly ruled that the jury's verdict in this case precluded a finding of liability against Imelda for fraudulent conveyances.

With regard to the plaintiffs-appellees' second point of error, we hold that the circuit court erred in its instructions regarding the value to be assigned to the converted property, although we adopt a rule different than that advocated by the plaintiffs-appellees. Accordingly, we remand for a new trial on the limited question of the proper valuation of the converted property.

Finally, we hold that the circuit court abused its discretion in failing to award prejudgment interest to GBC with respect to the damages resulting from the conversion of Roxas's property. Therefore, we remand the matter for the entry of an award of prejudgment interest in GBC's favor with respect to the converted property.

## I. BACKGROUND

### A. Factual Background[2]

#### 1. Discovery of the treasure

■ Roxas worked as a locksmith in Baguio City, the Philippines. He was also an

---

2. Most of the trial testimony relevant to this appeal and cross-appeal was introduced by way of the depositions of various witnesses (including, most crucially, Rogelio Roxas), which were read to the jury. Much of the remaining trial testimony consisted of edited videotapes of the depositions of other witnesses.

Over the course of several weeks of pretrial motions and conferences, the parties litigated which portions of the foregoing depositions would be admissible, and the circuit court rendered oral rulings from time to time. Apparently, the parties agreed that the court reporter would not transcribe the redacted trial deposition testimony as it was read into the record. Neither party appears to have marked the redacted versions of the deposition transcripts as trial exhibits for identification. Instead, the unredacted versions of the transcripts (both those read to the jury and those prepared in conjunction with the videotapes) were designated as part of the record on appeal, along with over one dozen videocassettes. In their briefs, all parties cite without explanation to the deposition transcripts, which, as noted, are not technically part of the trial record. Neither side indicates where, if anywhere, the record contains a centralized list-

ing of the admitted portions of the deposition testimony.

Accordingly, this court has been left to piece together crucial portions of the trial record through a maze of designations, counterdesignations, objections, and rulings spread in no particular order throughout thousands of pages of transcripts and more than twelve hours of videotaped testimony. This is not an appropriate means of preparing a record for review on appeal. For the purposes of any further proceedings in the present case on remand, *see infra*, and in future cases in general, the circuit courts should require that any deposition testimony read into evidence or displayed by means of videocassette recordings be transcribed by the court reporter as if it were live testimony.

For present purposes, we deem the parties, in effect, to have stipulated portions of the deposition transcripts as the trial record in their briefs. Furthermore, we note, subject to a few exceptions that are not material to our analysis, that the parties do not dispute the facts as adduced at trial. Accordingly, we have made reference to the deposition transcripts in the construction of the following statement of the facts, at the risk of reciting some facts that *may* not be in evidence,

amateur coin collector and treasure hunter. In 1961, Roxas met a man named Fuchugami in Baguio City, who claimed that his father had been in the Japanese army and had drawn a map identifying the location of the legendary "Yamashita Treasure." The treasure purportedly consisted of booty, which had been plundered from various Southeast Asian countries, during World War II, by Japanese troops under the command of General Tomoyuki Yamashita and which was allegedly buried in the Philippines during the final battle for the islands in order to keep it out of the hands of the Americans.

At around the same time, Roxas met Eusebio Ocubo, who claimed to have served as General Yamashita's interpreter during World War II. Ocubo advised Roxas that, during the war, he had been taken to some tunnels controlled by General Yamashita, in order to retrieve silver to pay for food for the Japanese troops. There, he observed boxes of various sizes that contained gold and silver. Shortly thereafter, he also observed a golden buddha statue, which was kept at a convent near the tunnels.

Armed with Fuchugami's description of his father's maps and Ocubo's representations, Roxas organized a group of partners and laborers to search for the treasure and obtained a permit for the purpose from Judge Pio Marcos, a relative of Ferdinand. Judge Marcos informed Roxas that, in accordance with Philippine law, a thirty-percent share of any discovered treasure would have to be paid to the government.

Sometime in 1970, Roxas's group began digging on state lands near the Baguio General Hospital. After approximately seven months of searching and digging "24 hours a day," the group broke into a system of underground tunnels.

Inside the tunnels, the group found wiring, radios, bayonets, rifles, and a human skeleton wearing a Japanese army uniform. After several weeks spent digging and exploring within the tunnels, Roxas's group discovered a ten-foot thick concrete enclosure in the floor of the tunnel. On January 24, 1971, the group broke through the enclosure. Inside, Roxas discovered a gold-colored buddha statue, which he estimated to be about three feet in height. The statue was extremely heavy; it required ten men to transport it to the surface using a chain block hoist, ropes, and rolling logs. Although he never weighed the statue, Roxas estimated its weight to be 1,000 kilograms, or one metric ton. Roxas directed his laborers to transport the statue to his home and place it in a closet.

Roxas also found a large pile of boxes underneath the concrete enclosure, approximately fifty feet from where the buddha statue had been discovered. He returned the next day and opened one small box, which contained twenty-four one-inch by two-and-one-half-inch bars of gold. Roxas estimated that the boxes were, on average, approximately the size of a case of beer and that they were stacked five or six feet high, over an area six feet wide and thirty feet long. Roxas did not open any of the other boxes.

Several weeks later, Roxas returned to blast the tunnel closed, planning to sell the buddha statue in order to obtain funds for an operation to remove the remaining treasure. Before blasting the tunnel closed, Roxas removed the twenty-four bars of gold, as well as some samurai swords, bayonets, and other artifacts. Roxas twice attempted to report his find to Judge Marcos, but was unsuccessful in contacting him.

During the following weeks, Roxas sold seven of the gold bars and sought a buyer for the golden buddha. Roxas testified that Kenneth Cheatham, the representative of one prospective buyer, drilled a small hole under the arm of the buddha and assayed the metal. The test revealed the statue to be solid twenty-two carat gold.[3] Roxas also tes-

---

with the understanding that our statement of the factual background essentially mirrors the facts as adopted by the parties in their appellate briefs.

**3.** Cheatham testified at trial. Although he acknowledged going to Roxas's house to see the buddha, he denied performing the assay, report-

ing instead that he "saw where someone had taken a—probably a primitive drill bit or a—a wooden drill and drilled a one-inch hole in the bottom of the Buddha to obtain a sample for analysis."

tified that a second prospective buyer, Luis Mendoza, also tested the metal of the statue, using nitric acid, and concluded that it was "more than 20 carats."

On April 1, 1971, Roxas showed the buddha to a third prospective buyer, Joe Oihara, who was accompanied by another individual, Romeo Amansec. Oihara told Roxas that he was staying at the home of Ferdinand's mother, Josefa Edralin Marcos. Oihara examined the buddha at length, performed another assay, and also closely scrutinized the designs on the statue. He indicated an interest in buying the buddha, promising to return in several days with a partial payment of one million pesos. Rendered suspicious by Oihara's long scrutiny of the buddha, Roxas undertook his own examination and discovered that the head was removable. Inside, he found "more than two hand[s]ful" of what he surmised to be uncut diamonds. He placed the diamonds in his closet near the buddha and replaced the head.

## 2. *The raid on Roxas's house*

On April 5, 1971, at 2:30 a.m., men purporting to be from the Criminal Investigation Service (CIS) and the National Bureau of Investigation (NBI), two Philippine national security agencies, knocked on Roxas's door, claiming to have a search warrant. When Roxas failed to respond, the men broke two of Roxas's front windows and pointed the barrels of their rifles inside. They informed Roxas that if he did not open the door within three minutes he would be shot.

Roxas opened the door, and eight men wearing military uniforms entered the house, accompanied by Oihara. They briefly displayed a document that they claimed was a search warrant. Before they snatched it away, Roxas was able to determine that it contained language regarding a "violation of [a] Central Bank regulation and illegal possession of firearms" and that it was signed by Judge Marcos. The men beat Roxas's brother with their rifles and ordered Roxas's family and his two bodyguards to lie down on the floor. When they left, they took the buddha, the diamonds, the remaining seventeen bars of gold, the samurai swords, a piggy bank belonging to Roxas's children, and his wife's coin collection.

Roxas reported the raid to the media and the local police. Subsequently, he went to Judge Marcos's home. Roxas asked Judge Marcos why he had signed the search warrant. Judge Marcos responded that he had had no choice because "the principe" ("the prince") had ordered the confiscation. When Roxas asked who "the principe" was, Judge Marcos responded that it was Ferdinand. Judge Marcos also advised Roxas that it was Oihara's companion, Amansec, who had initially applied for the search warrant, claiming to have seen a gun in Roxas's house. Judge Marcos appeared angry that Roxas had reported the case to the police and the media and stated that, as a result, the CIS and the NBI would likely kill Roxas. Roxas interpreted Judge Marcos's remarks as a threat; nevertheless, on April 7, 1971, Roxas returned to the police station and signed a complaint.

Roxas and his family traveled to Cabantuan City to enlist the aid of Provincial Governor Joson, who provided Roxas with four bodyguards. Roxas then went into hiding in Cabantuan City. Soon thereafter, on April 19, 1971, the military deposited a buddha statue with the City Court in Baguio City.

While he was in Cabantuan City, Roxas was approached by Rosario Uy and Anita Igna. They offered Roxas three million pesos to publicly affirm that the buddha statue held by the court was the same one that he had found. They also told him that they represented Ferdinand's mother. Roxas refused the offer. Later, Uy reached him by telephone and renewed the offer, assuring Roxas that he need not be afraid to accept because Ferdinand would be the one paying him. Roxas again refused.

Roxas's story began to appear regularly in the newspapers, radio, and television and to attract the attention of opposition politicians. Roxas met with a number of politicians, as well as with Philippine Secretary of Justice Vicente Abad Santos. Roxas told the Secretary his story, and the Secretary promised to guarantee Roxas's safety for a trip to Baguio City to identify the buddha in the City Court.

On April 29, 1971, Roxas traveled to the courthouse in Baguio City, accompanied by his bodyguards, two prosecutors from the Justice Department, a lawyer whom Roxas had hired, and a number of reporters and cameramen. Upon examination of the statue, Roxas concluded that it was not the same buddha that he had discovered because: (1) its color was different; (2) it had different facial features; (3) the head was not detachable; and (4) there was no hole under the arm where the original buddha had been drilled. On camera, Roxas announced his conclusion to those present. Roxas then brought the group to his house, where he showed them the damage caused by the raiding party and the closet where he had stored the buddha. Roxas later received an invitation to testify before the Philippine senate about the events; he did so on May 4, 1971.

### 3. *Arrest and torture*

On May 18, 1971, Roxas was arrested in Cabantuan City by three men in civilian clothing. Roxas testified that the men told him "to go with them to make a negotiation with the President." They also reassured him, "Don't be afraid. We are under Malacanang[4]—you know, we are under Malacanang agent. We can make a negotiation to the President, and nothing more." The men took him to the home of Colonel Ponciano Gonzales.

There, an individual identified as Colonel Olivas punched Roxas in the stomach five times. When Roxas asked him why he was being beaten, Colonel Olivas responded, "You're mentioning the name of the President[.]" One of the men then said, "We must report to the President that Rogelio Roxas is in our custody." Colonel Olivas placed a telephone call, during which he appeared to Roxas to be speaking to Ferdinand, because he addressed the other party as "Mr. President."

Subsequently, Roxas was taken to the constabulary headquarters in San Fernando, Pampanga. Once there, a number of soldiers led him to a dark room, where he was shown a picture of his wife and children and told that he must cooperate if he wanted to see them again. The soldiers ordered Roxas to "pinpoint those senators, that they pay me to implicate the name of the president." Roxas refused to sign such a statement, and the soldiers responded by shocking him with wires attached to a large battery. The soldiers also interrogated Roxas about the location of the remaining treasure; however, he refused to divulge this information. The soldiers continued to shock him for several hours and, on one occasion, burned him with cigarettes.

Roxas was then taken to the residence of a judge, where he was directed to sign an affidavit. However, because of the torture he had endured, he was unable to clasp his hand around the pen, and, therefore, could not sign. The soldiers then transported Roxas to a hotel in Angeles City. There, he was questioned again about the location of the treasure. When he refused to respond, he was beaten with a rubber mallet until he passed out. After the beatings, he noticed a great deal of damage to his right eye and ear, neither of which ever fully healed.

Roxas was kept in a room at the hotel for two weeks, during which time he was repeatedly ordered to sign yet another affidavit. This affidavit averred that the raid in his house had been performed "in a peaceful manner" and that the members of the raiding party had possessed no automatic weapons as had been reported in the press. When Roxas finally signed the affidavit, he was brought back to the city court in Baguio City and ordered to point at the buddha statue while being photographed and to identify gold bars as those taken from his home.

That night, Roxas picked the lock on the window of his room and escaped. After finding refuge at his sister's home, Roxas contacted a senator and was again asked to testify before the senate, which he did on June 30, 1971. In his deposition in the instant case, Roxas testified that, during the June 30, 1971 hearing, he told the senators about being tortured.[5]

---

4. The Malacanang Palace is the Philippine equivalent of the United States' "White House."

5. An excerpt of the official transcript of the June 30, 1971 hearing, which was read by the defense

**104**

After the senate hearing, Roxas returned to Baguio City. Once there, he received a letter from Cesar Dumlao, a finance officer at the Malacanang, requesting a meeting on behalf of Ferdinand. Roxas met with Dumlao and was shown a letter, which indicated that Ferdinand was offering to pay him five million pesos.[6] Roxas was instructed to return the next day; however, he did not report back because he became frightened.

One week after his return to Baguio City, Roxas was arrested for failing to appear at a hearing on an illegal weapons charge that had been pending against him since January 28, 1971. He was brought before a judge, who ordered him incarcerated as a result of his default.

On August 21, 1971, Senator Osmena sent an attorney to bail Roxas out of jail. Roxas traveled with the attorney to Manila to meet with Senator Osmena. Senator Osmena asked Roxas to speak at a political rally that evening. Roxas agreed, but he was unable to speak because the rally was bombed before he could start. Roxas ran away and went into hiding for almost one year.

When Roxas finally returned to his Baguio City home in July 1972, he was immediately arrested by two men, who represented to him that they were from the CIS. These men took Roxas to a naval base in the province of Zambales, where he was confined in the stockade. While there, Roxas was questioned by Provincial Commander Rodolfo Patalinghod about his discovery of the golden buddha.

On September 21, 1972, Ferdinand declared martial law in the Philippines; the order remained in effect until 1983. After the declaration, General Fabian Ver visited Roxas in his cell. General Ver admitted that he had been among the raiding party at Roxas's house. He also told Roxas that there had been "an order to kill [Roxas] by the military," but that the order had been canceled when it was discovered that Roxas was a member of the Church of Christ. He

advised Roxas to keep quiet about his case, in light of the fact that martial law had been declared.

In January 1973, Roxas was transferred to a prison camp in Baguio City and tried on the charges of possession of an illegal firearm and unlawfully firing a revolver into the air. He was convicted of both counts by the Third Branch of the City Court of Baguio and sentenced, in connection with the first charge, to an "indeterminate penalty of imprisonment ranging from One (1) year and One (1) day as minimum to Four (4) years as maximum" and, in connection with the second, to a fine. Judgment was entered on January 31, 1973. During his incarceration, Roxas was beaten and questioned about the location of the treasure on two occasions by a man known as Colonel Gemoto—who identified himself as a member of the "Task Force Restoration"—accompanied by representatives of the CIS.

### 4. *Military excavations*

Roxas was released from prison on November 19, 1974. When he arrived home the next day, he noticed soldiers standing outside tents near the Baguio General Hospital. Sometime in December 1974, some soldiers visited Roxas in his shop and told him that they were members of the Task Force Restoration, which was conducting excavations behind the hospital. They listed their address in Roxas's logbook (which was never produced at trial) as Malacanang Palace. The soldiers asked him to come with them to help with the excavation; he refused. Roxas passed by the site in 1976 and saw that the excavations were still ongoing. In October 1976, Roxas and his family moved to Visayan City, where they stayed for the next ten years without further incident relating to the Yamashita treasure.

Juan Quijon (Juan) and his son, Romulo Quijon (Romulo), corroborated Roxas's testimony regarding the excavations. Juan had

to the jurors, indicated that Roxas answered questions about his actions during the period of his alleged abduction, but did not mention being kidnaped or tortured. However, it appears that the entire transcript of the hearing was not intro-

duced into evidence. Therefore, it is unclear whether the excerpted portion contained the entirety of Roxas's testimony on that occasion.

**6.** Neither letter was produced at trial.

worked as a nursing attendant at Baguio General Hospital from 1945 to 1988. He noticed a number of soldiers involved in excavation behind the hospital between 1974 and 1975. Over a one-week period, Juan observed men carrying large wooden boxes out of a tunnel and placing them in trucks. Each box was carried by at least four—and sometimes six—men. The soldiers' uniforms bore the initials "PSC," and the trucks had the letters "PMA" painted on them. Juan also observed men removing some steel boxes with the aid of a winch. The soldiers left in August 1975.

Romulo testified that he worked as a cook for the soldiers performing excavations behind the hospital in 1974. Romulo testified that the "PSC" on the soldiers' uniforms stood for "Presidential Security Command," and the "PMA" painted on the trucks stood for "Philippine Military Academy." The soldiers employed civilians to perform most of the digging. Romulo saw these civilians pushing and pulling boxes out of a hole and loading them into trucks. The boxes appeared to be old and in poor condition. Some fell apart while being carried, and gold-colored bars fell out onto the ground. Romulo observed approximately ten boxes per day being loaded into trucks over a period of one year. He testified that the soldiers were "very strict" about keeping the public out of the area and that armed guards were posted at the trucks during the loading.

### 5. *Laundering and sale of the gold*

Robert Curtis, an American owner of a mining and refining business in Sparks, Nevada, testified that, in late 1974, he received a number of telephone calls from Norman Kirst, an associate of Ferdinand, inviting him to travel to the Philippines to meet the president. Kirst stated that Ferdinand wanted Curtis's company to resmelt some gold bars and change the "hallmarks." [7] Ferdinand also wanted Curtis to change the chemical composition of the gold while resmelting it so that its origin would not be identifiable. Curtis initially refused the invitation, but fi-

nally relented and traveled to the Philippines to meet with Ferdinand.

When he arrived, Curtis met with a number of Ferdinand's aides and generals, including General Ver. He also met with Colonel Lachica, who was "Imelda Marcos' personal security and went with her wherever she went." Colonel Lachica took part in the conversations about resmelting and "rehallmarking and purifying the gold[.]" Finally, after approximately ten days, he met with Ferdinand, Olof Jonsson (another American, *see infra*), General Ver, and Kirst.

Ferdinand told Curtis that he had recovered an enormous amount of gold from the Yamashita treasure, which he had found at various sites, and that he needed help because the "International World Court had ... passed a ruling that any ... World War II treasures that were recovered would revert back to the countries from ... whence they were taken." Ferdinand told him that he had so much gold that selling it could have a large effect on the world economy or even "start World War III."

Curtis also testified that General Ver had brought him to a basement room in the Marcoses' Miravelles summer palace, where the gold bars were kept. Curtis entered a room "about roughly 40 by 40," stacked to the ceiling with bars of gold. He estimated the ceiling to be ten feet high. Two or three four-foot wide aisles ran through the stacks of gold. The bars were in a standard seventy-five kilogram size. He noticed that the bars had "[o]riental markings" on them. Later, Ferdinand showed Curtis a solid gold buddha statue with a removable head, which Curtis identified from the pictures taken at Roxas's house as the same buddha that Roxas had discovered.

On cross-examination, Curtis testified that his study of the Yamashita treasure had suggested that the treasure contained eighteen buddhas and was distributed among 172 sites. He also testified that Ferdinand had told him that the gold that Curtis had seen

---

**7.** The "hallmark" of a gold bar is a stamp with a serial number, which indicates its registration in a particular country.

had come from a site in the Luzon region. Moreover, in 1975, while Curtis was working with Ferdinand, another site was discovered in the town of Teresa, and more gold was retrieved.

Curtis and others began the work of designing and building a refinery in the Philippines to fulfill Ferdinand's requests. However, on July 5, 1975, General Ver took him to a military cemetery at Fort Bonafacio, walked him to a freshly-dug hole, and put a gun to his head, saying "[W]e're good friends but[,] I'm sorry, I have to do this." Curtis was able to talk General Ver out of shooting him and then quickly left the Philippines. He did not return to the Philippines as long as Ferdinand remained in power.

Olof Jonsson also testified that he had seen stacks of gold bars. Jonsson testified that he had first traveled to the Philippines at the invitation of a colonel stationed at Clark Air Force Base. He was brought there to use his powers as a psychic to locate gold that the colonel believed to be buried there. Jonsson described his psychic powers as including telekinesis, clairvoyance, telepathy, and the power to dematerialize objects with his mind.

While he was in the Philippines, Jonsson was asked to meet Ferdinand. He was brought to Ferdinand's office in the Malacanang Palace. Ferdinand invited Jonsson to stay at a guest house on the palace grounds. After several weeks, Jonsson left the Philippines, but he returned in 1975 with Curtis when the latter had traveled to the Philippines in order to discuss resmelting gold with Ferdinand. On this occasion, Jonsson met again with Ferdinand and General Ver. General Ver showed him a basement room in the guest house outside Malacanang Palace and another room in the summer palace, both filled with gold. He was also shown a golden buddha in the summer palace that was too heavy for him to move. Jonsson described the basement room in the guest cottage as being approximately twenty feet wide, forty feet long, and twelve feet high. He estimated the room in the summer palace as measuring "probably 40 feet by 25 or something" and twelve feet in height. Both rooms were filled with two-foot-long bars of gold stacked to the ceiling. Jonsson testified that it was possible that the bars were four inches wide and four inches thick, but that he could not recall exactly.

A number of witnesses also testified regarding Ferdinand's alleged attempts to sell his gold surreptitiously. Two Australian citizens, Michael O'Brien and John Doel, testified that they were partners in an Australian real estate venture. In 1983, O'Brien and Doel were seeking capital to finance their project. The partners met a Malaysian, Andrew Tan Beng Chong (Tan), who asked the partners to serve as brokers for the sale of ten thousand metric tons of gold in exchange for commissions on the sale. When O'Brien asked Tan the identity of the owner of such a large amount of gold, Tan stated only that the gold was available and could not be sold by regular means because of the source. O'Brien and Doel agreed to assist and created a company, designated "Remington," to carry out the transactions. The partners found buyers for the gold, and Doel subsequently traveled to the Philippines on April 20, 1983 at Tan's instruction. Doel met with Colonel Eike Manois, who claimed to represent the principal seller in the transaction but refused to disclose the seller's identity. At a subsequent meeting, however, a man identified as "Doming" Clemente, an associate of the colonel's, told Doel that Ferdinand was the owner of the gold. Clemente also stated that Imelda was aware of the transaction, but that Ferdinand was handling the details.

During the time that Doel and O'Brien were working on completing the transaction, Clemente relayed an offer from Ferdinand to sell Doel a one-ton golden buddha that Ferdinand had obtained in Baguio City. Doel refused the offer. Clemente also told Doel that the gold bars, which were the object of their transaction, had been "war booty items" and had been "buried in tunnels behind the hospital at Baguio City."

O'Brien also traveled to the Philippines. At one point, when he expressed doubt as to the existence of so much gold, he was blindfolded and taken to a warehouse. Inside the warehouse was a stack of approximately three hundred to four hundred boxes, each the size of a six-pack of beer. O'Brien

opened one and observed that it contained three crudely smelted gold bars, which he described as being pitted "like an orange peel." He tried to lift several other boxes and found them too heavy to move. The partners were successful in having the parties sign contracts for the sale of the gold, but, as of July 1983, only a portion of the contracts were executed to their knowledge.

Norman Dacus, a retired American police officer, testified that he lived in the Philippines between August 1983 and April 1985. Dacus had relocated there because he had been recruited by a friend, Joseph Zbin, to become his partner "in brokering gold for [President] Marcos[.]" Dacus met with O'Brien and Clemente with respect to arranging gold transactions. He also met with Ferdinand, General Ver, and other army officers. Dacus was involved in "educating" Ferdinand about "how gold has a fingerprint on it and how you can tell which gold comes from which country." Ferdinand advised him that the first increments of gold he planned to sell were in ten-kilogram ingots, bearing the stamp of the Central Bank. At a subsequent meeting, Ferdinand stated that some of the gold was in metric ton blocks. On one occasion, Dacus was shown what he estimated to be one hundred metric tons of gold, located in a vault at the Coconut Planter's Bank. Later, Dacus was flown to Ilocas Norte and taken to a shrine constructed for Ferdinand. Inside, he observed an approximately four-foot tall, gold-colored buddha statue and what he estimated to be three hundred to five hundred metric tons of gold comprised of twenty-five kilogram ingots.

Based on portions of the testimony of Robert Curtis, Olof Jonsson, Michael O'Brien, and Norman Dacus, Nelson Colton, a long-time gold trader and manager in the gold refining industry, rendered an opinion regarding the value of the gold that the witnesses had allegedly observed. Colton estimated the volume and value of the gold described by the various witnesses in terms of the price of gold on the world market on various dates, including the time of the alleged conversion and in 1980, when gold was at its highest world price subsequent to the alleged conversion.

### 6. *Move to Hawai'i*

On February 25, 1986, after they were removed from power by a popular revolution, the United States government transported Ferdinand and Imelda to Hawai'i. Soon thereafter, Roxas contacted a childhood friend, Felix Dacanay, who had become a Georgia resident, to help him press his claims against the Marcoses. On June 3, 1986, Roxas assigned all of his rights to the Yamashita treasure to GBC, which Dacanay had incorporated in Georgia, in exchange for a minority holding of non-voting shares.

Richard Hirschfield, an American attorney, testified that he met the Marcoses in Hawai'i in 1986 or 1987. Ferdinand hired him to arrange for an eighteen million dollar loan from Al–Fassi, a member of the Saudi royal family. Marcos offered to secure the loan with gold bullion, of which he claimed to possess tons. He told Hirschfield that he "had access to this Yamashita Treasure from the General of the Japanese War." Hirschfield also testified that either Ferdinand or Imelda told him that they had taken a golden buddha from the person who discovered the treasure and replaced it with a brass buddha.

### 7. *The Baguio City Court proceeding regarding the buddha*

Roxas died on May 25, 1993. On April 20, 1995, his brother, Jose Roxas (Jose), commenced an action in Branch III of the Regional Trial Court of Baguio City, praying for release of the buddha statue being retained by the clerk of court and claiming that "I and our family desire to keep the said buddha as a m[e]mento of our late brother, ROGELIO D. ROXAS." Jose's petition was supported by two of Roxas's sons; however, Jose admitted to the court that Roxas had had a number of children out of wedlock whose names he did not know "because [Roxas] had several mistresses."

At the initial hearing on the petition, conducted on April 28, 1995, Jose testified that he had been present when the raiding party confiscated the buddha. The court directed Jose to inspect the buddha in the clerk's possession and testify whether it was the same one taken from Rogelio Roxas. The

court noted from its own observation that "[i]t appears ... that the color is gold but it is superficial, it is only the outer part because there are parts where the color was chipoff [sic] and what you see is silver or white[.]" Jose identified the buddha as the statue confiscated from Roxas's house.

At a second hearing, held on May 15, 1995, Jose testified that the buddha that had been in Roxas's house was "made of lead or copper but the reporters added that said Buddha was made of gold." He testified further that "[Roxas] also knew it was made of lead" but that Roxas had claimed that it was gold because he had been bribed by politicians to do so. Accordingly, Jose described his purpose in initiating the proceeding as follows:

It is the claim of the reporter[s] that it was made of gold. The reporters are wrong. That's why if that Buddha will be given to me, I want it to be burned so that there will be no evidence against the Marcoses or it will not be a cause of shame to our country.

When the court asked him what he meant by "shame to our country," he responded that

a politician will be able to use it against [Ferdinand Romualdo, aka] Bongbong[,] Marcos [II] .... [b]ecause it is still fresh in the minds of our people that his father was blamed for confiscating the Buddha but the truth is that he did not do it. What I mean is that this Buddha can be a ground for shame as it was a substitute for what was allegedly to be the golden Buddha and allegedly seized by President Marcos and so lest it will be used for that purpose, this should be melted and obliterated....

The trial court's record included a letter to the judge sent by Daniel Cathcart, the attorney for GBC and the Roxas Estate, dated June 27, 1995. The letter alleged that Imelda had met with Jose and offered him money to petition the court for the brass buddha and falsely identify it as the one taken from Rogelio. In the letter, Cathcart further stated:

I understand that another hearing is set for sometime in the month of July at which time the court may turn over the fake Buddha to Jose Roxas. I bring these facts

to your attention so that you can determine whether or not the facts are true, and under the facts as you find them, whether the Buddha should be turned over to Jose Roxas.

Cathcart's letter concluded by asking the court to "deny possession of the fake Buddha to Jose Roxas." Another Philippine national, Alberto Umali, also submitted a claim to the buddha, based on a purported contract with Roxas to share the treasure that Roxas found. Umali claimed that he needed custody of the buddha in order to use it as evidence in furtherance of his efforts to recover the actual golden buddha.

The trial court filed an order containing its findings on May 30, 1996. The court determined that the buddha had been kept solely on the authority of a search and seizure order issued in 1971 and that the state was no longer legally justified in retaining it. The only question that remained was, as between Umali and Jose, who had the better claim to the buddha. The court ruled that Umali's contractual claim should be brought against the administrator of the Roxas Estate and was insufficient to support the release of the buddha to Umali in the current proceeding. Accordingly, the court released the buddha to Jose "IN TRUST FOR the estate of the late Rogelio Roxas." The court added the following observations:

Now, as to whether or not there is that controversial Golden Buddha different from the one now in custody of this Court, there is none. It bears repeating that the Republic of the Philippines with the vast resources under its command surely would and should have found that kind of treasure a long time since but the fact remains that it has not and the fact that it is made of gold appears merely to be the creation of unscrupulous minds.

This Court feels, rather sadly, that when the true Marcos estate is finally unraveled and subsequently ordered to be divided, everyone wants to be counted in. And in the frenzied and mad scramble for a share of the late President Marcos's estate, everything and anything is possible and anyone who shall get a share, whether deserved or not, becomes a matter of who

has the cutting edge and the speculation is that whoever gets hold of the Buddha, in the final analysis, has that edge.

The court's order made no mention of Cathcart's letter or the facts alleged therein.

### B. *Procedural Background*

#### 1. *Initial pleadings*

Roxas and GBC filed the instant lawsuit against Ferdinand and Imelda on February 19, 1988. In the complaint, Roxas asserted claims of false imprisonment and battery against Ferdinand only. These claims related to his repeated detentions and torture, which the complaint specifically alleged that Ferdinand had orchestrated "for and on his own behalf and not in any official capacity as President of the Philippines or otherwise[.]" GBC asserted claims for relief against both Ferdinand and Imelda for (1) conversion, (2) constructive trust, and (3) fraudulent conveyances. In particular, GBC's claims related to the taking of the golden buddha, the gold bars, and other items from Roxas's home, as well as the taking of the gold bars from the treasure site and the subsequent conveyances of some of those items.

The Marcoses attempted to remove the action to the United States District Court for the District of Hawai'i, but the federal district court remanded the matter back to the first circuit court by an order filed on August 23, 1988. The Marcoses' first responsive pleadings in the state trial court consisted of a motion to dismiss the complaint, accompanied by a motion for a more definite statement, both filed on January 20, 1989. In their memorandum in support of the motion to dismiss, the Marcoses argued that the complaint should be dismissed because: (1) service of process was improper; (2) the actions were barred by the statute of limitations; (3) the defendants were immune under the doctrine of "head-of-state" immunity; (4) adjudication of the case was precluded under the "act of state" doctrine; and (5) the doctrine of *forum non conveniens* compelled dismissal.

The circuit court denied both motions by order dated April 25, 1989. The Marcoses filed an answer to the complaint on April 6, 1989. Among the affirmative defenses included in the answer was the claim that "[t]he court lacks personal jurisdiction over the Defendants."

#### 2. *Substitution of parties*

On September 29, 1989, Ferdinand died. His death was first reflected in the record on June 5, 1990, when the plaintiffs-appellees filed motions for an order compelling discovery concerning the identity of the proper person to substitute as a party defendant for Ferdinand, as well as for an order extending the time to effect the substitution. Apparently, during the same period, Imelda was pursuing litigation in the Philippines in an attempt to be appointed personal representative of the Marcos Estate. In anticipation of her success, on March 17, 1992, the parties filed the following written stipulation:

> IT IS HEREBY STIPULATED and agreed that Imelda Marcos be substituted pursuant to Rule 25 of the Hawai'i Rules of Civil Procedure[8] for the purpose of defending this litigation as the representative of Defendant Ferdinand Marcos deceased. This stipulation is without prejudice to any issue pertaining to abatement or survival of actions or claims.

After Roxas's death in 1993, the circuit court granted a motion to substitute Dacanay, in his capacity as personal representative of the Roxas Estate, for Roxas as a party plaintiff.

---

**8.** HRCP Rule 25 (1996) provides in relevant part:
**Substitution of Parties.**
**(a) Death.**
(1) If a party dies and the claim is not thereby extinguished, the court may order substitution of the proper parties. The motion for substitution may be made by any party or by the successors or representatives of the deceased party and, together with the notice of hearing, shall be served on the parties as provided in Rule 5 and upon persons not parties in the manner provided in Rule 4 for the service of summons, and may be served in any judicial district. Unless the motion for substitution is made not later than 120 days after the death is suggested upon the record by service of a statement of the fact of the death as provided herein for the service of the motion, the action shall be dismissed as to the deceased party.

On June 6, 1995, Imelda's counsel filed a status report with the circuit court, noting that

> [t]he government of the Republic of the Philippines ("Republic") and Mrs. Marcos have, during this time, litigated in the courts of the Philippines the question of whether the Republic or Mrs. Marcos should be designated by the Philippines probate court as personal representative of the estate of the late President Marcos. The probate court has ruled in favor of the Republic, and has appointed its designated representative as the administrator of the estate of the late President Marcos. Mrs. Marcos has vigorously opposed this decision on the grounds the Republic claims to be a creditor of the estate to the extent of the entirety of the assets in the estate, and therefore, is disqualified from being administrator of the estate.

Attached to the status report was a copy of a letter purportedly sent to one of the Marcoses' attorneys by the Solicitor General of the Philippines. The letter stated that a probate proceeding had been opened for Marcos's estate in the Regional Trial Court of Pasig, Metro Manila, the Philippines, and that the Commissioner of the Philippine Bureau of Revenue, Liwayway Vinzons–Chato, had been provisionally appointed as special administrator of the estate. Because Vinzons–Chato had not appointed counsel to represent her in any American trial proceedings, the Solicitor General instructed Imelda's counsel "to desist from representing the Estate of the late Ferdinand E. Marcos and/or to appear in any proceedings involving the Estate of the late Ferdinand E. Marcos, such as in the taking of depositions and/or representing the Estate thereat or at any other forum." The status report concluded that, "[i]n view of the conflicting positions, the Court may wish to defer trial of the cause until further resolution of the ongoing dispute between the Republic and Mrs. Marcos in the courts of the Republic." Vinzons–Chato never made any attempt to intervene in the present action, and neither party attempted to add her as a party defendant.

■■■ On January 11, 1996, the Regional Trial Court of the National Capital Judicial Region, Branch 156, in Pasig City, Metro Manila, filed an order admitting the will of Ferdinand Marcos to probate.[9] Pursuant to the provisions of that will, the court appointed Imelda Marcos and her son, Bongbong, as executors and personal representatives of the estate contingent on the filing of a bond. However, at oral argument in the instant appeal, Imelda's counsel represented to this

9. This evidence was included in the record on appeal to this court from the first circuit court's orders declining to open probate proceedings and appoint a personal representative for the Marcos Estate in Hawai'i. This court's disposition of that appeal was filed on September 16, 1998. *See In re Estate of Marcos*, 88 Hawai'i 148, 774 P.2d 1124 (1998). Both Imelda and GBC were parties to that action. In addition, Irene Silverman (a California attorney temporarily named special administrator of Marcos's California assets, *see infra* ) and Commissioner Vinzons–Chato were active parties.

The Pasig City trial court's January 11, 1996 order was not made a part of the record on appeal in the instant case. "While matters not properly presented to the trial court may not ordinarily be considered by the appellate court on appeal, an appellate court may[,] in its discretion, take judicial notice of files or records of a case on appeal." *State v. Schmidt*, 70 Haw. 443, 446, 774 P.2d 242, 244 (1989) (citing *Eli v. State*, 63 Haw. 474, 478, 630 P.2d 113, 116 (1981) and Hawai'i Rules of Evidence (HRE) Rule 201). Moreover, "[c]ourts have generally recognized that they may, in appropriate circumstances, take notice of proceedings in other courts, both within and without their judicial system[,] if those proceedings have a direct relation to the matter at issue." *Sapp v. Wong*, 3 Haw.App. 509, 512 n. 3, 654 P.2d 883, 885–86 n. 3 (1982) (citations omitted). *See also Turner v. State*, 79 Hawai'i 118, 120, 899 P.2d 401, 403 (App.), *cert. denied*, 79 Hawai'i 341, 902 P.2d 976 (1995); *Waimea Falls Park, Inc. v. Brown*, 6 Haw.App. 83, 87–88, 712 P.2d 1136, 1140 (1985); *State v. Durry*, 4 Haw.App. 222, 224–25, 665 P.2d 165, 169 (1983), *overruled on other grounds by State v. Jackson*, 81 Hawai'i 39, 912 P.2d 71 (1996).

The resolution of Imelda's actual status as a court-appointed executor of Ferdinand Marcos's estate directly affects the propriety of her substitution as a party on behalf of the estate of Ferdinand Marcos in the present lawsuit. Thus, the Pasig City court's order is highly pertinent. Furthermore, given that (1) all parties in the present appeal were active participants in the probate action in Supreme Court No. 20885 and (2) those proceedings were clearly ancillary to the instant lawsuit (because they were initiated by GBC in order to assure satisfaction of its anticipated judgment in this case), it is equitable to notice the record in those proceedings.

court that, on appeal of the trial court's order by the state, the Philippines Supreme Court had reversed the trial court's order appointing Imelda and Bongbong as executors.[10]

On April 16, 1996, the plaintiffs-appellees moved to substitute Irene Silverman for Ferdinand as a party defendant. Silverman, a California attorney, had been appointed personal representative of the Marcos Estate, with power over its California assets, by the Los Angeles County Superior Court, in a probate action initiated by GBC in California. *See supra* note 9. In addition, GBC had petitioned the first circuit court to open a probate proceeding in Hawai'i, naming Silverman as personal representative of the Marcos Estate.[11] The plaintiffs-appellees brought their motion for substitution of parties "on the grounds that, as [a] result of the death of Ferdinand Marcos, it [was] necessary to add the judicially-appointed personal representative of his estate as a party defendant in his place and stead." Imelda opposed the motion, arguing that the March 17, 1992 stipulated substitution filed by the parties sufficed: "[T]here is a proper Rule 25 Substitution of Party. All defendants who have appeared in this case, as I say, have been substituted where appropriate in this case and there is no logical or legal basis to appoint a personal representative." In opposing the motion, however, Imelda made no mention of the January 11, 1996 Baguio City trial court order. The plaintiffs-appellees countered that "[w]hether or not that stipulation is effective and equivalent to having a

judiciously [sic] appointed administrator is an issue that could be raised at a later time that could collaterally attack this judgment, and[,] accordingly[, we] want to make sure we had the right people here before we went to trial."

The circuit court denied the plaintiffs-appellees' motion on the ground that "Imelda Marcos has already by stipulation agreed to defend as a personal representative," but offered to reconsider its ruling if GBC was successful in procuring an order from the Hawai'i probate proceeding naming Silverman as personal representative of the Marcos Estate.

The plaintiffs-appellees renewed their motion for substitution on June 7, 1996. In her memorandum in opposition, Imelda argued that Silverman was not a proper party for substitution. In addition, however, her memorandum raised, for the first time, the following equivocation:

> Although the undersigned counsel continue to represent Imelda Marcos, individually and in her capacity as the agreed upon representative of the defendant Ferdinand E. Marcos in this litigation, we do not, and never have, represented any judicially·appointed personal representative of the Estate of Ferdinand E. Marcos in this or any other litigation.
>
> ... Without addressing the issue of whether the stipulation entered into by the parties in this case is binding on the Estate for purposes of being able to enforce whatever judgment, if any, may be entered

---

10. The plaintiffs-appellees adduced no evidence on this issue. Moreover, the Philippine Regional Trial Court's order regarding the Marcos Estate, introduced into the record in the Hawai'i probate proceedings, states that, "[u]pon filing of a bond in the amount of $50,000.00, let letters testamentary be issued *in solidum* to Imelda Trinidad Romualdez–Marcos AND Ferdinand Romualdez Marcos II, named executors therein." The order also clarified that, "[p]ending the filing of said bond and their oath, Commissioner Liwayway Vinzons–Chato of the Bureau of Internal Review is hereby authorized to continue her functions as Special Administrator of the Estate of Ferdinand Edralin Marcos." The probate record is silent as to whether Imelda ever took the oath or filed the bond. Accordingly, the present record is devoid of any indication that Imelda has ever been judicially recognized as executrix or administrator of the Marcos Estate.

11. GBC first sought to institute probate proceedings for the Marcos Estate in 1990, but its petition was denied by the first circuit court. *See In re Estate of Marcos*, 88 Hawai'i at 151, 963 P.2d at 1127. Its motion for reconsideration was also denied. *See id.* at 152, 963 P.2d at 1128. A 1995 pleading "again attempted to open a probate proceeding in Hawai'i" and requested that Silverman be appointed personal representative of the estate. *See id.* at 152, 963 P.2d at 1128. Finally, in 1996, Silverman petitioned the probate court for appointment as special administrator of the Marcos Estate. That petition was also denied. *See id.* at 153, 963 P.2d at 1129. On appeal, this court affirmed the probate court's orders. *Id.* at 158–159, 963 P.2d at 1134–35.

in this case against the Estate, and without addressing the issue of whether the Estate may have a valid objection to these proceedings and the enforcement of any judgment rendered herein on the grounds that the undersigned counsel did not have any authority to represent the Estate, Irene Silverman should not be substituted in this action as the personal representative of the Estate....

... Defendants do not, by virtue of this memorandum, take a position on the necessity of adding a judicially appointed representative of the Estate of Ferdinand E. Marcos for purposes of this litigation....

The circuit court again denied the plaintiffs-appellees' motion for substitution, apparently [12] based on the probate court's earlier oral ruling denying GBC's 1995 petition for adjudication of intestacy and appointment of a personal representative.

On July 8, 1996, the probate court filed a written order finally disposing of GBC's petition for appointment of Silverman as personal representative of the Marcos Estate, ruling that the Marcos Estate was not subject to probate in Hawai'i because Ferdinand had neither (1) been domiciled in the state nor (2) maintained property in the state at the time of his death. Nevertheless, Silverman subsequently filed another petition asking to be named special administrator of the Marcos Estate. The probate court denied that petition, by order dated February 24, 1997, on the same grounds.

On July 10, 1996, the plaintiffs-appellees petitioned this court for a writ of mandamus ordering the circuit court to substitute Silverman as a party defendant, arguing that the March 17, 1992 stipulated substitution of Imelda was insufficient as a matter of law. We denied the petition.

The issue resurfaced on several occasions during the trial. In the course of jury selection, Imelda's counsel stated that he

represent[ed] Ferdinand Marcos and Imelda Marcos. Ferdinand Marcos, as most of you know, if not all of you, is deceased and his estate was never joined in this case so it's just as if he was being sued as if [he] was [sic] alive. Of course he's not.

The only thing that I want is someone who would be fair to my *clients*. ...

(Emphases added.) In addition, during the settling of jury instructions, the plaintiffs-appellees agreed with Imelda to modify an instruction that advised the jury, as originally drafted, that "[t]he defendants [in this case] are Imelda Marcos and the Estate of Ferdinand Marcos" by removing the reference to "the Estate." Imelda's counsel then requested that Ferdinand's name appear before Imelda's in the instruction. The circuit court agreed to the further modification.

3. *Motion in limine to exclude out-of-court statements of the Marcoses' alleged co-conspirators*

On January 29, 1996, Imelda filed a "Trial Brief On Conspiracy, Vicarious Admissions[,] and Defendant's Assets" in support, *inter alia*, of a motion in limine to exclude the out-of-court statements of the Marcoses' alleged co-conspirators and agents. She argued that the plaintiffs-appellees had proffered no evidence, other than the hearsay statements of the alleged co-conspirators and agents themselves, to connect the Marcoses to any conspiracy. The plaintiffs-appellees responded on February 28, 1996 with an "Offer of Proof Re Conspiracy and Agency." Attached to this lengthy document as appendices were portions of the depositions of a number of witnesses, including Robert Curtis, Norman Dacus, John Doel, Olof Jonsson, and Michael O'Brien. The plaintiffs-appellees noted that Ferdinand had been seen in possession of enormous amounts of gold, as well as a golden buddha statue.

On February 14, 1996, the circuit court conducted a hearing on Imelda's motion in limine. The court ruled that, as a threshold matter, the plaintiffs-appellees had established the existence of a conspiracy involving Ferdinand and numerous others, the object of which was to deprive Roxas of his discovered treasure, arrest him, and torture him. In this connection, the court ruled that

---

**12.** No transcripts were included in the record on appeal in *In re Estate of Marcos,* No. 20885.

the parties that were involved in the conspiracy are Romeo Amansec, Colonel Marcelino Barba, Marcelino Cubacub, Sergeant DeVera, Colonel Eduardo, Colonel Gonzalez, Anita Inga, Ferdinand Marcos, Judge Pio Marcos, Colonel Olivas, the Presidential Security Command, Joe Uehara,[13] Rosario Uy[,] and General Fabian Ver. That is as to the original conspiracy to obtain the property.

There are some unidentified parties, but to the extent that they were testified about and to the extent that they made statements and appear to have been in contact with then President Marcos, those statements can also come in.

The circuit court also found that there had been a separate conspiracy to launder and dispose of the discovered treasure, the members of which included Ferdinand and Imelda, as well as

Domingo [sic] Clemente, Robert Curtis, Norman Dacus, Francisco DeGuzman, John Doel, Norman Kirst, Colonel Lachica, Pedro Laurel, ... Ferdinand Bong Bong Marcos, Jr., ... Victor Nituda, Michael O'Brien, the President of the Central Bank[,] and General Fabian Ver.

Accordingly, the circuit court ruled that the out-of-court statements of these people, uttered in furtherance of the conspiracy, would be admissible under the co-conspirators exception to the hearsay rule pursuant to HRE Rule 803(a)(2).

### 4. *Motions for partial summary judgment and in limine regarding the Baguio City Regional Trial Court order*

On June 7, 1996, Imelda filed a motion for partial summary judgment on GBC's claim for conversion of the golden buddha, as well as a motion in limine to exclude evidence concerning the golden buddha. Both motions were predicated on the May 30, 1996 order of the Baguio City Regional Trial Court releasing the buddha in the clerk's custody to Jose Roxas. Imelda contended that the trial court's finding that the buddha taken from Roxas was not made of gold was binding on GBC "under the principles of res judicata and collateral estoppel." She ar-

gued that Cathcart's letter constituted an "appearance" in the proceedings in the Baguio City Regional Trial Court and that Umali also represented GBC as local counsel. Cathcart denied that Umali was associated with GBC and asserted that he had been accorded no notice of the proceedings in the Baguio City Regional Trial Court prior to writing his letter.

On July 16, 1996, the circuit court denied Imelda's motions, ruling that GBC had not been accorded due process in the Baguio City proceedings.

### 5. *Motion for directed verdict*

Imelda moved for a directed verdict on July 12, 1996. She argued that: (1) the "act of state" doctrine precluded the plaintiffs-appellees' lawsuit; (2) the "head of state" doctrine rendered the Marcoses immune from the lawsuit; (3) the circuit court lacked personal jurisdiction over Ferdinand Marcos; and (4) there was insufficient evidence to support any of the asserted claims for relief. The circuit court denied the motion.

### 6. *Verdict and judgment*

The circuit court submitted the Roxas Estate's claims of battery and false imprisonment and GBC's claim of conversion to the jury. It reserved GBC's equitable claims of constructive trust and fraudulent conveyances to be decided by the court after the jury returned its verdict.

The jury returned a special verdict on July 19, 1996, finding in favor of the Roxas Estate and against "Ferdinand Marcos" on the Roxas Estate's claims of battery and false imprisonment and awarding damages in the amount of $6,000,000.00. The jury further found in favor of GBC and against "Ferdinand Marcos" on the conversion claim, itemizing the value and quantity of property converted, "on the date of the conversion," on the verdict form as follows: (1) one golden buddha, valued at $1,300,000.00; (2) seventeen gold bars, valued at $100,000.00; (3) one coin collection, valued at $5,000.00; (3) "3 handfuls" of diamonds, of unknown value;

---

**13.** This appears to be an alternate spelling for "Joe Oihara."

and (4) "one storage area" of gold bullion, valued at $22,000,000,000.00.

By contrast, the jury found in favor of Imelda, in her individual capacity, and against GBC on its conversion claim against her. In addition, the jury found, *inter alia,* that: (1) Ferdinand had not been "acting in his capacity as President and Commander–in–Chief of the Armed Forces of the Philippines when he took the actions complained of by the plaintiffs"; (2) the converted property had not been "taken pursuant to a valid search warrant"; (3) Roxas had not been "lawfully arrested, tried, convicted and imprisoned in accordance with Philippine law"; and (4) the plaintiffs had "filed this lawsuit within the time frame provided by law."

The circuit court filed its judgment pursuant to the jury's verdict on August 28, 1996. The judgment recited that it was entered "in favor of Plaintiff Felix Dacanay, as Personal Representative of the Estate of Roger Roxas" and "against Defendant Ferdinand Marcos" on the battery and false imprisonment claims and in favor of GBC and "against Defendant Ferdinand Marcos" on the conversion claim. Judgment, however, was entered in favor of Imelda and against the plaintiffs-appellees on all claims that they had asserted against her. In the judgment, the circuit court reserved jurisdiction over GBC's claims of constructive trust and fraudulent conveyance as to Ferdinand, as well as over the issues of costs, attorneys' fees, and prejudgment interest.

### 7. *Motion for prejudgment interest*

The circuit court addressed the plaintiffs-appellees' motion for prejudgment interest at a hearing held on September, 20, 1996. The Roxas Estate argued that it was entitled to prejudgment interest at the rate of ten percent per annum from April 5, 1971, the date on which Roxas was allegedly first beaten, through July 19, 1996, the date of the jury's special verdict. GBC argued that it was entitled to prejudgment interest at the rate of ten percent per annum from January 1, 1975 through July 19, 1996, encompassing "the period of time in which [Ferdinand]

converted the balance of the treasure from the tunnels at Baguio City." During the hearing on the issue, the circuit court indicated that it was concerned that the jury instructions had not made clear to the jury whether its damage award for battery and false imprisonment was to be based on the value of the injury at the time it was sustained and that the award might have been made in "today's dollar[,] which is very different from what the value of the assault may have been on the date of the assault." Accordingly, the circuit court took the matter under advisement.

In an order filed on October 18, 1996, the circuit court granted the plaintiffs-appellees' motion in part and denied it in part, awarding GBC prejudgment interest at the rate of ten percent per annum from February 19, 1988—the date of the filing of the lawsuit—to July 19, 1996—the date of the jury's special verdict—, in the amount of $18,517,346,-893.15. The circuit court denied the motion as to the claims of the Roxas Estate.

### 8. *Imelda's motions for judgment not-withstanding the verdict and for a new trial*

Imelda filed a motion for judgment notwithstanding the verdict on September 9, 1996, reiterating the arguments advanced in support of her motion for a directed verdict. On the same day, she filed a motion for a new trial as to Ferdinand only, arguing that: (1) the circuit court had erred by admitting hearsay statements under the co-conspirators exception of HRE Rule 803; and (2) the verdict was against the weight of the evidence, both as to liability and as to the amount of damages. The circuit court denied both motions in orders filed on October 18, 1996.

### 9. *The plaintiffs-appellees' motion to alter the judgment*

On September 6, 1996, the plaintiffs-appellees moved to alter the judgment pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 59 (1996).[14] The plaintiffs-appellees ar-

---

**14.** HRCP Rule 59 provides in relevant part that "[a] motion to alter or amend the judgment shall be served not later than 10 days after entry of judgment."

gued that the judgment should be amended: (1) to add the "Estate of Ferdinand Marcos" as a proper party defendant; (2) to increase the value of damages awarded to GBC to reflect the highest value of the gold during the time of the conversion; (3) to strike the judgment in favor of Imelda, inasmuch as GBC's claims of constructive trust and fraudulent conveyance against her had yet to be tried; and, accordingly, (4) to reserve jurisdiction on those claims as well with regard to the Marcos Estate.

At the conclusion of the hearing on the motion, the circuit court ruled as follows:

With regard to Imelda Marcos as a party to the remaining causes of action[,] the Court notes that[,] by way of its verdict, the jury has found that she was not legally responsible for any conversion. And a conversion is a condition precedent to establishing constructive trust or that there be fraudulent conveyance thereafter. And so the Court denies the plaintiffs' request to add Imelda Marcos as to the remaining causes of action.

With regard to the matter of the Estate of Ferdinand Marcos, as counsel are well aware, at every juncture when the plaintiffs had attempted to add or substitute Irene Silverman as a representative of the Estate, this Court did not intend to suggest that the appropriate party defendant was the Estate of Ferdinand Marcos. And the Court refers counsel to the action taken by the Honorable Patrick Yim[,] who, pursuant to Rule 25, did substitute Imelda Marcos as a representative for the Estate of Ferdinand Marcos.

So the Court will grant the Motion to Alter Judgment. And the judgment will reflect a judgment against the Estate of Ferdinand Marcos, Imelda Marcos as personal representative.

With regard to the Motion to Alter Judgment, with regard to the amount of damages returned by the jury, the Court stands on its prior ruling that the issue of the value of gold should be the value at the time of the conversion and not at the highest value reached. And the Court denies the Motion to Alter Judgment to reflect damages at the $860 an ounce amount.

Accordingly, the circuit court entered judgment against "Defendant Imelda Marcos, as Personal Representative of the Estate of Ferdinand Marcos" on the battery, false imprisonment, and conversion claims, by an amended judgment filed on October 21, 1996.

## II. STANDARDS OF REVIEW

### A. Motion To Alter Judgment

 This court reviews a circuit court's decision to grant a motion to alter a judgment pursuant to HRCP Rule 59(e) for abuse of discretion. *Gossinger v. Association of Apartment Owners of the Regency of Ala Wai*, 73 Haw. 412, 425, 835 P.2d 627, 634 (1992). "An abuse of discretion occurs if the trial court has clearly exceeded the bounds of reason or has disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *State v. Davia*, 87 Hawai'i 249, 253, 953 P.2d 1347, 1351 (1998) (citations and internal quotation signals omitted).

### B. Conclusions Of Law

We review the trial court's [conclusions of law] *de novo* under the right/wrong standard. *Raines v. State*, 79 Hawai'i 219, 222, 900 P.2d 1286, 1289 (1995). "Under this ... standard, we examine the facts and answer the question without being required to give any weight to the trial court's answer to it." *State v. Miller*, 4 Haw.App. 603, 606, 671 P.2d 1037, 1040 (1983). *See also Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 119, 839 P.2d 10, 28, *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992). Thus, a [conclusion of law] "is not binding upon the appellate court and is freely reviewable for its correctness." *State v. Bowe*, 77 Hawai'i 51, 53, 881 P.2d 538, 540 (1994) (citation omitted).

*State v. Kane*, 87 Hawai'i 71, 74, 951 P.2d 934, 937 (1998) (quoting *Aickin v. Ocean View Inv. Co.*, 84 Hawai'i 447, 453, 935 P.2d 992, 998 (1997)) (brackets in original).

### C. Motions For Directed Verdict And For Judgment Notwithstanding The Verdict

[D]enials of directed verdict or judgment notwithstanding the verdict (JNOV) mo-

tions are reviewed de novo. Verdicts based on conflicting evidence will not be set aside where there is substantial evidence to support the jury's findings. We have defined "substantial evidence" as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

In deciding a motion for directed verdict or JNOV, the evidence and the inferences which may be fairly drawn therefrom must be considered in the light most favorable to the nonmoving party and either motion may be granted only where there can be but one reasonable conclusion as to the proper judgment.

*Kawamata Farms v. United Agri Products*, 86 Hawai'i 214, 253, 948 P.2d 1055, 1094 (1997) (quoting *Takayama v. Kaiser Found. Hosp.*, 82 Hawai'i 486, 495, 923 P.2d 903, 912 (1996) (citation, some internal quotation marks, and original brackets omitted)). *See also Tabieros v. Clark Equip. Co.*, 85 Hawai'i 336, 350, 944 P.2d 1279, 1293 (1997).

D. *Summary Judgment*

We review [a] circuit court's [denial] of summary judgment *de novo* under the same standard applied by the circuit court. *Amfac Inc.*, ... 74 Haw. [at] 104, 839 P.2d [at] 22 ... (citation omitted). As we have often articulated:

> [s]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

*Id.* (citations and internal quotation marks omitted); *see* ... HRCP ... Rule 56(c) (1990).

*Estate of Doe v. Paul Revere Ins. Group*, 86 Hawai'i 262, 269–70, 948 P.2d 1103, 1110–11 (1997) (quoting *Morinoue v. Roy*, 86 Hawai'i 76, 80, 947 P.2d 944, 948 (1997)) (some brackets added and some in original).

E. *Admission Of Statements Of Co–Conspirators*

Before admitting a co-conspirator's statement over objection that it does not qualify under HRE 803(a)(2)(C), the trial court must be satisfied that the statement actually falls within the definition of that rule; "[t]here must be evidence that there is a conspiracy involving the declarant and the nonoffering party, and that the statement was made 'during the course and in furtherance of the conspiracy.' " *Bourjaily [v. United States ]*, 483 U.S. [171,] 175 [107 S.Ct. 2775, 97 L.Ed.2d 144 (1987) ]; *accord State v. Yoshino*, 45 Haw. 206, 214–15, 364 P.2d 638, 644 (1961). "Preliminary questions concerning the ... admissibility of evidence shall be determined by the court." HRE 104(a) (1985). Where the preliminary facts necessary for the admissibility of evidence are disputed, the offering party has the burden to prove facts supporting admission by a preponderance of the evidence. *See Bourjaily*, 483 U.S. at 176 [107 S.Ct. 2775]. ...

On appeal, the trial court's determination of preliminary factual issues concerning the admission of evidence will be upheld unless clearly erroneous. *See id.* at 181 [107 S.Ct. 2775]. ... "A finding of fact is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed." *Hawai'i's Thousand Friends v. City and County of Honolulu*, 75 Haw. 237, 248, 858 P.2d 726, 732 (1993) (citation omitted) (internal brackets omitted).

*State v. McGriff*, 76 Hawai'i 148, 157, 871 P.2d 782, 791 (1994).

F. *Jury Instructions*

When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading.

Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.

*Tabieros*, 85 Hawai'i at 350, 944 P.2d at 1293 (quoting *State v. Arceo*, 84 Hawai'i 1, 11, 928 P.2d 843, 853 (1996) (citations, internal quotation marks, and brackets omitted)).

### G. Prejudgment Interest

■ "Prejudgment interest, where appropriate, is awardable under Hawai'i Revised Statutes (HRS) § 636–16 (1993)[15] in the discretion of the court and is reviewed under the abuse of discretion standard." *Eastman v. McGowan*, 86 Hawai'i 21, 26–27, 946 P.2d 1317, 1322–23 (1997) (citations omitted).

### III. DISCUSSION

A. *The Circuit Court Committed An Abuse Of Discretion In Altering The Judgment To Designate Imelda Marcos As Personal Representative Of The Marcos Estate, But Imelda's Own Misconduct Warranted Entry Of Judgment Against Her In Her Personal Capacity To The Extent Of Her Interest In The Marcos Estate.*

Imelda urges on appeal that the circuit court erred in granting the plaintiffs-appellees' motion to alter the judgment in order to enter judgment against her as "personal representative" of the Marcos Estate. She asserts that her stipulated substitution, pursuant to HRCP Rule 25, *see supra* note 8, as "the representative of Defendant Ferdinand Marcos deceased" was insufficient to justify the entry of a judgment against the Marcos Estate itself.

■ HRS § 634–61 (1993) provides in pertinent part that "[t]he death of a ... defendant ... shall not cause an action to abate, but it may be continued upon substitution of the proper parties *as determined by the rules of court* [.]" [16] (Emphasis added.) HRCP Rule 25(a)(1), *see supra* note 8, provides for the substitution of "the proper parties" in the case of the death of an originally named party. The term "proper parties" is neither defined in the HRS nor in the HRCP.

15. HRS § 636–16 provides:

**Awarding interest.** In awarding interest in civil cases, the judge is authorized to designate the commencement date to conform with the circumstances of each case, provided that the earliest commencement date in cases arising in tort, may be the date when the injury first occurred and in cases arising by breach of contract, it may be the date when the breach first occurred.

16. None of the parties address the issue of choice of law in their briefs. In a ruling that has apparently not been made part of the record, the circuit court decided to apply Philippine law to a number of the issues raised by this case, including the parameters of the plaintiffs-appellees' claims for relief for battery, false imprisonment, and conversion. In determining what law governs when multiple jurisdictions are implicated in an action,

[w]e have moved away from the traditional and rigid conflict-of-laws rules in favor of the modern trend towards a more flexible approach looking to the state with the most significant relationship to the parties and subject matter. *See Peters v. Peters*, 63 Haw. 653, 634 P.2d 586 (1981). Primary emphasis is placed on deciding which state would have the strongest interest in seeing its laws applied to the particular case. *Cf. id.*

*Lewis v. Lewis*, 69 Haw. 497, 499, 748 P.2d 1362, 1365 (1988).

In this case, all the relevant events occurred in the Philippines, and, at the time, all parties were residents of the Philippines. Neither of the plaintiffs—Felix Dacanay, as personal representative of the Roxas Estate, or GBC—has any particular ties to this jurisdiction. Hawai'i is no more than the forum of the present dispute. Accordingly, the Philippines have the greater interest in its outcome, and it was appropriate for the circuit court to apply Philippine law, as it did, *see infra*, to the plaintiffs-appellees' claims for relief.

In light of the foregoing, it would have made sense for the circuit court to have applied Philippine law as to the survival or abatement of those claims for relief. *See* Restatement (Second) of Conflict of Laws § 167 (1971). However, as far as we can discern, the parties never addressed Philippine law, if there is any, on the question at trial, and their appellate briefs are silent on the issue. This court may take judicial notice of the law of foreign countries. *See* Hawai'i Rules of Evidence (HRE) Rule 202(c)(5) (1993). "The court, in determining foreign law, may consider any relevant material or source, including testimony, *whether or not submitted by a party* or admissible under the Hawai'i Rules of Evidence. The court's determination shall be treated as a ruling on a question of law." HRCP Rule 44.1 (1996) (emphasis added). Nevertheless, a number of cases in this and other jurisdictions have held that where the parties have failed to supply or address applicable foreign law, local law will be applied. *See Touche Ross Ltd. v. Filipek*, 7 Haw.App. 473, 479, 778 P.2d 721, 726 (1989); *Block v. Lea*, 5 Haw.App. 266, 268 n. 4, 688 P.2d 724, 727–28 n. 4, *cert. denied*, 67 Haw. 685, 744 P.2d 781 (1984); *Hall v. American Airlines, Inc.*, 1 Haw.App. 258, 617 P.2d 1230 (1980); *see also Carey v. Bahama Cruise Lines*, 864 F.2d 201, 205–06 (1st Cir.1988); *Nikimiha Sec. Ltd., v. Trend Group, Ltd.*, 646 F.Supp. 1211, 1227

Imelda argues that "proper parties," within the meaning of HRCP Rule 25(a)(1), are restricted to *legal* representatives, *i.e.*, judicially-appointed representatives. Accordingly, Imelda maintains that, inasmuch as she was not a judicially-appointed personal representative, she had no power to bind the Marcos Estate, and the amended judgment against it was, therefore, a nullity.

The plaintiffs-appellees counter that: (1) Imelda's argument is precluded by the doctrine of collateral estoppel; (2) HRCP Rule 25(a)(1) allows for substitution of the heirs of a party and not the party's legal representative; and (3) Imelda's stipulation should bind her and this court on the issue of her status as the successor to Ferdinand in the instant litigation.

We address the foregoing issues in the order presented by the plaintiffs-appellees.

1. *The "substitution of parties" issue is not precluded by the doctrine of collateral estoppel.*

The plaintiffs-appellees argue that the question whether Imelda could properly be substituted as the personal representative of the Marcos Estate was previously litigated and decided in a federal lawsuit brought against the Marcoses by a class of Philippine victims of torture and detention. *See Hilao v. Estate of Marcos*, 103 F.3d 762 (9th Cir. 1996) (*Hilao I*). Roxas was not a party to *Hilao I*, having opted out of the group of class action plaintiffs in order to pursue the instant lawsuit.

In that case, the plaintiffs moved for a contempt order against Imelda and Bongbong, alleging violation of a preliminary injunction prohibiting the Marcos Estate and its representatives from disposing of any assets of the Estate. *Id.* at 763. The plaintiffs maintained that Imelda and Bongbong had transgressed the preliminary injunction by "(1) agreeing to transfer artworks beneficially owned by the Defendant Estate from the United States to the Philippines; and (2) agreeing to divide all assets owned by the Estate between the Republic and the Appellants." *Id.* at 763–64. The district court granted the motion. *Id.* at 764. On appeal, the United States Court of Appeals for the Ninth Circuit ruled, *inter alia*, as follows:

> Appellants argue that they are non-parties to this litigation and have not been appointed as personal representatives of the Estate. They argue that their status leaves them powerless to transfer or alienate assets of the Estate, and therefore incapable of being in contempt of an injunction forbidding transfer and alienation. Appellants acknowledge their voluntary substitution as legal representatives of the Defendant Estate for the purposes of defending this action, but argue that in spite of the substitution, they remain non-parties.
>
> Appellants' arguments regarding their status as non-parties are without merit. Rule 25(a)(1) of the Federal Rules of Civil Procedure [ (FRCP) ] provides that "[i]f a party dies and the claim is not thereby extinguished, the court may order substitution of the proper parties". The substituted party steps into the same position as [the] original party. *Ransom v. Brennan*, 437 F.2d 513, 516 (5th Cir.), *cert. denied*, 403 U.S. 904, 91 S.Ct. 2205, 29 L.Ed.2d 680 ... (1971). As properly substituted parties in this case, Appellants obviously are not non-parties. Appellants clearly had notice of, and were subject to, the terms of the injunction.

*Id.* at 766 (footnote omitted). Pursuant to the foregoing passage from *Hilao I*, the plaintiffs-appellees insist that Imelda is es-

---

(E.D.Pa.1986); *Miller v. A.N. Webber, Inc.*, 484 N.W.2d 420, 422 (Minn.Ct.App.1992); Restatement (Second) of Conflict of Laws § 136 comment (h); Eugene F. Scoles & Peter Hay, *Conflict of Laws* §§ 12.18–12.19 (1992) (collecting cases); *contra*, *Walton v. Arabian Am. Oil Co.*, 233 F.2d 541 (2d Cir.), *cert. denied*, 352 U.S. 872, 77 S.Ct. 97, 1 L.Ed.2d 77 (1956) (dismissing the case where foreign law was not proved). In the present matter, we need not directly address whether it is *generally* appropriate for courts in this jurisdiction to ascertain foreign law *ex officio* because reliable sources of Philippine law are not available. Under such conditions, it is eminently sensible to cast the burden of apprising the court regarding foreign law on the parties, and, where they fail to meet their burden, to assume acquiescence in the application of local law. Accordingly, we apply HRS § 634–61 to our analysis.

topped from asserting that her substitution was improper in the instant case.

 Collateral estoppel is a bar to relitigation of an issue where "(1) the issue decided in the prior suit is identical to the issue presented in the action in question; (2) there was a final judgment on the merits in the prior suit; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior suit." *State of Hawai'i Org. of Police Officers (SHOPO) v. Society of Professional Journalists—University of Hawai'i Chapter,* 83 Hawai'i 378, 400, 927 P.2d 386, 408 (1996) (citing *Bush v. Watson,* 81 Hawai'i 474, 480, 918 P.2d 1130, 1136, *reconsideration denied,* 82 Hawai'i 156, 920 P.2d 370 (1996), *cert. denied sub nom Albino v. Machado,* 519 U.S. 1149, 117 S.Ct. 1082, 137 L.Ed.2d 217 (1997)).

 The first prong of the test for collateral estoppel—identity of issue—has not been met here. The *Hilao I* court decided that Imelda and Bongbong had been properly substituted in that case pursuant to Rule 25 of the *federal* rules of civil procedure. In the present case, Imelda raises a question of interpretation of the *Hawai'i* rule. As the plaintiffs-appellees note, "HRCP Rule 25 is nearly identical to its federal counterpart." Nonetheless, they are not coextensive, and the federal court's interpretation of the federal rule is not binding on Hawaii's interpretation of its own rule. Accordingly, the *Hilao I* court's legal conclusion as to FRCP Rule 25 did not decide the same issue as that presented in the matter before us, and Imelda is therefore free, on appeal, to question the significance of her substitution pursuant to the March 17, 1992 stipulation.

2. *HRCP Rule 25(a)(1) does not allow for substitution of a party merely because she is the widow of the original defendant.*

a. *There is no controlling Hawai'i case law.*

Turning, then, to the substance of Imelda's argument, we address the meaning of the term "proper parties" for purposes of HRCP Rule 25(a)(1). The plaintiffs-appellees argue that existing Hawai'i precedent supports their argument that "proper parties" include an heir of a deceased defendant, regardless of whether the heir has been judicially appointed as the legal representative of the estate. They cite first to *Colburn v. United States Fidelity and Guaranty Co.,* 25 Haw. 479 (1920). In *Colburn,* this court addressed the question whether, under the then-existing statutory framework, a plaintiff-appellant who died after filing an appeal could be replaced by the executor of his estate as a proper party. *Id.* This court held that

[t]he statute makes no provision for procedure where a case has proceeded to final judgment and has been removed to this court upon appeal but it seems clear to us that in such a case where the plaintiff dies after the case is entered in this court the personal representative of the deceased plaintiff (*or his heirs where they instead of the personal representative would succeed to his rights*) should be permitted to appear in his stead.

*Id.* at 481 (emphasis added). Although the plaintiffs-appellees rely on the foregoing language, it is apparent, in context, that this court's parenthetical qualification was intended to apply to instances in which heirs have succeeded directly to the plaintiff's rights, if any, in a claim for relief, such as, for example, an action for title to land. In the present case, Imelda does not claim to be Ferdinand's successor-in-interest to any material claims for relief. Unlike the procedural posture of *Colburn,* the present case poses the question whether Imelda may be substituted, as a successor defendant on behalf of the Marcos Estate, regarding claims for battery, false imprisonment, and conversion initially asserted against Ferdinand.

 Next, the plaintiffs-appellees cite *Sutton v. Ho,* 43 Haw. 241 (1959), for the proposition that, as the plaintiffs-appellees put it, "in an action involving title to land, heirs may be substituted for the deceased party, though they need not be." Be that as it may, the *Sutton* court emphasized that "[t]here is no question that the administrators are the proper and the only necessary parties to be substituted for present appellees if the case involved a controversy over personal property only." *Id.* at 242 (citing,

*inter alia, Colburn*). It is only where a dispute involves *title to land* that a claim for relief *may* be revived in the names of a deceased's heirs, although such a claim for relief may also be revived exclusively in the name of the deceased's personal representative. *Id.; see also Campbell v. DePonte*, 57 Haw. 510, 518, 559 P.2d 739, 744, *reh'g denied*, 57 Haw. 564, 560 P.2d 1303 (1977). Of course, the instant case does not involve real property.

▮ Finally, the plaintiffs-appellees point out that, in *Carter v. Davis*, 18 Haw. 439, 454 (1907), this court "construed the terms 'legal representatives' and 'personal representatives' to mean 'heirs,' as well as executors and administrators of an estate within the context of a trust deed." Once again, however, the plaintiffs-appellees fail to appreciate the context of this court's ruling. As the *Carter* court clearly held, the construction of particular terms contained within a trust deed is dependent upon the relationship between those terms and the rest of the document, as well as the intent of the deed's drafter. *Id.* at 454–55. Accordingly, this court's construction of the terms "legal representatives" and "personal representatives," as contained in the particular 1879 trust deed at issue in *Carter*, is of little assistance to our current task of interpreting the meaning of HRCP Rule 25(a)(1).

This court came closer to addressing the issue at bar in *Bagalay v. Lahaina Restoration Foundation*, 60 Haw. 125, 588 P.2d 416 (1978). In *Bagalay*, this court construed the former version of HRS § 663–7 (1955), which allowed survival of actions "in favor of the legal representative" of the decedent party. *Id.* at 135 & n. 5, 588 P.2d at 423 & n. 5. Noting the holding in *Carter*, the *Bagalay* court observed that,

> [i]n the context of survival statutes similar to that of HRS § 663–7, one court has

construed the term to include heirs-at-law, regardless of the fact that the heir had not qualified as an administrator of the decedent's estate. *Strother v. District of Columbia*, 372 A.2d 1291 (D.C.1977). Other courts have held that the term refers only to executors and administrators who have been appointed either by law or by will. *Hill v. James*, 252 Miss. 501, 175 So.2d 176 (1965); *State v. Hollenbeck*, 394 S.W.2d 82 (Mo.[Ct.App.] 1965).

*Id.* at 136, 588 P.2d at 423–24. However, the *Bagalay* court expressly declined to weigh in with respect to the conflicting authority: "It is not necessary, in this case, to decide whether the term 'legal representative' includes heirs at law[.]" *Id.* at 136, 588 P.2d at 424 (emphasis added).[17]

Accordingly, it appears that the question at issue remains one of first impression in Hawaiʻi.

b. *The majority rule in other jurisdictions is that only judicially appointed representatives may be substituted for a decedent party.*

▮ Imelda cites to the decisions of a number of federal and state courts that have construed their respective equivalents of HRCP 25(a)(1) to restrict the substitution of the parties in the event of death to the deceased's legal representative, meaning the judicially appointed representative. Indeed, this appears to be the majority view. *See, e.g., Mallonee v. Fahey*, 200 F.2d 918, 919 (9th Cir.1952); *Roberson v. Wood*, 500 F.Supp. 854, 859 (S.D.Ill.1980); *Marcano v. Offshore Venezuela*, 497 F.Supp. 204, 207 (E.D.La.1980); *Madison v. Vintage Petroleum, Inc.*, 872 F.Supp. 340, 342 (S.D.Miss. 1994), *aff'd*, 87 F.3d 1311 (5th Cir.1996); *Killough v. Killough*, 373 So.2d 336, 337–38 (Ala. Ct.App.1979); *Fryer v. Kaiser Found. Health Plan, Inc.*, 221 Cal.App.2d 674, 34

---

17. The *Bagalay* court also noted that "[t]he will of appellant clearly stated that [his guardian] was to be the executrix of the estate, and as such, she would have been the proper party to be substituted for the appellant." *Bagalay*, 60 Haw. at 136, 588 P.2d at 423–24. This sentence might be interpreted to mean that a person may be substituted for a deceased party so long as she is named as executrix in the decedent's will. How-

ever, in an earlier part of the opinion, the *Bagalay* court clarified that it meant that the executrix in a *probated* will was the proper party: "For the purposes of pursuing the present case, we can see no reason why counsel ... did not promptly apply for a *probate of the will* and have [the appellant's guardian] *designated* as executrix and legal representative of appellant." *Id.* at 134–35, 588 P.2d at 423 (emphases added).

Cal.Rptr. 688, 691 (Cal.Ct.App.1963); *Epps v. Vogel,* 454 A.2d 320, 323 n. 3 (D.C.Ct.App. 1982) (noting that the federal courts normally require a legal representative); *In re Estate of Einstoss,* 26 N.Y.2d 181, 309 N.Y.S.2d 184, 257 N.E.2d 637, 641 (N.Y.1970); *see also* 7C Wright & Miller, *Federal Practice and Procedure* § 1956 (1986).

A number of courts have crafted a narrow exception to the foregoing rule in favor of the primary distributee of an already-distributed estate. *See Kilgo v. Bowman Transp. Inc.,* 87 F.R.D. 26 (N.D.Ga.1980), *aff'd* 789 F.2d 859 (11th Cir.1986) (person named as executor in plaintiff's will, but who does not become executor because he elects statutory share rather than probating will, is a substitutable "proper party"); *Ashley v. Illinois Cent. Gulf R.R. Co.,* 98 F.R.D. 722, 724 (S.D.Miss.1983) ("Unless the estate of a deceased party has been distributed at the time of the making of the motion for substitution, the 'proper' party for substitution would be either the executor or administrator of the estate of the deceased."); *Hardy v. Kaszycki & Sons Contractors,* 842 F.Supp. 713 (S.D.N.Y.1993) (mem.) (holding that widow was proper party to substitute, where husband's estate contained insurance policies in favor of his heirs); *Gronowicz v. Leonard,* 109 F.R.D. 624, 626 (S.D.N.Y.1986).

As noted above, the plaintiffs-appellees rely on *Hilao I,* in which the Ninth Circuit upheld the substitution of Imelda and Bongbong for the Marcos Estate pursuant to FRCP Rule 25(a)(1). *Hilao I,* 103 F.3d at 766. However, we are constrained to note that the *Hilao I* court offered no analysis in reaching its *ipse dixit* result. Further, the plaintiffs-appellees cite to *McSurely v. McClellan,* 753 F.2d 88 (D.C.Cir.), *cert. denied,* 474 U.S. 1005, 106 S.Ct. 525, 88 L.Ed.2d 457 (1985). In that case, the court held that requiring a "legal representative" for substitution under Rule 25(a)(1) would be overly burdensome on a plaintiff: "[c]ompelling a plaintiff to 'institut[e] machinery in order to produce some representative of the estate ad litem' would contravene the purpose of amended Rule 25(a)(1) 'to dispel unwarranted rigidity and allow more flexibility in substitution.'" *Id.* at 98 (quoting *Rende v.*

*Kay,* 415 F.2d 983, 986 (D.C.Cir.1969)). However, in *McSurely,* the estates of the deceased parties had been distributed to the respective widows prior to their substitution, and the court relied, in part, on the "already-distributed estate" exception described in *Ashley* and *Kilgo, supra. McSurely,* 753 F.2d at 96, 99. By contrast, there is no evidence in the present record that the Marcos Estate had been distributed—either at the time the stipulated substitution was filed or at the time the plaintiffs-appellees moved to alter the judgment.

In any event, to the extent that the broad language of *McSurely* supports the plaintiffs-appellees' position that *any* heir may be substituted for a deceased defendant, the reasoning is unpersuasive. A party-defendant might very well, depending on the laws of the state or country with jurisdiction over probate, disinherit his or her spouse in his or her will. Moreover, a lawsuit in which the decedent's spouse is substituted as a party defendant may come to judgment before probate of the decedent's will is completed. Knowing that he or she is not provided for in the decedent's will, such a spouse might not be motivated properly to defend the estate's interests as a substituted party.

Alternatively, the rule suggested by the plaintiffs-appellees invites the scenario in which an heir is substituted as the "proper party" even though a personal representative or special administrator has already been appointed by a probate court for the estate of the deceased party. Indeed, in the instant case, a special administrator, Commissioner Vinzons–Chato, *had* been named for the Marcos Estate by the Philippine probate court prior to the filing of the plaintiffs-appellees' motion to alter the judgment. As all sides appear to acknowledge, Vinzons–Chato and Imelda were not of one mind as to the distribution of the Marcos Estate. Moreover, at the time of the motion to alter the judgment, both the parties and the circuit court were aware that GBC had failed to secure the appointment of an alternate personal representative in Hawai'i probate proceedings.

█ Finally, we note that the Hawai'i Uniform Probate Code (UPC), HRS chapter

560, clearly contemplates that a personal representative or special administrator is to represent an estate, in judicial proceedings and otherwise, in dealing with the estate's creditors. *See* HRS §§ 560:3–104 ("No proceeding to enforce a claim against the estate of a decedent or the decedent's successors may be revived or commenced before the appointment of a personal representative."), 560:3–617 ("A special administrator appointed by order of the court in any formal proceeding has the power of a general personal representative except as limited in the appointment[.]"), 560:3–715(22) ("[A] personal representative ... may properly ... [p]rosecute or defend claims, or proceedings in any jurisdiction for the protection of the estate[.]"), and 560:3–804 (providing that creditors must present their claims to the personal representative) (Supp.1997).

 Accordingly, we hold, as a general rule, that an heir of an undistributed estate, who has not been judicially appointed as the personal representative of a decedent's estate, is not a "proper party" for substitution pursuant to HRCP Rule 25(a)(1).[18]

3. *Imelda is judicially estopped from attempting to renounce her prior disingenuous position regarding her legal status, argued to and accepted by the circuit court, and, therefore, has constructively consented to personal liability for the judgment against the Marcos Estate to the extent of her share of the estate's assets.*

 The plaintiffs-appellees alternatively argue that, even if Imelda's status as Ferdinand's widow is insufficient in itself to justify her substitution pursuant to HRCP Rule 25, the fact that she stipulated to the substitution should operate to estop her from claiming that the Marcos Estate was not properly substituted as a party defendant. Clearly,

Imelda could not unilaterally appoint herself the personal representative of the Marcos Estate merely by way of stipulation with another party, *see* HRS 560:3–103 (Supp. 1997) (providing that personal representatives are "appointed by order of the court or registrar"); neither could the circuit court's acceptance of the parties' stipulation constitute an order of the probate court appointing Imelda as personal representative of the estate.

Nevertheless, this court cannot and need not blind itself to the deception Imelda has obviously attempted to perpetuate upon the court in this case. As she conceded at oral argument, Imelda herself drafted the March 17, 1992 stipulation for substitution and has employed the same language with respect to stipulations entered into in lawsuits in other jurisdictions. The stipulation is cleverly worded to avoid the use of the terms *"personal* representative" and *"Estate* of Ferdinand Marcos." *See supra* section I.B.2. The lack of these terms, however, does not alter the obvious purpose of the document—to substitute Imelda as the "proper party" to defend the lawsuit on behalf of her deceased husband.

Imelda also concedes that she was fully aware that she had not, as of the time she entered into the stipulation, been appointed executrix of Ferdinand's will. However, she maintains that she entered into the stipulation because "it was believed that, as surviving spouse and heir of the decedent, [she] would eventually be appointed personal representative" and that, after her attempt to achieve this end was initially thwarted in the Philippine probate proceeding, she promptly informed the circuit court and the other parties. However, the "morphing" quality of Imelda's characterizations of her own con-

---

18. As she acknowledged at trial, and as the record in the Hawai'i probate case indicates, Imelda was actively engaged in litigating the issue of her appointment as representative of the Marcos Estate in the Philippines. If, in fact, she had been named executrix and personal administrator prior to the present appeal (and even subsequent to the circuit court's ruling), this court would not disturb her substitution pursuant to HRCP Rule 25(a)(1) or her designation as the personal representative of the Marcos Estate. "[A]s long as the 'proper party' actually defends the suit, such defense can cause a waiver of the right to formal substitution." *Matthews v. Matthews,* 599 So.2d 1218, 1221 (Ala.Ct.App.1992) (internal quotation marks and citation omitted). However, on the record before us, the plaintiffs-appellees have failed to establish that Imelda has been so appointed.

duct and motives belies her alleged good intentions.

Imelda appears first to have proposed the concept of substituting herself for Ferdinand in a letter dated February 14, 1991, signed by her counsel and addressed to counsel for plaintiffs-appellees. That letter, a copy of which Imelda apparently sent to the motions judge, proposed in relevant part:

> As you know, the will of Ferdinand Marcos named his widow, Imelda Marcos[,] as one of the personal representatives of the estate. Pursuant to Haw. R. Civ. P. 25, we hereby offer to stipulate to the substitution of Mrs. Marcos in this action *as the representative of the Ferdinand Marcos Estate.* Enclosed is an executed stipulation making the substitution. If the form is satisfactory to you, you are authorized to file it with the Court.

(Emphasis added.)

When the plaintiffs-appellees later moved to substitute Irene Silverman as personal representative of the Marcos Estate, "on the grounds that . . . it is necessary to add the judicially-appointed personal representative of his estate," Imelda's counsel opposed the motion, arguing that "[t]here is a proper Rule 25 Substitution of Party. All defendants who have appeared in this case . . . have been substituted where appropriate . . . and there is no logical or legal basis to appoint a personal representative." The circuit court expressly relied on Imelda's argument—which is the diametric opposite of that offered by Imelda on appeal—as the basis for denying the plaintiffs-appellees' motion. Imelda did not dispute the plaintiffsappellees' representation to the circuit court that her counsel had signed no less than forty documents already filed with the court, which characterized Imelda as the "representative" of the Marcos Estate.

Imelda's counsel first began to backpedal from his position that Imelda was the Marcos Estate's "representative" in his memorandum in opposition to the plaintiffs-appellees' second motion to substitute Silverman, *see supra* section I.B.2, simultaneously maintaining that he (1) "continued to represent Imelda . . ., individually and in her capacity as the agreed upon representative of the defendant Ferdinand," (2) did not and never had "represented any judicially appointed personal representative of the [Marcos Estate]" in the present or any other litigation, (3) expressed no view as to whether the March 17, 1992 stipulation bound the Marcos Estate in any way with respect to any judgment that might be entered against it, and (4) took no "position on the necessity of adding a judicially appointed representative of the [Marcos Estate] for purposes of this litigation." At the same time, Imelda's counsel insisted that "Irene Silverman should not be substituted in this action as the personal representative of the [Marcos] Estate."

As the trial progressed, Imelda's counsel made continued references to her representative capacity with regard to her deceased spouse and to Ferdinand's status as a defendant in the litigation. During jury selection, Imelda's counsel declared to the potential jurors that he represented Ferdinand Marcos in the action "just . . . as if [he] was [sic] alive," despite the fact that the Marcos Estate had "never been joined." Further, during the settlement of jury instructions, Imelda's counsel insisted that Ferdinand's name be read first to the jurors before Imelda's when describing the defendants.

Imelda has never attempted to explain how it is conceptually possible for her to have represented "Ferdinand E. Marcos, deceased" in this litigation without representing his estate pursuant to HRCP Rule 25. As Imelda herself concedes, Ferdinand ceased to be a party upon his death, and, therefore, could only be "present" in the litigation through a representative of his estate. *See Bagalay,* 60 Haw. at 135, 588 P.2d at 423 ("A deceased person cannot be a party to a legal proceeding, and the effect of death is to suspend the action as to the decedent until his legal representative is substituted as a party.") Moreover, Imelda never moved to set aside her stipulated substitution as the "proper party" to succeed Ferdinand as a party defendant or for summary judgment on the basis that her substitution was improper, deliberately choosing, instead, to persist in the defense of the case against Ferdinand.

In *Rosa v. CWJ Contractors, Ltd.*, 4 Haw. App. 210, 664 P.2d 745 (1983), the Intermediate Court of Appeals (ICA) was confronted with a party advancing a similarly shifting set of contentions. In that case, the plaintiffs had obtained a judgment against CWJ Corporation, Ltd. (Corporation). *Id.* at 211–12, 664 P.2d at 747. Subsequently, the plaintiffs sued CWJ Contractors, Ltd. (Contractors), alleging the same facts and asserting a number of the same claims previously directed against Corporation. Contractors moved to dismiss two of the counts, invoking res judicata as a defense. *Id.* at 212, 664 P.2d at 748. The plaintiffs successfully opposed the motion, arguing that res judicata did not apply because Contractors and Corporation were distinct entities and Contractors was not a party to the first lawsuit. *Id.* at 218, 664 P.2d at 751. Subsequently, the plaintiffs filed a successful motion for summary judgment, wielding res judicata offensively against Contractors and arguing that Contractors was a wholly-owned subsidiary of Corporation and was in privity with it. *Id.* The ICA held that the plaintiffs were precluded, by virtue of the doctrine of "judicial estoppel," from prevailing on the basis of two mutually exclusive positions regarding the relationship between Contractors and Corporation. *Id.* at 220, 664 P.2d at 749.

 Pursuant to the doctrine of judicial estoppel,

> [a] party will not be permitted to maintain inconsistent positions or to take a position in regard to a matter which is directly contrary to, or inconsistent with, one previously assumed by him, at least where he had, or was chargeable with, full knowledge of the facts, and another will be prejudiced by his action.

*Id.* at 218, 664 P.2d at 751 (quoting 28 Am. Jur.2d *Estoppel and Waiver* § 68, at 694–95 (1966) (indentation omitted)). Judicial estoppel "'partakes . . . of positive rules of procedure based on manifest justice and, to a greater or less[er] degree, on considerations of the orderliness, regularity, and expedition of litigation.'" *Id.* at 219, 664 P.2d at 751 (quoting *Trask v. Tam See*, 42 Haw. 324, 333 (1958)). This doctrine prevents parties from "playing 'fast and loose' with the court or blowing 'hot and cold' during the course of litigation." *Id.* (citing *Godoy v. Hawaii County*, 44 Haw. 312, 354 P.2d 78 (1960); *see also Yuen v. London Guar. & Accident Co., Ltd.*, 40 Haw. 213 (1953); *Allen v. Zurich Ins. Co.*, 667 F.2d 1162 (4th Cir.1982); *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595 (6th Cir.1982)).

 By means of her stipulation in this case, Imelda accepted the benefit of maintaining full control over the defense of the Marcos Estate, in which she had a substantial interest. Now that the plaintiffs-appellees have prevailed against the estate, Imelda argues that she was without authority to act as she did in proffering and entering into the stipulation. In other words, she now claims that because of *her* wrongful act of holding herself out as a proper party for substitution, the plaintiffs-appellees should now be stripped entirely of their judgment.[19]

19. We note that Imelda is not alone in adopting a different stance on appeal. In support of their motions to substitute Silverman, the plaintiffs-appellees argued that the stipulation might not be sufficient to guard the judgment against collateral attack without a judicially appointed representative of the Marcos Estate. On appeal, they argue that the stipulated substitution of Imelda is sufficient to support the judgment. However, the doctrine of judicial estoppel does not apply unless the changed argument *prejudices* the opposing party. *Rosa*, 4 Haw.App. at 218, 664 P.2d at 751. "To constitute this sort of estoppel[,] the act of the party against whom the estoppel is sought must have gained some advantage for himself or produced some disadvantage to another; or the person invoking the estoppel must have been induced to change his position or by reason thereof the rights of other parties must have intervened." *Yuen*, 40 Haw. at 230 (citation and internal quotation signals omitted). In other words, a party is free to "plead[ ] inconsistent claims or defenses within a single action," but "[a] party is precluded from subsequently repudiating a theory of action [that has been] *accepted and acted upon by the court*" or that has otherwise detrimentally affected the opposing party. *Rosa*, 4 Haw.App. at 220, 664 P.2d at 752 (emphasis added). Here, the plaintiffs-appellees' arguments regarding the sufficiency of the stipulation were rejected by the circuit court and did not otherwise appear to affect Imelda's defense. Accordingly, the plaintiffs-appellees' change of heart on appeal does not prejudice Imelda, whereas Imelda's insistence below that the stipulation was sufficient to protect the interests of the plaintiffs-appellees was adopted by the circuit court to the plaintiffs-appellees' detriment.

The Arizona Supreme Court rejected a similar argument in *Jasper v. Batt*, 76 Ariz. 328, 264 P.2d 409 (Ariz.1953). In *Jasper*, the plaintiffs sued in an Arizona state court for injuries arising out of an automobile accident. *Id.* at 410. After the defendant died during the pendency of the litigation, the plaintiffs stipulated with the widow, who had been named executrix of defendant's will by a California court, to substitute her name as defendant in the lawsuit. *Id.* No ancillary probate proceedings were ever initiated in Arizona. *Id.* After a jury trial, the executrix prevailed. *Id.* On appeal, the plaintiffs argued that the trial court lacked jurisdiction to enter judgment in favor of the executrix, inasmuch as she was never appointed by an Arizona court as the representative of her husband's estate. *Id.* at 411.

The *Jasper* court held that "[t]he court had jurisdiction to try and determine the case as originally instituted, and the court had the jurisdiction and power to proceed with the case when there was brought before it one who was represented by both parties as having the authority to represent the estate." *Id.* at 412. The court further held that the

plaintiffs were bound by their stipulation because they had failed, pursuant to Arizona Rules of Civil Procedure Rule 9(a),[20] to "negatively aver" that the executrix lacked the requisite authority "to be sued in a representative capacity." *Id.* In response to the plaintiffs' argument that, "had they been successful, their judgment would have been void and not a valid claim against the Arizona estate," the court noted that

> [w]e do not decide this question as to parties not before the court who might have an interest in the estate. *We do hold, however, that all parties to the litigation, so far as their personal interests are concerned, waived any question as to authority and were bound by the result.* [The executrix,] having by stipulation represented [that] she had authority to appear and defend the action on behalf of the Arizona estate, had equally with the plaintiffs waived her right to question the untruthfulness of such representation.

*Id.* (emphasis added) (indentation omitted).[21]

 We deem the *Jasper* court's analysis to be instructive, although we rely upon the

---

Moreover, we note that the fact that the plaintiffs-appellees may also have been aware that Imelda had not been judicially appointed as personal representative of the Marcos Estate at the time they entered into the stipulation does not defeat the application of judicial estoppel to Imelda in this case. Judicial estoppel is a subset of the doctrine of "quasi-estoppel," which "has its basis in election, waiver, acquiescence, or an acceptance of benefits. A party is precluded from asserting[,] to another's disadvantage, a right inconsistent with a position previously taken by him. *No misrepresentation or concealment of facts by one and ignorance of the other are necessary.*" *Id.* at 219 n. 12, 664 P.2d at 751 n. 12 (citing *Godoy, Yuen,* and *Hartmann v. Bertelmann*, 39 Haw. 619 (1952)) (emphasis added).

20. Rule 9(a) Rules of Civil Procedure, Section 21–413, A.C.A.1939, provides that if a party litigant desires to raise the issue of the authority of one to be sued in a representative capacity it must be done by specific negative averment. Rule 12(d) Rules of Civil Procedure, Section 21–436, A.C.A.1952, provides in effect that any objection to such authority is waived unless presented before trial.

*Jasper*, 264 P.2d at 412. *Accord* HRCP Rule 9(a) (1996) ("When a party desires to raise an issue as to ... the authority of a party to sue or be sued in a representative capacity, he shall do so by specific negative averment, which shall include such supporting particulars as are peculiarly

within the pleader's knowledge."); HRCP Rule 12(h)(1) (1996) ("A defense of lack of jurisdiction over the person ... is waived ... if it is neither made by motion under this rule nor included in a responsive pleading or an amendment thereof permitted by Rule 15(a) to be made as a matter of course.").

21. The *Jasper* court also approvingly cited to the common law doctrine of "executor[ship] de son tort" as "another sound reason for sustaining the judgment." 264 P.2d at 412.

> [A]ny intermeddling with the estate of a decedent under a claim of authority, or any act characteristic of the office of a rightful executor or which evinces legal control, makes the person doing such act an *executor de son tort*. Probably, the most common form of intermeddling is taking possession of the assets without administration and controlling the property as if the taker were the legal representative.

*In re Estate of Johnson*, 705 So.2d 819, 822 (Miss.1996) (citation omitted). *See also In re Estate of Retzel*, 586 So.2d 1247, 1252 (Fla.Ct. App.1991), *review denied by CSX Transp. Inc. v. Estate of Retzel*, 593 So.2d 1051 (Fla.1992); *Palmisano v. Connell*, 179 Ill.App.3d 1089, 128 Ill. Dec. 638, 534 N.E.2d 1243, 1249 (Ill.Ct.App.), *appeal denied*, 127 Ill.2d 621, 136 Ill.Dec. 591, 545 N.E.2d 115 (Ill.1989). An executor de son tort may also bind the estate if (1) he or she is

doctrine of judicial estoppel to reach the same result. Parties should not be permitted to abuse the mechanism of substitution of parties by stipulation to derive unfair advantage on appeal when the judgment in the trial court is unfavorable or not otherwise to their liking. Accordingly, insofar as Imelda's "personal interests" are concerned, we hold that she has waived any question as to her own authority and is personally bound by the judgment in this case. However, as discussed *supra* in section III.A.2, no matter how unfair Imelda's action may be, she nevertheless lacked the legal authority to bind the Marcos Estate. Thus, we may, for our own purposes, answer the question left unaddressed by the *Jasper* court's holding—the Marcos Estate was not bound by Imelda's stipulation.

To clarify what we mean by Imelda's "personal interests," we turn to fundamental principles of equity, from which the doctrine of judicial estoppel derives.

> One of the glories of equity jurisprudence is that it is not bound by the strict rules of the common law, but can mold its decrees to do justice amid all the vicissitudes and intricacies of life. The principles upon which it proceeds are eternal; but their application in a changing world will necessarily change to meet changed situations. We hold the court of equity has plenary power to mold its decrees in such form as to conserve the equities of all parties[.]

*Fleming v. Napili Kai, Ltd.*, 50 Haw. 66, 70, 430 P.2d 316, 319, *reh'g denied*, 50 Haw. 83, 431 P.2d 299 (1967) (citation and internal quotation signals omitted). In other words, " '[t]he relief granted in equity is dictated by the equitable requirements of the situation, and must be adapted to the facts and circumstances of the particular case.' " *Almeida v. Almeida*, 4 Haw.App. 513, 523, 669 P.2d 174, 182 (1983) (quoting *Shinn v. Edwin Yee, Ltd.*, 57 Haw. 215, 235, 553 P.2d 733, 746 (1976)). *See also Food Pantry v. Waikiki Business Plaza, Inc.*, 58 Haw. 606, 614, 575 P.2d 869, 876 (1978). Moreover, " 'equity will not permit a wrong to be without remedy.' " *Meheula v. Hausten*, 29 Haw. 304, 313 (1926).

Due in large part to the circuit court's reliance on Imelda's arguments regarding the propriety of her substitution as a party defendant for Ferdinand, the plaintiffs-appellees have obtained a judgment that cannot be enforced against the Marcos Estate. Simply "estopping" Imelda from claiming that the estate is not bound, when in fact the plaintiffs-appellees cannot collect their judgment from the estate, offers the plaintiffs-appellees no relief from Imelda's wrongdoing. At the same time, it is clear that Imelda fully defended her interests in the estate by vigorously contesting the merits of the plaintiffs-appellees' case against her late husband through the services of the same counsel employed by Ferdinand for the same purpose while he was alive. Therefore, in order to achieve manifest justice consistent with the doctrine of judicial estoppel, the equities of this case require us to hold Imelda personally liable, at least to the extent of her interest in the assets of the Marcos Estate, for the amount of the plaintiffs-appellees' judgment against Ferdinand, as that amount has been modified according to this opinion, *see generally infra*.[22]

Accordingly, we vacate the portion of the circuit court's amended judgment entered

later appointed executor, (2) he or she undertakes an action on behalf of the estate in good faith that the lawfully-appointed administrator failed to attempt, despite a duty to do so, or (3) the lawfully appointed executor or administrator ratifies his or her actions. *Jasper*, 264 P.2d at 413.

This court long ago rejected the doctrine of executorship de son tort, reasoning that our probate statutes "allow a creditor of a deceased person to apply for administration" of an estate, and, therefore, that "[t]he creditor has it always in his power, by this method, to protect himself, and to obtain possession of the assets and to prevent any improper meddling with or wasting of the estate[.]" *Frag v. Adams*, 5 Haw. 664, 666 (1886). *But see supra* note 18, regarding the application of the harmless error doctrine to the situation in which a substituted party is subsequently named executor.

22. We express no view as to the potential res judicata or collateral estoppel effect of this opinion, or as to the application of any relevant statute of limitations, on any future lawsuit prosecuted against the Marcos Estate by the plaintiffs-appellees and based upon the claims for relief asserted in the present case.

against "Defendant Imelda Marcos, as Personal Representative of the Estate of Ferdinand Marcos" with respect to the plaintiffs-appellees' battery, false imprisonment, and conversion claims and remand for entry of judgment as to those claims against Imelda, in her personal capacity, to the extent of her interest in the Marcos Estate.

### B. The Statute Of Limitations Was Tolled During The Period Of Ferdinand's Constitutional Immunity From Suit.

Imelda contends that Roxas's claims for relief sounding in battery and false imprisonment, as well as GBC's claim of conversion, were barred by operation of the relevant statutes of limitations. She points out that the instant lawsuit was not filed until seventeen years after the golden buddha was allegedly confiscated, fourteen years after Roxas was last allegedly assaulted, and twelve to thirteen years after the remaining treasure was allegedly recovered from the tunnel near the Baguio General Hospital.

HRS § 657–9 (1993) provides that

[w]hen a cause of action has arisen in any foreign jurisdiction, and by the laws thereof an action thereon cannot there be maintained against a person, by reason of the lapse of time, an action thereon shall not be maintained against the person in this State, except in favor of a domiciled resident thereof, who has held the cause of action from the time it accrued.

Thus, by its terms, HRS § 657–9 requires that the plaintiffsappellees' claims for relief must have been brought in compliance with the time constraints imposed by any applicable Philippine statute of limitations.

The parties do not dispute that Imelda adequately established that the relevant time

period mandated by the statute of limitations for false imprisonment and battery, pursuant to Article 1146 of Philippine Civil Code, is two years, and, for conversion, pursuant to Article 1140 of the Philippine Civil Code, four years. The jury was instructed regarding these statutes of limitations. However, the jury was also instructed, without objection, that "[t]he statute of limitations has been devised to operate primarily against those who slept on their rights and not against those desireous to act but who cannot do so for causes beyond their control." The latter instruction was a direct quotation from *Republic of the Philippines v. The Court of Appeals*, 137 SCRA 220, 228 (1985) (*de Vera*), an authority supplied to the circuit court by the plaintiffs-appellees. In addition, the jury was instructed—in this instance, over Imelda's objection—that "[t]he time for filing a lawsuit does not begin to run on plaintiff if it was impossible or virtually impossible for Roger Roxas to file a lawsuit. The statute of limitations only begins to run from the date that the lawsuit could be filed."

In their closing argument, the plaintiffs-appellees urged that the relevant statutes of limitations were tolled in the present case because Ferdinand, while still in power, (1) had engineered an amendment to the Philippine Constitution making him immune from lawsuit during his term of office and (2) had so threatened Roxas that he had justifiably feared challenging Marcos in court. On appeal, Imelda argues that (1) Hawai'i should not recognize duress as a defense to the statute of limitations, citing cases from a number of state and federal jurisdictions, and (2) Ferdinand was not immune from lawsuits unrelated to his *official* acts. Inasmuch as we disagree with Imelda's latter argument, we need not reach the former.[23]

---

**23.** The plaintiffs-appellees advance the additional argument that Imelda is collaterally estopped from raising the statute of limitations issue by *Hilao v. Marcos*, 103 F.3d 767 (9th Cir.1996) (*Hilao II*). In *Hilao II*, the United States Court of Appeals for the Ninth Circuit considered the appeal of the final judgment entered in the same lawsuit giving rise to *Hilao I*, discussed *supra* in section III.A.1. Among the issues raised by the Marcos Estate in *Hilao II* was the effect of the statute of limitations on the plaintiffs' claims. The parties disputed whether the applicable stat-

ute of limitations should be derived from the Philippine Civil Code, the federal Torture Victim Protection Act (TVPA), or 42 U.S.C. § 1983. *Id.* at 773.

The *Hilao II* court responded that "[w]e need not decide which statute of limitations applies because Hilao's suit was timely under any of the proposed statutes when equitable tolling principles are applied." *Id.* The court cited authority for the proposition that both the TVPA and Hawai'i law (implicated because section 1983 suits incorporate state statutes of limitations) allow for

In *de Vera*, the issue before the Philippine Supreme Court was whether a trial court's issuance of an alias writ of execution of a prior judgment was barred by the statute of limitations, inasmuch as the judgment had become final more than five years before. *de Vera*, 137 SCRA at 227. The Republic had sued Mercy and Juan de Vera (collectively, the de Veras) for back rent for an apartment the de Veras rented in a building owned by the state. *Id.* at 222. The Republic prevailed, and a judgment was filed in its favor on May 18, 1961. *Id.* at 223. The de Veras appealed the judgment, but, by decision filed on August 27, 1968, the Republic prevailed in the Court of Appeals. On April 15, 1969, the Republic filed its first motion for the execution of the trial court's judgment. *Id.* The motion was granted by an order filed on April 17, 1969. However, the de Veras appealed the order on the ground that service of the Republic's motion had been insufficient. *Id.* at 224. Pending the appeal, the trial court recalled the writ of execution. *Id.* at 225. The Republic again prevailed on appeal and filed a motion for the issuance of an alias writ of execution on January 25, 1974. *Id.* The de Veras opposed the motion, but the trial court granted it in an order filed on July 12, 1974. *Id.* at 226.

The de Veras moved to quash the writ, but the trial court refused to do so. *Id.* at 226. The de Veras then appealed to the Court of Appeals, where they prevailed. *Id.* In response to the petition for a writ of certiorari filed by the Republic in the Philippines Su-preme Court, the de Veras argued that the Republic's motion for the alias writ of execution was time-barred because Rule 39, Section 6 of the Revised Rules of Court provided that "a judgment may be executed on motion within five (5) years from the date of its entry or from the date it became final[.]" *Id.* at 227.

The Philippines Supreme Court held that the statute of limitations had been tolled because the de Veras had, by their own actions, caused the delay in filing the writ. *Id.* at 228. Accordingly, the Supreme Court reversed the decision of the Court of Appeals. As noted above, the *de Vera* court also expressly held that the statue of limitations does not apply to "those desirous to act but [who] cannot do so for causes beyond their control." Thus, pursuant to *de Vera*, (1) if a party, through her own actions, causes a delay resulting in her opponent's inability to comply with the statute of limitations in a timely fashion or (2) if it is otherwise impossible for a party to comply with the statute of limitations, then (3) the statute of limitations is tolled under Philippine law.

■ It is manifestly apparent in this case that it would have been impossible for Roxas to file a lawsuit in the Philippines, which asserted the claims for relief at issue herein, during the Marcos regime. Article VII, § 7 of the 1973 Philippines Constitution (adopted through Ferdinand's instrumentality) provided as follows: "The President shall be immune from suit during his tenure." In 1981, when the constitution was further amended

equitable tolling. *Id.* at 773. However, the *Hilao II* court failed to note or discuss any applicable Philippine authority. The court then determined that any of the statutes would have been tolled during the Marcos presidency because (1) Ferdinand "engineered the passage of a constitutional amendment granting him, and others acting at his direction, immunity from suit during his tenure in office" and (2) the plaintiffs were justifiably afraid of retribution. *Id.* Accordingly, the *Hilao II* court concluded that "the filing of this action was timely under *any* of the asserted statutes of limitations." *Id.* (emphasis added).

It would, therefore appear that, technically, the plaintiffs-appellees have established the elements of collateral estoppel in the present case, inasmuch as:

(1) the issue decided in the prior suit [*i.e.*, whether equitable tolling applies] is identical to the issue presented in the action in ques-tion; (2) there was a final judgment on the merits in the prior suit; and (3) the party against whom collateral estoppel is asserted [—Imelda Marcos, in her alleged capacity as personal representative of the Marcos Estate—] was a party or in privity with a party to the prior suit.

*SHOPO*, 83 Hawai'i at 400, 927 P.2d at 408 (citing *Bush*, 81 Hawai'i at 480, 918 P.2d at 1136). On the other hand, the *Hilao II* court failed to (1) cite any Philippine authority indicating that Philippine law allows for equitable tolling or (2) otherwise justify its conclusion. The *Hilao II* court's *ipse dixit* answer to the question of equitable tolling is thus unsatisfying. As discussed *infra*, the plaintiffs-appellees should prevail via application of Philippine law in any case. Accordingly, we need not rely on the doctrine of collateral estoppel to dispose of the equitable tolling issue.

and the relevant section was renumbered, the following language was added: "Thereafter, no suit whatsoever shall lie for official acts done by him or by others pursuant to his specific orders during his tenure. The immunities provided herein shall apply to the incumbent President referred to in Article XVII of this Constitution." Phil. Const. art. VII, § 15 (1981).[24]

 Imelda argues that the foregoing constitutional language stands only for the proposition that, as president, Ferdinand was immune from suit for his *official* acts. She points out that, in response to her defenses of "head of state" and "act of state" immunity (*see* discussion *infra*), the plaintiffsappellees have argued that Ferdinand's alleged acts of appropriating the gold and causing Roxas to be unlawfully detained and tortured were not "official." However, she cites no Philippine legal authority to support her reading of the constitution.

Absent case law construing the relevant provision, this court is left only with the plain language of the constitution itself. Nothing in the plain language of article VII, § 7 of the 1973 constitution supports the proposition that its scope was restricted to lawsuits predicated on "official acts," as Imelda suggests. Rather, the more literal sense of the section is that it absolutely barred *all* lawsuits filed against the president while he held that office. Our interpretation is only fortified by the 1981 amendment, which clarified that, even *after* his tenure as president, Ferdinand would not be subject to lawsuits based on his *official* acts. Pursuant to the rule of statutory construction denominated *expressio unius est exclusio alterius*—the

express inclusion of a provision implies the exclusion of another—, Ferdinand would have been subject to suit *only* for his "nonofficial acts" once his presidential term had ended. *See Fought & Company v. Steel Eng'g and Erection, Inc.*, 87 Hawai'i 37, 55, 951 P.2d 487, 505 (1998); *Keliipuleole v. Wilson*, 85 Hawai'i 217, 227, 941 P.2d 300, 310 (1997); *State v. Cornelio*, 84 Hawai'i 476, 495 n. 33, 935 P.2d 1021, 1040 n. 33 (1997); *Arceo*, 84 Hawai'i at 29 n. 38, 928 P.2d at 871 n. 38; *International Sav. and Loan Ass'n v. Wiig*, 82 Hawai'i 197, 200, 921 P.2d 117, 120 (1996).

Accordingly, it is clear that Roxas would have been unable to bring *any* lawsuit against Ferdinand in the Philippines so long as Ferdinand remained in power. Thus, pursuant to *de Vera*, the statutes of limitations were tolled as a matter of law until the collapse of Ferdinand's regime. The record indicates that Ferdinand's presidency effectively ended on the date he was brought to Hawai'i—February 25, 1986. The instant lawsuit was filed on February 19, 1988, within the two-year Philippines statute of limitations relating to battery and false imprisonment (*i.e.*, Article 1146) and the four-year Phillipines statute of limitations relating to conversion (*i.e.*, Article 1140). Imelda's statute of limitations defense therefore fails.

C. *The Plaintiffs–Appellees' Lawsuit Was Not Barred By The Act Of State Doctrine.*

 Imelda next argues that the plaintiffs-appellees' claims were barred by the "act of state" doctrine.[25] Pursuant to the

---

24. Imelda claims that all of the language of article VII, section 7 quoted above was added to the Philippines Constitution by the 1981 amendment. Our research indicated to the contrary. *See, e.g.*, Jose N. Nolledo, *The New Constitution of the Philippines Annotated* 193 (1975) ("Section 7 of Article VII provides that the President during his tenure is immune from suits . . . ."). *Compare also* Primo L. Tongko, *Philippine Government Under the New Constitution* 380 (1975) (reproducing the language of article VII § 7 as quoted above) *with* Primo L. Tongko, *The Philippine Government Under the Fourth Republic* 371 (1981) (reproducing the language of article VII § 15 of the amended constitution as quoted above).

25. The plaintiffs-appellees once again argue that the issue is precluded by collateral estoppel, this time arising from two unpublished opinions of the United States Court of Appeals for the Ninth Circuit. In *In Re Estate of Ferdinand Marcos Human Rights Litigation*, 94 F.3d 539, 542 & n. 1 (9th Cir.1996), the Ninth Circuit noted that it had previously reversed the dismissal—on "act of state" grounds—of five human rights lawsuits against the Marcoses in two unpublished opinions reported in the federal reporter's table of decisions as *Hilao v. Marcos*, 878 F.2d 1438 (9th Cir.1989) (*Hilao III*), and *Trajano v. Marcos*, 878 F.2d 1439 (9th Cir.1989). The plaintiffsappellees maintain that this precedent precluded Imelda

act of state doctrine, a court will not review the actions of a foreign sovereign because

> [e]very sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.

*Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 416, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (quoting *Underhill v. Hernandez,* 168 U.S. 250, 252, 18 S.Ct. 83, 42 L.Ed. 456 (1897)). Although earlier decisions described the doctrine in terms of international comity, in *Sabbatino,* the United States Supreme Court made clear that the act of state doctrine is not merely a function of comity, but a restriction on federal courts emanating from the structure of the United States Constitution itself:

> The text of the Constitution does not require the act of state doctrine; it does not irrevocably remove from the judiciary the capacity to review the validity of foreign acts of state.
>
> The act of state doctrine does, however, have "constitutional" underpinnings. It arises out of the basic relationships between branches of government in a system of separation of powers. It concerns the competency of dissimilar institutions to make and implement particular kinds of decisions in the area of international relations. The doctrine as formulated in past decisions expresses the strong sense of the

Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole in the international sphere.

376 U.S. at 423, 84 S.Ct. 923. *See also W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., Int'l,* 493 U.S. 400, 404, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990) ("This Court's description of the jurisprudential foundation for the act of state doctrine has undergone some evolution over the years. We once viewed the doctrine as an expression of international law.... We have more recently described it, however, as a consequence of domestic separation of powers[.]" (citing, *inter alia, Sabbatino* )). Despite the fact that it justified the act of state doctrine on the basis of the separation of powers among the federal branches of government, the *Sabbatino* court also clarified that the doctrine is binding on state courts as well, as an "exclusive[ ] ... aspect of federal law." *Sabbatino,* 376 U.S. at 424–26.

Imelda contends that the act of state doctrine covers any "governmental" act by a foreign official, regardless of the act's illegality under international or local law. She interprets a number of Supreme Court and other older federal appellate decisions to support her position. *See, e.g., Sabbatino,* 376 U.S. at 431, 84 S.Ct. 923 ("the act of state doctrine is applicable even if international law has been violated"); *American Banana v. United Fruit Co.,* 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909) (act of state doctrine barred judicial inquiry into seizure of planta-

---

from raising the act of state doctrine as a defense in the instant case. We disagree.

We note at the outset that the Ninth Circuit also rejected the Marcoses' assertion of the act of state defense in an action brought by the Republic of the Philippines, which asserted RICO claims against the Marcoses. *See Republic of the Philippines v. Marcos,* 862 F.2d 1355, 1360–61 (9th Cir.1988) (en banc), *cert. denied,* 490 U.S. 1035, 109 S.Ct. 1933, 104 L.Ed.2d 404 (1989) (*Republic II* ). We also note that, although *Hilao III, Trajano,* and *Republic II* all involved many of the same parties, they were nevertheless substantively distinct lawsuits and related to each other only in subject matter.

As discussed above, a precondition to collateral estoppel *is identity of issues. SHOPO,* 83

Hawai'i at 400, 927 P.2d at 408. By its very nature, *see infra,* the act of state doctrine is concerned with the particular circumstances of the individual "acts" in question. Neither the alleged conversion of the gold claimed by Roxas, his detention, nor his torture were at issue in any of the federal lawsuits cited. Furthermore, the plaintiffs-appellees have alleged in the present matter that Ferdinand's conduct vis-a-vis Roxas arose out of the former's personal desire to acquire the latter's wealth, rather than out of a generally oppressive political regime. Thus, inasmuch as the foregoing federal human rights cases did not address issues identical to those raised in the instant matter, their holdings may not collaterally estop the assertion of the act of state doctrine as a defense here.

tion by Costa Rican soldiers allegedly acting at the behest of the defendant company); *Oetjen v. Central Leather Co.,* 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1918) (act of state doctrine barred inquiry into the Mexican government's confiscation of leather hides); *Ricaud v. American Metal Co.,* 246 U.S. 304, 38 S.Ct. 312, 62 L.Ed. 733 (1918) (act of state doctrine barred judicial inquiry into the Mexican government's confiscation of lead bullion); *Bernstein v. Van Heyghen Freres Societe Anonyme,* 163 F.2d 246 (2d Cir.) (act of state doctrine barred judicial inquiry into false imprisonment and conversion under Nazi anti-Jewish laws), *cert. denied,* 332 U.S. 772, 68 S.Ct. 88, 92 L.Ed. 357 (1947).

Imelda fails, however, to cite *Republic of the Philippines v. Marcos,* 862 F.2d 1355 (9th Cir.1988) (en banc), *cert. denied,* 490 U.S. 1035, 109 S.Ct. 1933, 104 L.Ed.2d 404 (1989) (*Republic II*).[26] In that case, the Republic sued the Marcoses, alleging that they had stolen public and private Philippine money and arranged for it to be transferred out of the Philippines. *Republic II,* 862 F.2d at 1358–59. The Marcoses asserted the act of state doctrine as a defense. In its initial opinion on appeal, the Ninth Circuit, sitting as a panel of three judges, sided with the Marcoses, holding that the act of state doctrine barred the lawsuit. *See Republic of the Philippines v. Marcos,* 818 F.2d 1473 (9th Cir.1987). However, on rehearing *en banc,* the Ninth Circuit reversed itself. *Republic II,* 862 F.2d at 1360–61. The court noted that, in *Sabbatino,* the United States Supreme Court had tempered the act of state doctrine with regard to officials who were no longer in power at the time of the filing of the lawsuit in question. *Id.* at 1360. The *Sabbatino* Court had observed that, in deciding whether the act of state doctrine applied, "[t]he balance of relevant considerations may also be shifted if the government which perpetrated the challenged act is no longer in existence ... for the political interest of this country may, as a result, be measurably altered." *Sabbatino,* 376 U.S. at 428, 84 S.Ct.

923. Interpreting the foregoing language, the Ninth Circuit held that,

[o]nce deposed, the dictator will find it difficult to deploy the defense successfully.... *A fortiori,* when a ruler's former domain has turned against him and seeks the recovery of what it claims he has stolen, the classification has little or no applicability. The act of state doctrine is supple, flexible, ad hoc. The doctrine is meant to facilitate the foreign relations of the United States, not to furnish the equivalent of sovereign immunity to a deposed leader.

*Republic II,* 862 F.2d at 1360–61. The *Republic II* court further noted that, in *Alfred Dunhill of London Inc. v. Republic of Cuba,* 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976), the United States Supreme Court had held that the burden of proving that the acts in question were "acts of state," (*i.e.,* "facts ... sufficient to demonstrate that the conduct in question was the *public act* of those with authority to exercise sovereign powers," *id.* at 694, 96 S.Ct. 1854 (emphasis added)) rests on the defendants. *Republic II,* 862 F.2d at 1361. *See also Clayco Petroleum Corp. v. Occidental Petroleum Corp.,* 712 F.2d 404, 406 (9th Cir.1983) ("[W]ithout sovereign activity effectuating 'public' rather than private interests, the act of state doctrine does not apply."), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984).

The United States Court of Appeals for the Second Circuit came to a similar conclusion in a lawsuit brought by the Republic against the Marcoses and some of their holding companies, which sought an injunction barring the defendants from transferring or encumbering properties allegedly purchased in New York with monies wrongfully taken from the Philippines. *See Republic of the Philippines v. Marcos,* 806 F.2d 344 (2d Cir. 1986), *cert. denied sub nom New York Land Co. v. Republic of the Philippines,* 481 U.S. 1048, 107 S.Ct. 2178, 95 L.Ed.2d 835 (1987) (*Republic I*).[27] The *Republic I* court de-

**26.** For ease of reference, we have labeled this decision *Republic II, see supra* note 25, and we will designate *Republic of the Philippines v. Marcos,* 806 F.2d 344 (2d Cir.1986), *cert. denied sub nom New York Land Co. v. Republic of the Philip-*

*pines,* 481 U.S. 1048, 107 S.Ct. 2178, 95 L.Ed.2d 835 (1987), as *Republic I, see infra.*

**27.** *See supra* note 28.

scribed its rejection of Marcos's act of state defense in the following terms:

> Appellants simply fail to make the crucial distinction between acts of Marcos as head of state, which may be protected from judicial scrutiny even if illegal under Philippine law, and his purely private acts. Although the distinction between public and private acts of a foreign official may be difficult to determine, our courts have repeatedly done so.

*Id.* at 359 (citations omitted). In this connection, the *Republic I* court also observed that the fact of Ferdinand's involuntary ouster greatly lessened the danger of the court encroaching upon the prerogatives of the federal executive:

> [T]he Marcos government is no longer in power. Thus, the danger of interference with the Executive's conduct of foreign policy is surely much less than the typical case where the act of state is that of the foreign government.... Thus, before the doctrine is applied even to Marcos's public acts, the court must weigh in balance the foreign policy interests that favor or disfavor application of the act of state doctrine.

*Id.* (citations omitted).

Similarly, in addressing Manuel Noriega's appeal from his conviction of drug-related offenses, the United States District Court for the Southern District of Florida emphasized that not all acts of a head of state are public acts:

> The fact that Noriega is alleged to have utilized his official position to engage in criminal activity does not, as Defendant suggests, cast his actions in a public light; as we well know, government officials are as capable of exploiting their positions of power for private, selfish ends as they are for [a] public purpose. *The inquiry is not whether Noriega used his official position to engage in the challenged acts, but whether those acts were taken on behalf of Noriega instead of Panama.*

*United States v. Noriega,* 746 F.Supp. 1506, 1522 (S.D.Fla.1990), *aff'd,* 117 F.3d 1206 (1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1389, 140 L.Ed.2d 648 (1998) (emphasis added). *See also Jimenez v. Aristeguieta,* 311 F.2d 547, 557–58 (5th Cir.1962) ("Appellant's

acts constituting the financial crimes ... were not acts of Venezuela sovereignty .... [E]ach of these acts was for the private financial benefit of the appellant. They constituted common crimes committed by the Chief of State in violation of his position and not in pursuance of it. They are as far from being an act of state as rape." (Internal quotation marks omitted.)), *cert. denied,* 373 U.S. 914, 83 S.Ct. 1302, 10 L.Ed.2d 415 (1963).

 In the present matter, Roxas alleged that Ferdinand detained and tortured him in order to ascertain the location of the Yamashita treasure and that Ferdinand had converted the golden buddha and the rest of the treasure for his own "private, selfish ends." Thus, this case, as Roxas cast it, is distinguishable from *Sabbatino, Oetjen,* and *Ricaud,* in which revolutionary governments appropriated private property for public use.

Imelda, on the other hand, emphasizes that

> [t]he evidence at trial established that the treasure allegedly confiscated by Marcos was supposedly discovered on government property, that the government by law owned a substantial interest in the treasure, that Roxas concealed the treasure in his home for months without reporting his discovery to any government official, that he thereafter sold a portion of the treasure and attempted to locate a buyer for the rest of it without the government's knowledge or consent, and that after learning about the existence of the alleged treasure, the police confiscated it pursuant to a search warrant issue by a Philippine court. The evidence further established that Roxas was charged, tried, convicted, sentenced, and imprisoned by a Philippine court for illegal possession of a firearm.

Assuming, *arguendo,* that Imelda's characterization of what the evidence at trial "established" is accurate, she has nevertheless failed to meet her burden of demonstrating that Marcos's acts were acts of state (*i.e.,* public acts). First, the testimony of Olsson, Doel, and O'Brien regarding (1) the storage of gold in Ferdinand's "summer palace" and at the Malacanang and (2) Ferdinand's surreptitious attempts to sell it, combined with

(3) Hirschfield's testimony regarding Ferdinand's post-presidential attempts to use the gold as security for a personal loan, was sufficient for the circuit court to reasonably infer, as a threshold evidentiary matter, that Ferdinand had converted the treasure strictly for his benefit, rather than for that of the state. Thus, although evidence that the state had some legitimate interest in the gold supported Imelda's position, the circuit court could rationally have been persuaded that Ferdinand never had any intention of turning the gold over to the state.

Further, although the evidence showed that Roxas was tried for and convicted of a crime in a Philippine court, it also showed that he was repeatedly detained and tortured before any trial ever took place. During these detentions, he was interrogated about the Yamashita treasure—a subject having nothing to do with his alleged possession of a firearm. Roxas's testimony also indicated that, while he was imprisoned by the civil authorities after his conviction on the firearm charges, he was periodically removed for further questioning and beatings by military personnel in connection with his discovery of the treasure. The circuit court could reasonably have inferred that his detention and torture were carried out at Ferdinand's personal command and effectuated in order for Ferdinand personally to appropriate the treasure. Accordingly, although there was conflicting evidence, the circuit court's implied finding that Ferdinand's acts were of a personal rather than public nature was not clearly erroneous. Moreover, as noted by the *Republic I* and *Republic II* courts, Marcos's status as a *deposed* dictator appears to have greatly lessened any potentially adverse

foreign policy impact that this case might have.

Finally, we are aware that Congress has expressly exempted confiscations of personal property that are illegal under international law from the scope of the act of state doctrine. *See* 22 U.S.C.A. § 2370(e)(2) (1990).[28] This provision, variously referred to in the case law as the "*Sabbatino* amendment" and the "Hickenlooper amendment," was enacted in response to the Supreme Court's decision in *Sabbatino*. *See West v. Multibanco Comermex, S.A.*, 807 F.2d 820, 829 (9th Cir.), *cert. denied*, 482 U.S. 906, 107 S.Ct. 2483, 96 L.Ed.2d 375 (1987). Despite its "constitutional underpinnings," the power of Congress to limit the act of state doctrine has been upheld by virtue of its peculiarly prudential character. *See id.* at 829 n. 8; *Banco Nacional de Cuba v. Farr*, 383 F.2d 166, 178–83 (2d Cir.), *cert. denied*, 390 U.S. 956, 88 S.Ct. 1038, 19 L.Ed.2d 1151 (1967). Under international law, "[v]alid expropriations must always serve a public purpose[.]" *West*, 807 F.2d at 831.

In the present case, Ferdinand's expropriation of the Yamashita treasure and Roxas's attendant detention and torture were shown to have been carried out for Ferdinand's personal benefit and were therefore violative of international law. That being so, we hold that the act of state doctrine is no bar to the plaintiffs-appellees' claims for relief.

D. *Because He Had Already Been Deposed When The Present Lawsuit Was Filed, Ferdinand Was Not Protected By "Head Of State" Immunity.*

 Imelda asserts that Ferdinand was immune from suit in Hawai'i by virtue of the "head of state" doctrine.

---

**28.** 22 U.S.C. § 2370(e)(2) provides:

Notwithstanding any other provision of law, no court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other right to property is asserted by any party including a foreign state (or a party claiming through such a state) based upon (or traced through) a confiscation or other taking after January 1, 1959, by an act of that state in violation of the principles of international law, including the principles of compensation and the other standards set out in this subsection: *Provided,* That

this subparagraph shall not be applicable (1) in any case in which an act of a foreign state is not contrary to international law or with respect to a claim of title or other right to property acquired pursuant to an irrevocable letter of credit of not more than 180 days duration issued in good faith prior to the time of confiscation or other taking, or (2) in any case with respect to which the President determines that application of the act of state doctrine is required in that particular case by the foreign policy interests of the United States and a suggestion to this effect is filed on his behalf in that case with the court.

(Emphasis in original.)

Grounded in customary international law, the doctrine of head of state immunity provides that a head of state is not subject to the jurisdiction of foreign courts, at least as to official acts taken during the ruler's term of office. The rationale behind the doctrine is to promote international comity and respect among sovereign nations by ensuring that leaders are free to perform their governmental duties without being subject to detention, arrest, or embarrassment in a foreign country's legal system.

*Noriega,* 746 F.Supp. at 1519 (citations and footnote omitted). Imelda asserts that head of state immunity applies equally to former heads of state, citing *Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982) (holding that the United States president has absolute immunity for acts within the 'outer perimeter' of his official responsibility), and *Hatch v. Baez,* 7 Hun. 596, 600 (N.Y.1876) (holding that former heads of state retain their immunity).

 *Nixon* is clearly inapposite to the instant matter because the immunity discussed in that case derived from the constitutional role of the president of the United States within the construct of separation of powers. *See Nixon,* 457 U.S. at 753, 102 S.Ct. 2690. It is worth noting that the United States Court of Appeals for the Ninth Circuit has rejected a similar attempt by Marcos, in connection with a contempt citation entered against him in a federal lawsuit, to claim protection by analogy to federal presidential immunity:

> Marcos' reliance upon [presidential immunity] is misplaced. His status is hardly comparable to that of a President of the United States. Although Marcos originally was granted immunity from liability in this case as a head of state, he is now an alien with no official status who has chosen to take up his residence in this country.

*Estate of Domingo v. Republic of the Philippines,* 808 F.2d 1349, 1351 (9th Cir.1987) (*Domingo I* ).[29]

The United States District Court for the Western District of Washington relied in part on the foregoing characterization to reject Ferdinand's assertion of head of state immunity, ruling that "[h]ead of state immunity serves to safeguard the relations among federal governments and their leaders, not[,] as the Marcoses assert, to protect former heads of state regardless of their lack of status." *Estate of Domingo v. Republic of the Philippines,* 694 F.Supp. 782, 786 (W.D.Wash.1988), *appeal dismissed,* 895 F.2d 1416 (9th Cir.1990) (*Domingo II* ).

In any case, other than the nineteenth century New York decision cited by Imelda, we have found no other authority that applies head of state immunity to *former* heads of state. Modern authority is to the contrary. As the plaintiffs-appellees have observed, Ferdinand has repeatedly and unsuccessfully claimed head of state immunity in various lawsuits around the country. *See, e.g., Domingo II,* 694 F.Supp. at 786; *In re Mr. and Mrs. Doe,* 860 F.2d 40, 45 (2d Cir.1988) (holding that any immunity had been waived by the Republic, but noting that "were we to reach the merits of the [head of state immunity] issue, we believe there is respectable authority for denying head-of-state immunity to a former head of state"); *Republic II,* 806 F.2d at 360 (also failing to reach the issue directly, but noting that the court was "not at all certain" that head of state immunity applied to former heads of state).

Accordingly, we hold that Ferdinand is not protected by head of state immunity.

E. *Ferdinand Was Subject To The Personal Jurisdiction Of The Circuit Court.*

Imelda maintains that it was improper for the circuit court to exercise personal jurisdiction over Ferdinand because: (1) the events upon which the plaintiffs-appellees' claims were based occurred exclusively in the Philippines; (2) Roxas was a citizen and resident of the Philippines; (3) Ferdinand was a citizen and resident of the Philippines; (4) Fer-

---

**29.** We have denominated this case as *Domingo I* because it appears to be both related, and chronologically antecedent, to the opinion of the United States District Court for the Western Dis-

trict of Washington in *Estate of Domingo v. Republic of the Philippines,* 694 F.Supp. 782, 786 (W.D.Wash.1988), *appeal dismissed,* 895 F.2d 1416 (9th Cir.1990), *see infra.*

dinand's presence in Hawai'i was due to his involuntary exile from the Philippines, which was caused by a "unilateral act of the United States government—an act tantamount to kidnapping"; (5) Ferdinand never intended to become a permanent resident of Hawai'i, but, rather, intended to return to the Philippines; and (6) Ferdinand transacted no business, committed no tortious act, caused no injury, and owned no real estate in Hawai'i.

■ The plaintiffs-appellees respond that the issue of personal jurisdiction is precluded by the doctrine of collateral estoppel, in light of a purported ruling of the United States District Court for the District of Hawai'i, which they cite as *Republic of the Philippines v. Marcos,* 1986 U.S. Dist. LEXIS 22542. However, the plaintiffs-appellees failed to provide a certified copy of this apparently unpublished opinion. Accordingly, they have failed to offer proof of the prior adjudication of the issue.

■ In any event, Imelda's arguments regarding personal jurisdiction fail because the Marcoses waived the issue at the outset of the lawsuit. Their first responsive pleading in this case was a motion to dismiss the complaint, accompanied by a motion for a more definite statement, both filed on January 20, 1989. Their motion to dismiss alleged several defects in the complaint, including insufficiency of service, but did not allege that the circuit court generally lacked personal jurisdiction over Marcos. HRCP Rule 12(g) (1996) provides that

[a] party who makes a motion under this rule may join with it any other motions herein provided for and then available to him. If a party makes a motion under this rule but omits therefrom any defense or objection then available to him which this rule permits to be raised by motion, he shall not thereafter make a motion based on the defense or objection so omitted, except a motion as provided in subsection (h)(2) hereof on any of the grounds there stated.

HRCP Rule 12(h)(1) (1996) provides that

*[a] defense of lack of jurisdiction over the person,* improper venue, or insufficiency of service of process *is waived (A) if*

*omitted from a motion in the circumstances described in subdivision (g),* or (B) if it is neither made by motion under this rule nor included in a responsive pleading or an amendment thereof permitted by Rule 15(a) to be made as a matter of course.

(Emphases added.)

We therefore hold, notwithstanding that the defense of lack of personal jurisdiction was asserted in the Marcoses' answer to the plaintiffs-appellees' complaint, that the Marcoses' failure to assert it in their motion to dismiss constitutes a waiver of the issue pursuant to HRCP Rule 12(g) and (h).

Even if the issue had not been waived, Imelda's argument would fail. In order to exercise personal jurisdiction over a defendant,

[d]ue process requires that a nonresident defendant have sufficient "minimum contacts" with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958)). The determining inquiry is whether "'the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" *Id.* at 474, 105 S.Ct. at 2183 (quoting *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980)). There is no "talismanic jurisdictional formula" and the court weighs each case on its facts. *Id.* at 485–86, 105 S.Ct. at 2189 (citation omitted).

*In re John Doe, Born on August 6, 1987,* 83 Hawai'i 367, 373, 926 P.2d 1290, 1296 (1996) (quoting *Shaw v. North Am. Title Co.,* 76

Hawai'i 323, 329–30, 876 P.2d 1291, 1297–98 (1994)).

It is undisputed that Ferdinand lived in Hawai'i from February 25, 1986 until his death on September 29, 1989. Although Imelda alleges that Ferdinand was involuntarily removed from the Philippines and desired to return there, she does not allege that he was somehow imprisoned in Hawai'i. In other words, there is nothing in the record suggesting that, had he wished, Ferdinand could not have moved somewhere else. Nothing requires that a person establish Hawai'i as a *domicile* (*i.e.,* move here with the present intention of remaining indefinitely) in order to purposefully avail himself of this forum. *Cf. Estate of Marcos,* 88 Hawai'i at 154–55, 963 P.2d at 1130–31 (holding that the Hawai'i circuit court had no jurisdiction *over the probate* of Ferdinand's estate, inasmuch as *probate* jurisdiction is limited by statute to decedents formerly *domiciled* in the state). Pursuant to Imelda's logic, a person could move to Hawai'i and live here for an indeterminate period of time, so long as he or she never formed the intent to remain indefinitely, without ever becoming subject to personal jurisdiction in this state. This would be absurd.

Ferdinand's three-year and seven-month sojourn in Hawai'i was neither fleeting nor involuntary. Accordingly, he "availed himself" sufficiently of the forum to be amenable to suit in this jurisdiction.

F. *The Circuit Court Did Not Err In Its Preliminary Determination That The Plaintiffs–Appellees Had Established The Existence Of Conspiracies Involving Ferdinand and Numerous Others—The Objects Of Which Were To Deprive Roxas Of His Discovered Treasure, Arrest And Torture Him, And Then Launder And Dispose Of The Treasure—As The Evidentiary Basis For The Admission Of The Out–Of–Court Statements Of A Number Of Ferdinand's Subordinates.*

Imelda contends that the circuit court erred in its preliminary determination, made pursuant to HRE Rules 104(a) and 803(a)(2)(c), *see supra* note 1, that the Mar-

coses were members of conspiracies to take and dispose of Roxas's property, as well as to arrest, detain, and torture Roxas. She complains that the circuit court's ruling opened the door to a "tremendous amount of hearsay testimony," so great that she was unable to designate each instance in her brief. Imelda did, however, expressly identify the following "blatant and prejudicial" examples:

Oihara's statements, as claimed by Roxas[,] that "his [Oihara's] address [was that] of Dona Josefa Edralin Marcos" and "he [Oihara] is staying at the house of Dona Josefa." . . .

Judge Marcos' statements, as claimed by Roxas, "He said we cannot do nothing because the prince—the prince in Tagalog is principe. That's prince in English. Principe ordered the confiscation of the buddha" and in response to counsel's question as to who was the prince, "He said the President. He said President Marcos." . . .

Statements made by Anita Inga and Rosario Uy, as claimed by Roxas in response to his question inquiring on whose behalf they are negotiating, "who according to them, the name is Dona Josefa Edralin Marcos. That is the—that is the—told me that words and they even give me a phone number of that Dona Josefa." . . . . "Next, we receive a long distance from Rosario Uy telling me that I'm not afraid because President Marcos is the one will pay—will pay me.". . . . "That I'm not afraid because the President will—is the one who will pay me." . . .

The statement allegedly made by the men who arrested him in Cabantuan City on or about May 18, 1971, as claimed by Roxas, "They told me to go with them to make a negotiation to the President." "You follow me, according to them. Don't be afraid. We are under Malacanang—you know, we are under Malacanang agent. We can make a negotiation to the President, and nothing more.". . . . "They said that they are from Malacanang, and I believe them because they have a gun." . . .

Statements allegedly made by Colonel Olivas, as claimed by Roxas, in

response to Roxas' inquiry as to why he is being punched in the stomach, "You're mentioning the name of the President, according to him." .... Further, the statement of another unidentified person present at the time of the above statement, "We must report to the President that Rogelio Roxas is in our custody." ...

■ Further statements allegedly made by Colonel Olivas while he was talking on the telephone, as claimed by Roxas, "I want to talk to boss—to the boss. And then maybe the other side said the boss is sick, you know. He is not doing well. He said—he said to the boss that Rogelio Roxas—we captured this Rogelio Roxas. And then after a few second, there is a—he said Mr. President, yes. Maybe something like that. Mr. President, we captured Rogelio Roxas." ...

■ Statements allegedly made by two men who visited Roxas in his shop in December 1974, as claimed by Roxas, "As I understand, they are belong to those groups who are digging at the back of the hospital. The military. They are belong to the Task Force Restoration." .... "They address is Malacanang Palace, is Malacanang." "First we only talking about tunnel, about my experience. And after several visit in my house—in my shop, I mean, I'm sorry—they reveal that they belong to the excavation in the back of the hospital. And they ask me if I can help them because I have a lot of past experience about the diggings." ...

■ Statements allegedly made by Doming Clemente during the 1983 gold negotiations, as claimed by John Doel[:] "He at all times and immediately confirmed and referred to as 'these items belonged to code one.' We talked frequently in codes. It was a stipulation and instruction that Doming said was established by the palace." "He identified code one as the President." "The owner of the gold, as advised and confirmed frequently, was code one, President Ferdinand Marcos." "Clemente always arrived with the reference, 'I have received instructions. I

have received instructions from the palace. I have just come from the palace." "Occasionally, he confirmed that his instructions came directly from the President." .... "He frequently stated that the items, these items, these pieces were stored in Baguio, Baguio City. He said these were—These items were war booty items. They had been buried in tunnels behind the hospital in Baguio City. ... Doel further testified Clemente offered to sell him a "one tonne" buddha from "Baguio" on "account of the principal, code one."

Imelda further argues that there was no evidence of conspiracy among Ferdinand and Oihara, Uy, Igna, Clemente, the various individuals who arrested Roxas in Cabantuan City, and Judge Pio Marcos.

In this connection, Imelda urges that we adopt the rule of the United States Court of Appeals for the Ninth Circuit, interpreting of Federal Rules of Evidence Rule (FRE) 801(d)(2)(E) [30] that "a co-conspirator's out-of-court statement, standing alone, is insufficient to establish that the defendant had knowledge of and participated in a particular conspiracy." *United States v. Silverman,* 861 F.2d 571, 577 (9th Cir.1988). The *Silverman* court tempered its rule as follows:

[W]hen the proponent of the co-conspirator's statement offers no additional proof of defendant's knowledge of and participation in the conspiracy, the statement must be excluded from evidence. Where, on the other hand, some additional proof is offered, the court must determine whether such proof, viewed in light of the co-conspirator's statement itself, demonstrates by a preponderance of the evidence that defendant knew of and participated in the conspiracy.

*Id.* at 578 (emphasis in original).

■ Even if this court were to adopt the *Silverman* rule for its analysis of HRE Rule 803(a)(2)(C), the requirements of the rule would be satisfied in the present case. As the plaintiffs-appellees pointed out to the circuit court, a number of witnesses, including

**30.** FRE Rule 801(d)(2)(E) provides in pertinent part that "[a] statement is not hearsay if ... [t]he statement is offered against a party and is ... a

statement by a co-conspirator of a party during the course and in furtherance of the conspiracy."

Curtis, Jonsson, and Doel, testified that they had personally seen a golden buddha statue, as well as rooms full of gold bars, in locations controlled by Ferdinand, including his own office and summer home. Ferdinand's personal possession of the fruits of the alleged conspiracy to convert Roxas's property is strong evidence of Ferdinand's involvement. Moreover, Ferdinand's witnessed possession of large amounts of gold, combined with the testimony of Curtis, O'Brien, Doel, and Dacus that at least some of the gold was resmelted and surreptitiously sold, constitutes sufficient corroboration of the testimony that Ferdinand was attempting to launder and fraudulently convey Roxas's gold. Placing the testimony of percipient witnesses in the context of the many statements of the alleged conspirators that implicated Ferdinand, the *Silverman* anti-bootstrapping rule is satisfied.

Imelda also makes arguments with regard to individual co-conspirators. First, she challenges the sufficiency of the evidence regarding a conspiracy between Oihara and Ferdinand. However, Roxas's deposition testimony indicated that Oihara represented that he was sojourning at Ferdinand's mother's home and that he had accompanied the raiding party on Roxas's home when the buddha had been taken. The foregoing, in conjunction with the evidence that Ferdinand had possession of a similar buddha at a later time, constituted a sufficient basis for the circuit court's ruling.

Second, Imelda argues that only their own statements tie Uy, Igna, Clemente, and the persons who arrested Roxas to Ferdinand. Once again, however, the fact that Ferdinand had possession of the buddha and gold bullion corroborates the statements of these individuals that they were attempting to collect the gold for Ferdinand.

Finally, Imelda argues that there was no evidence of "any meeting, understanding, agreement, or communication between Judge Pio Marcos and former President Marcos that would support the existence of an unlawful conspiracy between them." This argument ignores the testimony of Roxas to the effect that Judge Marcos told him that he, Judge Marcos, had issued a search warrant on Ferdinand's order, and that Roxas's life would be in danger if Roxas pursued his claim for return of the buddha. Obviously, Ferdinand's order to Judge Marcos was "a communication," and because the search warrant was not issued in accordance with Philippine law, the circuit court could legitimately determine that a conspiracy existed between the two to perpetrate an illegal confiscation of Roxas's property. Thus, Imelda's argument must fail.

On balance, we hold that the plaintiffs-appellees' proffer to the circuit court was sufficient to justify its preliminary determination of the existence of conspiracies, and this court cannot hold that it was clearly erroneous.

G. *There Was Sufficient Evidence To Support The Jury's Special Finding That Ferdinand Converted The Treasure That Roxas Found.*

■ Imelda argues that there was insufficient evidence to support the jury's special finding that Ferdinand converted the golden buddha and the rest of the treasure found by Roxas. She reasons that: (1) there was no evidence to show that the search warrant displayed by the raiding party was not valid; and (2) Roxas failed adequately to "occupy" the treasure remaining in the tunnels after dynamiting the entrance closed and, therefore, had no further right of possession.

1. *There was sufficient evidence that the raid on Roxas's home was illegal.*

As noted, Imelda contends that there was no evidence to support the jury's special finding that Roxas's property was taken pursuant to an invalid search warrant under Philippine law. The jury was instructed in accordance with Imelda's Proposed Instruction No. 29, which stated that,

[i]f the golden Buddha and other property was withheld from Roxas pursuant to a valid search warrant, the Golden Budha Corporation cannot recover on its conversion claim. A search warrant is valid if the following requisites exist:

(1) It must be issued upon probable cause.

(2) The probable cause must be personally determined by the judge.

(3) The judge must examine under oath or affirmation the complainant and the witnesses he may produce.... The judge must, before issuing the warrant, personally examine in the form of searching questions and answers[ ] in writing and under oath the complainant and any witnesses he may produce on facts personally known to them and attach to the record their sworn statements together with any affidavit submitted....

(4) The warrant must describe with particularity the place to be searched and the person or things to be seized.

(5) The warrant must be in connection with one specific offense.

Proposed Instruction No. 29 was based on a summary of the applicable Philippine law, as set forth in an affidavit of Renato Dilag, a Philippine lawyer, which Imelda had proffered.

Because the search warrant was never produced at trial, it is difficult to assess whether all of the foregoing prerequisites were satisfied. However, the jury could reasonably have inferred that the seizure of the golden buddha and other items was unlawful based on the following evidence: (1) Roxas's testimony that Judge Pio Marcos had represented to him that he, Judge Marcos, had issued the warrant on Ferdinand's personal order, rather than on his own, independent analysis of the presence or absence of probable cause; (2) Roxas's testimony that he had been coerced into identifying a false buddha that had been placed in the custody of the clerk of court; and (3) the testimony of Jonsson and Curtis that they had observed Ferdinand in possession of a golden buddha. These facts, taken as true, support an inference that the raid on Roxas's home did not constitute a legitimate governmental seizure of evidence, but was rather a wrongful appropriation of Roxas's property orchestrated by Ferdinand himself. Accordingly, the circuit court did not err in denying Imelda's motion for a directed verdict, allowing the question to go to the jury, and denying Imelda's motion for JNOV or for new trial.

2. *There was sufficient evidence to support the jury's determination that Roxas "found" the treasure pursuant to Philippine law.*

■ Imelda cites a number of federal cases addressing the maritime laws of finds and salvage to support her contention that, because Roxas's actions with regard to the treasure he left in the tunnels failed to alert others of his claim to possession, he failed to "occupy" it and, therefore, lost his rights to it. *See, e.g., Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel,* 640 F.2d 560 (5th Cir.1981); *Cobb Coin Co., Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel,* 525 F.Supp. 186 (S.D.Fla.1981); *Moyer v. Wrecked and Abandoned Vessel, Known as the Andrea Doria,* 836 F.Supp. 1099 (D.N.J.1993); *Bemis v. R.M.S. Lusitania,* 884 F.Supp. 1042 (E.D.Va. 1995), *aff'd,* 99 F.3d 1129 (4th Cir.1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 1558, 140 L.Ed.2d 791 (1998). However, as discussed *supra* note 16, Philippine law, not American maritime law, governs this case, and it was the responsibility of the parties to apprise the court of the relevant Philippine law.

■ With regard to "possession" under Philippine law, the circuit court instructed the jury, pursuant to Philippine Civil Code § 438, as follows:

To recover on its claim for conversion, plaintiff must prove that Roger Roxas had a right under Philippine law to possess whatever treasure he found.

In this regard you are instructed that[,] under Philippine law[,] hidden treasure belongs to the owner of the land on which it is found. Nevertheless, when the discovery is made on the land of another, or of the government, or any of its subdivisions, the finder is entitled to one-half of the treasure so long as the discovery was by chance or by good luck.

You are further instructed that if the finder is a trespasser, he shall not be entitled to any share of the treasure.

The foregoing instruction was a slightly modified version [31] of Imelda's Proposed Instruction No. 37. Imelda did not propose any instructions regarding "occupancy" as an element of possession under Philippine law, nor did she ever suggest to the circuit court that her instruction failed to completely define "possession" for purposes of Philippine law. Inasmuch as Imelda failed to advise the circuit court of any additional elements of possession pursuant to Philippine law, she cannot now complain that the circuit court gave and the jury followed her own proposed instruction.[32]

We hold that Roxas's deposition testimony contained sufficient evidence to support the jury's finding that he "found" the treasure "by chance or by luck." Accordingly, there was sufficient evidence to support the jury's verdict concerning Ferdinand's liability for conversion.

**31.** The circuit court removed a sentence originally included in the proposed instruction, which stated: " 'By chance' means that there must be no purpose or intent to look for the treasure." The circuit court also added the phrase "or by luck" to the end of the third sentence of the instruction. While these modifications were significant, they had nothing to do with the constructs of "occupancy" or constructive "possession." Imelda has not raised the circuit court's modification of her proposed instruction as a point of error on appeal.

**32.** With respect to a plainly erroneous jury instruction given in a criminal case, we are aware that

> it is of no consequence that the trial court gave the ... instruction at [the defendant's] request. This is because
>
> > the trial court is the sole source of all definitions and statements of law applicable to an issue to be resolved by the jury. Moreover, it is the duty of the circuit court to see to it that the case goes to the [jurors] in a clear and intelligent manner, so that they may have a clear and correct understanding of what it is that they are to decide, and [the trial court] shall state to them fully the law applicable to the facts. And faced with inaccurate or incomplete instructions, the trial court has a duty to, with the aid of counsel, either correct the defective instructions or to otherwise incorporate it into its own instructions. In other words, the ultimate responsibility properly to instruct the jury lies with the circuit court and not with trial counsel.
>
> *State v. Kupau*, 76 Hawai'i 387, 394–95, 879 P.2d 492, 499–500 (1994) (citations, footnotes,

### H. There Was Sufficient Evidence To Support The Jury's Special Finding That Ferdinand Caused Roxas To Be Falsely Imprisoned.

Imelda argues that Roxas failed to prove that his detention and imprisonment were unlawful, inasmuch as he was tried and convicted by the Baguio City Regional Trial court on firearms charges. However, Roxas's uncontroverted testimony was that he was first detained on May 18, 1971 by military personnel, who interrogated him about the Yamashita treasure and also subjected him to torture. This detention obviously had nothing to do with any weapons charge. The jury could reasonably have based its finding that Ferdinand falsely imprisoned Roxas based on the foregoing testimony alone. Accordingly, Imelda's argument is without merit.

> internal quotation marks, brackets, and emphasis omitted).

*State v. Loa*, 83 Hawai'i 335, 358, 926 P.2d 1258, 1281 (1996).

Civil cases, on the other hand, are governed by the HRCP. HRCP Rule 51(e) (1996) provides in relevant part that "[n]o party may assign as error the giving or the refusal to give, or the modification of, an instruction

... unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." Nevertheless, "even the complete failure to object to a jury instruction does not prevent an appellate court from taking cognizance of the trial court's error if the error is plain and may result in a miscarriage of justice." *Montalvo v. Lapez*, 77 Hawai'i 282, 288, 884 P.2d 345, 351, *reconsideration denied*, 77 Hawai'i 489, 889 P.2d 66 (1994) (citations and internal quotation marks omitted). This too is because, "[o]nce all the evidence has been presented, it becomes the court's fundamental duty to properly instruct the jury on the law on the precise issues of fact it is to decide." *Id.* at 291, 884 P.2d at 354 (footnote omitted).

In the present case, Imelda has made no showing that her Proposed Instruction No. 37 was plainly erroneous, and we have no reason to believe that it was. In any event, where the law of a foreign nation, which is not readily ascertainable by and accessible to the trial court, is outcome-dispositive of an issue central to a civil proceeding conducted in the circuit courts of this jurisdiction, the responsibility of the parties to assist the court in ferreting out the correct governing legal principles is particularly heightened. *See supra* note 16.

## I. There Was Insufficient Evidence To Support The Jury's Damage Award Pertaining To The Value Of The Gold Bars Allegedly Contained In The Unopened Boxes Found Near The Golden Buddha.

Imelda next contends that there was insufficient evidence to support the jury's award of $22,000,000,000.00, representing the supposed value of the boxes of gold purportedly found by Roxas in the Baguio City tunnel. In the Philippines,

> [t]he damages recoverable in any case must be susceptible of ascertainment with a reasonable degree of certainty or, as the rule is sometimes stated, must be certain both in their nature and in respect to the cause from which they proceed. Therefore, uncertain, contingent, or speculative damages cannot be recovered, either in actions *ex contractu*, or in actions *ex delicto*.

*Choa Tek Hee v. Philippine Publishing Co.*, 34 Phil. 447, 456 (1916) (citation and internal quotation marks omitted) (holding that insufficient proof of lost profits had been introduced to support damages in a libel action). *See also Heredia v. Salinas*, 10 Phil. 157, 162–63 (1908) (holding that alleged losses due to an attorney's flawed representation were too speculative to support a damage award).[33]

Imelda complains that Roxas never observed the contents of more than one of the boxes he found and that Ocubo testified that, when he looked inside the boxes during World War II, they had contained *both* gold and silver coins. Moreover, she asserts that there was insufficient evidence to link the rooms full of gold allegedly observed by Curtis, Jonsson, Dacus, and O'Brien with Roxas's discovery in the Baguio City tunnel. In this connection, she notes that Curtis testified that Ferdinand had represented to him that there were 172 Yamashita treasure sites from which he had extracted gold; thus, Imelda asserts that "the gold [that Curtis] and Jo[nsson] allegedly saw could have come from any of those sites." However, Doel testified that Clemente had told him that the tens of thousands of metric tons of gold he had been asked to sell on Ferdinand's behalf were "war booty ... [that] had been buried in tunnels behind the hospital at Baguio City."[34]

 It is well established that "[t]he [finder of fact] may accept or reject any witness' testimony in whole or in part." *State v. Clark*, 83 Hawai'i 289, 303–04, 926 P.2d 194, 208–09 (1996) (quoting *State v. Eastman*, 81 Hawai'i 131, 139, 913 P.2d 57, 65 (1996)) (some brackets in original and some added). The jury was free to credit Curtis's testimony that he had personally observed a room full of gold bars, but to reject his testimony as to its origin. Furthermore, the Quijons and Roxas testified that men appearing to be Ferdinand's soldiers had unearthed boxes where Roxas alleged that he discovered the gold and that at least some of the boxes were confirmed to have contained gold bars. A reasonable jury could have inferred from the totality of this evidence that: (1) the gold to which Clemente referred in his conversation with Doel was the same gold as that viewed by Curtis, Jonsson, Dacus, or O'Brien, or by all four of them at different times and in different locations; and (2) Clemente's admission signified

---

33. As it happens, Hawai'i law is in accord. *See, e.g., Tabieros*, 85 Hawai'i at 391, 944 P.2d at 1334 ("[A]ssumptions [relating to damages and] based on mere speculation that are foundational to an expert's opinion testimony render the latter inadmissible as untrustworthy, *i.e.*, as unreliable." (Citation and internal quotation marks omitted).); *Weinberg v. Mauch*, 78 Hawai'i 40, 50, 890 P.2d 277, 287 ("[I]t is of the essence in an action ... that the plaintiff suffer damages as a consequence of the defendant's conduct, and these damages cannot be speculative or conjectural losses." (Citation and internal quotation marks omitted).), *reconsideration denied*, 78 Hawai'i 421, 895 P.2d 172 (1995); *Chung v. Kaonohi Center Co.*, 62 Haw. 594, 612, 618 P.2d 283, 294–95 (1980) (approving an instruction that advised the jury that it was "not permitted to award a party speculative damages, which means compensation for loss or harm, which, although possible, is conjectural or not reasonably certain"); *McLellan v. Atchison Ins. Agency, Inc.*, 81 Hawai'i 62, 66, 912 P.2d 559, 563 (1996) ("Actual [losses or] damages are those that are real and substantial as opposed to speculative." (Citations and internal quotation marks omitted.) (Brackets in original.)).

34. Imelda's objection to the use of this testimony as hearsay is addressed *supra* in section III.F.

that all of the gold being laundered had been found in the tunnels that Roxas had discovered. Accordingly, regardless of whatever else was contained in the boxes when Roxas discovered them, there was substantial circumstantial evidence to support the jury's implicit finding that the gold in the Marcoses' possession, viewed by one or all of the foregoing percipient witnesses, had previously been contained in those same boxes.

 Imelda makes a more persuasive argument, however, with regard to the plaintiffs-appellees' evidence concerning the *quantity* and *value* of the gold observed by the percipient witnesses in the present case. The plaintiffs-appellees exhorted the jury to derive the value of the converted gold bullion based solely on the estimates of the ratio of the weight of gold to its volume, as offered by their expert, Nelson Colton, who premised his opinions on his reading of the deposition testimony of Curtis, Jonsson, Dacus, and O'Brien. The reported observations of these witnesses were extremely vague. For example, Jonsson testified that the room he had seen was "*[m]aybe* 40 feet by 20, *something like that*" (emphases added), and that he "believed" that the ceiling was twelve feet tall, "[m]aybe more. *I don't remember.*" (Emphasis added.) Later in his testimony, Jonsson opined that the room was "[m]aybe 42 feet or something.... Forty-five ... 45 by 25, *something like that.*" (Emphasis added.) He further testified that there had been a passageway "as wide as a person's body," which ran the length of the room. Similarly, Curtis described the room he had observed as "*roughly* 40 by 40" with a ceiling that was "*at least* ten-foot high." (Emphases added.) There were "*at least* two, *possibly* three aisles," which were "*not more than* four or five feet" wide, amidst the piles of gold which were "stacked *almost* to the top." (Emphases added.) For his part, O'Brien testified that he had been taken to a warehouse, in which he had observed a stack of "three to four hundred" boxes, only one of which he opened to find "crudely smelted" gold bars, which were "pitted ... like an orange peel." Finally, Dacus testified that he had observed gold stacked in a vault at the central bank, which he estimated to be "*about* a hundred cubic feet." (Emphasis added.) Dacus made

a similar estimate, without explaining his rationale, regarding the "300 to 500 metric tons of gold," which he testified that he had seen in Ilocas Norte.

While we acknowledge that it may be unreasonable to expect a passing eyewitness to be capable of quantifying the weight of an entire roomful of gold bars with mathematical precision, the fact remains that the foregoing witnesses' estimates afforded the jury no legitimate basis for determining damages. The range, for example, between O'Brien's estimate of 300 to 400 boxes of gold yields an enormous difference in value. Moreover, O'Brien testified that he actually opened only one box, which was not filled with gold, but only contained three bars. Similarly, Jonsson's vacillation among his various estimates of the dimensions of the room in which he had observed gold generates a margin of error comprising thousands of tons.

More importantly, none of the plaintiffs-appellees' witnesses could or did testify as to the degree of purity of the gold they had allegedly observed. As Colton testified, gold is stored and traded in widely varying degrees of purity—a variable that, of course, markedly affects the value of any particular quantity. Colton could not have known or reliably estimated the purity of the gold bullion observed by Curtis, Jonsson, Dacus, and O'Brien, inasmuch as none of these witnesses provided any reliable guidance on the question. Accordingly, his estimates of the gold's total value constituted little more than a guess.

Turning to the "handsful" of diamonds that Roxas had allegedly found secreted in the head of the golden buddha, counsel for the plaintiffs-appellees candidly admitted to the jury in his closing argument that he could not point to any evidence to establish their value: "How many diamonds were there? I don't know. What carat or weight were these diamonds? I don't know. How good were these diamonds? Were they blue whites? Were they the best, the wors[t]? We have no way of proving that to you." Accordingly, he counseled the jury to award GBC nothing with respect to these items: "I can't ask you to guess or speculate. And so

[GBC] can't recover anything for diamonds." Unfortunately for GBC, the same reasoning and result must also apply to the boxes of gold bullion.

■ By contrast, Roxas testified that he had estimated both the weight and size of the golden buddha statue based on the work of his laborers in removing it from the tunnels. The plaintiffs-appellees also introduced photographs showing the size and design of the statue. Furthermore, Roxas testified as to the results of two chemical analyses performed by potential purchasers of the statue, both of which determined the statue to be of a purity over twenty carats, and one of which allegedly determined that the gold in the statue was twenty-two carats. Accordingly, there was a reasonable basis for the jury to make a determination that the statue was composed of virtually pure gold and, as of the date of conversion, was worth $1,300,000.00,[35] in accordance with Colton's testimony.

Accordingly, we hold that the circuit court erred in failing to grant Imelda's motion for a directed verdict with respect to the damage award for the gold bullion allegedly contained in the unopened boxes that Roxas discovered. With respect to the remainder of the damage award, however, *see infra* sections III.L and III.M.

J. *The Circuit Court Rightly Refused To Give Preclusive Effect To The Baguio City Regional Trial Court's Decision.*

Borrowing an argument from the plaintiffs-appellees, Imelda herself invokes the doctrine of collateral estoppel in relation to her motion for partial summary judgment. She urges that: (1) Roxas entered an appearance in a Baguio City court proceeding regarding the golden buddha statue by way of a letter of his attorney, Daniel Cathcart; and (2) the Baguio City Regional Trial

Court's decision definitively settled the issue of the buddha's metallurgical composition.

■ The Hawai'i appellate courts have apparently never addressed the question whether the judgments of foreign countries will be recognized for purposes of collateral estoppel.[36] It is unnecessary to answer the question in the instant case, however, because, assuming the potential for collateral estoppel, the necessary prerequisites are not met by the Baguio City Regional Trial Court's order in any event.

■ As noted *supra*, in section III.A.1, collateral estoppel bars relitigation of an issue when the following conditions coalesce: (1) identity of issues; (2) a *final* adjudication on the merits; and (3) involvement *as a party* in the prior lawsuit of the person, or the person's privies, against whom it is asserted. *SHOPO*, 83 Hawai'i at 400, 927 P.2d at 408. First, the issue before the Philippine court, as that court articulated it, was who had the better claim to the buddha statue in the court's custody. The court's pronouncements that the statue was not composed of gold and that a golden buddha had never existed were not essential to the resolution of the issue before it. Second, there is no indication in the record that the document denominated an "Order," generated by the Baguio City Regional Trial Court, constituted a final judgment. Finally, and most crucially, the Roxas Estate was not involved as a party, either directly or through a proxy, in the Baguio City proceedings. In her argument to the circuit court, Imelda suggested that, under Philippine law, Cathcart's letter to the Baguio City Regional Trial Court constituted an "appearance" in that case. However, she cited no authority for this dubious proposition. *Cf. Bush*, 81 Hawai'i at 480–81, 918 P.2d at 1136–37 (holding that the filing of

**35.** We note that Imelda does not appear to have directly challenged the statute's value in her appellate briefing.

**36.** In 1996, the Hawai'i legislature passed the Uniform Foreign Money-Judgments Recognition Act, HRS ch. 658C.1996 Haw. Sess. L. Act 49, § 1–3 at 69–71. This legislation mandates the recognition of foreign judgments under certain conditions. It is not directly applicable in the present case, however, because, by its own terms, Act 49 relates only to "judgment[s] of a foreign state granting or denying recovery of a sum of money[.]" HRS § 658C–2 (Supp.1997). The Act does not preclude recognition of other types of judgments through the doctrine of comity. *See* HRS § 658C–8 (Supp.1997) ("This chapter shall not prevent the recognition of a foreign judgment in situations not covered by this chapter.")

an amicus brief in a former proceeding, which resulted in an adverse decision, was insufficient to support the application of collateral estoppel because the amicus had no power to control the course of the former proceeding). Neither the Roxas Estate nor GBC was listed as a party to the Baguio City proceeding in any of the associated documents that Imelda submitted to the circuit court. Further, the Baguio City Regional Trial Court's order makes no mention of the plaintiffs-appellees' "involvement" through Cathcart.

Imelda's alternative contention in the circuit court that Alberto Umali represented the Roxas Estate in the Baguio City proceeding has no greater support in the record. The pleadings and documents proffered by Umali to the Baguio City Regional Trial Court all assert his own interest in the buddha, based on an alleged contract between Umali and Roxas in which Roxas agreed to share the proceeds of his discovery. Umali never claimed to represent the Roxas Estate, either in documents filed with the court or in the transcripts of the proceedings that were provided to the circuit court.

Moreover, it is clear from his testimony that Jose Roxas neither represented the plaintiffs-appellees nor their interests. Jose testified that he wished to immediately burn the buddha in order to protect the Marcoses and the Philippines from further "shame" emanating from Roxas's ongoing claims against the Marcoses. Clearly, Jose Roxas was not of one mind with Felix Dacanay, the personal representative of the Roxas Estate and the incorporator of GBC, who has pursued the instant lawsuit. It is true that two of Roxas's sons were present at the hearings, providing their implicit support to Jose's petition. However, Jose himself testified that Roxas had other children who were not present or involved, and Roxas's widow was apparently not involved. Therefore, all potential beneficiaries of the estate were not represented.

Accordingly, we hold that the circuit court did not err as a matter of law in declining to give preclusive effect, by way of collateral estoppel, to the "order" of the Baguio City Regional Trial Court.

K. *The Circuit Court's Ruling That The Plaintiffs-Appellees' Claims For Constructive Trust And Fraudulent Conveyance Were Precluded By The Jury's Special Finding That Imelda Did Not Convert Roxas's Property Was Erroneous With Respect To The Claim For Constructive Trust But Correct With Respect To The Claim For Fraudulent Conveyance.*

In their cross-appeal, the plaintiffs-appellees contend that the circuit court erred in entering judgment in favor of Imelda on GBC's claims for constructive trust and fraudulent conveyance against Imelda in her individual capacity. They argue that the circuit court erred in ruling, as a matter of law, that these claims were precluded by the jury's special finding that Imelda did not convert Roxas's property.

1. *Philippine law does not interpose conversion as a precondition to the creation of a constructive trust.*

As noted *supra* at note 16, Philippine law governs the plaintiffs-appellees' substantive claims for relief in this case. The plaintiffs-appellees cite to a decision of the Philippines Supreme Court, *Sumaoang v. Honorable Judge, Regional Trial Court, Branch XXXI, Guimba, Nueva Ecija*, 215 SCRA 136 (Phil.1992), in support of their argument that conversion is not a condition precedent to the creation of a constructive trust. In that case, an attorney who had successfully litigated a land title dispute sued his former clients when they failed to pay him for his services. *Id.* at 138–41. Although the trial court expressly ruled that the attorney was entitled to one-half of the value of the land, in accordance with the terms of the contingent fee agreement signed by the parties, it nevertheless (and apparently inadvertently) awarded the attorney a sum equivalent to the value of the entire plot of land. *Id.* at 141. The attorney filed a writ of execution on his judgment and was subsequently able to purchase the entire plot of land at a public auction. *Id.* at 142.

The Philippines Supreme Court held that the trial court's order was erroneous and

that the attorney was deemed to have title to one-half of the plot of land in constructive trust for the benefit of his former clients. *Id.* at 145–46. The *Sumaoang* court explained that, in the Philippines, "[i]f property is acquired through mistake or fraud, the person obtaining it is, by force of law, considered a trustee of an implied trust for the benefit of the person from whom the property comes." *Id.* at 145–46 (quoting Phil. Civ. Code § 1456). The Court clarified, however, that it was not necessary that the constructive trustee personally be found liable for fraud or mistake. Rather, "[t]he 'mistake' or 'fraud' that results in an implied trust being impressed upon the property involved[ ] may be the mistake or fraud of a *third person*, and need not be a mistake or fraud committed directly by the trustee himself under the implied trust." *Id.* (emphasis in original) (footnote omitted). Accordingly, the *Sumaoang* court ruled that "an implied trust was established upon the land acquired by [the attorney] even though the operative mistake was a mistake of respondent trial judge." *Id.*

In response, Imelda quotes from an annotation of Philippine trust law, which states that, "if a person obtains legal title to property by fraud or concealment, courts of equity will impress upon the title a so-called constructive trust in favor of the defrauded party." Pompeyo Rodolfo J. Cabrillas, *Annota-tion, Trust and Trust Relations*, 61 SCRA 309 (1974). Imelda also notes, as have the plaintiffs-appellees, that Philippine Civil Code § 1456 links "mistake or fraud" with the establishment of a constructive trust. Neither of the foregoing authorities, however, stands for the proposition that only the individual personally responsible for the mistake or fraud may be subject to the imposition of a constructive trust. In any case, the clear holding of *Sumaoang* as described above, undermines any such argument. Likewise, Imelda's citation to various American authorities on constructive trust is immaterial, inasmuch as the Philippines Supreme Court possesses the ultimate authority to determine Philippine law. *See In re Shoop*, 41 SCRA 213, 254–58 (Phil.1920) (noting that the Philippines has a mixed common law/civil law system and that the supreme court's opinions represent controlling precedent).

Alternatively, Imelda argues that GBC's claim of constructive trust against her necessarily failed by virtue of the jury's implicit finding that she had never had possession or dominion over any of Roxas's property when it expressly found that she had not converted it. In this connection, we note that the jury was instructed regarding the issue of conversion pursuant to the provisions of Philippine Revised Penal Code Article 315 (Article 315), which pertains to the crime of "estafa" or "swindling." [37] At trial, Imelda proffered the

---

**37.** Article 315 provides in relevant part:

Swindling (estafa).—Any person who shall defraud another by any of the means mentioned hereinbelow shall be punished ... provided that ... the fraud be committed by any of the following means:

1. With unfaithfulness or abuse of confidence, namely:

(a) By altering the substance, quantity, or quality of anything of value which the offender shall deliver by virtue of an obligation to do so, even though such obligation be based on an immoral or illegal consideration.

(b) By misappropriating or converting, to the prejudice of another, money, goods, or any other personal property received by the offender in trust or on commission, or for administration, or under any other obligation involving the duty to make the delivery of or to return the same, even though such obligation be totally or partially guaranteed by a bond; or by denying having received such money, goods, or other property.

(c) By taking undue advantage of the signature of the offended party in blank, and by writing any document above such signature in blank, to the prejudice of the offended party or any third person.

2. By means of any of the following false pretenses or fraudulent acts executed prior to or simultaneously with the commission of the fraud:

(a) By using [a] fictitious name, or falsely pretending to possess power, influence, qualifications, property, credit, agency, business or imaginary transactions, or by means of other similar deceits.

(b) By altering the quality, fineness or weight of anything pertaining to his art or business.

(c) By pretending to have bribed any Government employee, without prejudice to the action for calumny which the offended party may deem proper to bring against the offender. In this case, the offender shall be punished by the maximum period of the penalty.

affidavit of a Filipino attorney, Renato Dilag, which averred that a private civil action for conversion in the Philippines is based on Article 315.[38] Pursuant to Dilag's affidavit and Imelda's proposed instruction, the jury was instructed that the essential elements of the Philippine tort of conversion are that: "(a) [t]he accused defrauded another by means of deceit[ ] and (b) [d]amage or prejudice capable of pecuniary estimation was caused to the offended party." Thus, it was on the strength of the foregoing instruction that the jury found that Imelda had not engaged in conversion. This can only mean that the jury was unable to (1) find that Imelda personally (a) defrauded Roxas (*i.e.*, exercised unauthorized control over Roxas's property) (b) by means of deceit, (2) determine the value of the property over which Imelda had control, or (3) both. We may not and do not infer, as Imelda would have us, that the jury necessarily found that Imelda exerted no dominion or control over Roxas's property. On the contrary, the jury might simply have found that any deceit involved was perpetrated by Ferdinand.

As Imelda points out, note 1 to Article 315 provides in relevant part that "[f]raud as used in the Code should be taken in the broad sense and includes any act by means of which an undue gain is obtained. To defraud is to deprive a person of what rightfully belongs to him." While the Philippine definition of fraud may be "broad," it nevertheless does not include the additional element of "deceit," which is apparently necessary to rise to the level of the criminal offense of "swindling" or "estafa."

 Note 47 to Article 315 defines "conversion" as

an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of the owner's rights. It takes place when a person actually appropriates the property of another to his own beneficial use and enjoyment or to that of a third person.

(Footnote omitted.) The foregoing definition of "conversion" lends credence to Imelda's argument that conversion is coextensive with the exercise of any unlawful dominion over

---

(d) By postdating a check, or issuing such check in payment of an obligation, the offender knowing that at the time he had no funds in the bank, or the funds deposited by him in the bank were not sufficient to cover the amount of the check, and without informing the payee of such circumstances.

(e) By obtaining any food, refreshment, or accommodation at a hotel, inn, restaurant, boarding house, lodging house, or apartment house and the like without paying therefor, with intent to defraud the proprietor or manager thereof, or by obtaining credit in a hotel, inn, restaurant, boarding house, lodging house, or apartment house by the use of any false pretense, or by abandoning or surreptitiously removing any part of his baggage from a hotel, inn, restaurant, boarding house, lodging house, or apartment house after obtaining credit, food, refreshment, or accommodation therein without paying for his food, refreshment, or accommodation.

3. Through any of the following fraudulent means:

(a) By inducing another, by means of deceit, to sign any document.

(b) By resorting to some fraudulent practice to insure success in a gambling game.

(c) By removing, concealing or destroying, in whole or in part, any court record, office files, document, or any other papers.

**38.** Article 315 is a curious basis for this civil conversion action. *See supra* note 37. None of its provisions appear to be limited directly to mere unlawful dominion over another's property. The most apposite would seem to be subsection (1)(b), which defines as *one* permutation of estafa circumstances in which a person "converts" property that has been "received in trust ... or under any other obligation involving the duty to return the same[.]" Given the circumstances of this case, it is significant that note 12 to Article 315 distinguishes estafa from the taking of property by force or intimidation:

The essential element of the crime of "estafa" consists in the ingenuity or cunning employed by the agent for the purpose of deceiving the one it is intended to victimize. Obtaining property by fraud is, in a sense, obtaining it against the true will of the owner, but not in the sense of obtaining it by force or intimidation, as in robbery.

It is therefore difficult, under Philippine law, to view estafa as somehow coextensive or synonymous with conversion. However, Imelda has not challenged the circuit court's jury instructions regarding conversion. Thus, despite the fact that these instructions appear confusing to us, we cannot, without independent access to Philippine legal authority, rule as a matter of law that Dilag's averment about Philippine law is erroneous.

another's property under Philippine law and, therefore, that the jury's finding exonerating Imelda of conversion necessarily precluded the imposition of a constructive trust. However, the jury was not instructed in accordance with note 47. On the contrary, Imelda's own proposed instruction, the substance of which the circuit court incorporated into that given the jury, mandated that the jury must find *deceit*—not merely unauthorized dominion—in order to establish conversion under Philippine law. "As a rule, we presume that the jury followed the circuit court's instructions." *Kawamata Farms*, 86 Hawai'i at 247, 948 P.2d at 1088 (citations omitted). Given the heightened responsibility of the parties to apprise the trial court of governing foreign law, Imelda cannot now complain that her own instructions misstated the law to her detriment. *See supra* notes 16 and 32. Thus, the jury's special verdict with respect to conversion could not definitively foreclose the imposition upon Imelda of the status of a constructive trustee. In other words, by following the circuit court's instruction, the jury could have found that Imelda had not converted Roxas's property because of the lack of any affirmative showing of "deceit" on her part.

Finally, Imelda argues that insufficient evidence was adduced at trial to support a finding that she had exercised dominion or control over Roxas's property. However, although it is not entirely clear, the record on appeal appears to reflect that the circuit court ruled that it would undertake its own fact-finding regarding the plaintiffs-appellees' equitable claims against the Marcoses after the jury's verdict.[39] There was, therefore, no need for the plaintiffs-appellees to adduce evidence regarding Imelda's control or dominion over Roxas's property during the phase of the proceeding that was tried to the jury.

Accordingly, we hold that the circuit court erred in ruling as a matter of law that the plaintiffs-appellees' constructive trust claim was foreclosed by the jury's verdict. We therefore vacate the circuit court's judgment in favor of Imelda in her individual capacity and against the plaintiffs-appellees with regard to their constructive trust claim and remand for further proceedings before the circuit court sitting in equity.

2. *The jury's special finding that Imelda did not convert Roxas's property precluded GBC from prevailing on its claim of fraudulent conveyance.*

■ The plaintiffs-appellees also contend that the circuit court erred in ruling that the

---

**39.** The parties' appellate briefs do not reveal where in the record the circuit court's order and/or discussion regarding the bifurcation of the trial as between legal and equitable issues is located. *Cf. Jenkins v. Cades Schutte Fleming & Wright*, 76 Hawai'i 115, 119, 869 P.2d 1334, 1338 (1994) ("Neither the parties nor counsel have a right to cast upon this court the burden of searching a voluminous record for evidence of finality[.]"); *International Bhd. Of Elec. Workers v. Hawaiian Tel. Co.*, 68 Haw. 316, 322–23 n. 7, 713 P.2d 943, 950 n. 7 (1986) (counsel has no right to cast upon the court the burden of searching through a voluminous record to find the ground for an objection). However, it is clear that the trial *was* bifurcated on this basis, and several comments made by the circuit court at various points during the proceeding lead us to believe that the court intended, as appropriate, to conduct further fact-finding regarding the plaintiffs-appellees' equitable claims following the return of the jury's verdict on the legal claims for relief.

For example, in response to Imelda's motion in limine to exclude evidence that Ferdinand had engaged in "resmelting operations," the plaintiffs-appellees argued that the evidence was relevant, *inter alia*, to their constructive trust claim against the Marcoses. The circuit court ruled that,

> if there [are] any issues of equity such as whether or not a constructive trust should be placed on the property, that would be an issue for the Court to decide and would not be a jury issue.... [T]he Court's responsibility is to only permit relevant evidence for the fact finder.

Ruling that resmelting was not relevant to the *legal* claim of conversion, inasmuch as any conversion of Roxas's property would have had to have taken place before any resmelting could occur, the circuit court granted Imelda's motion in limine. By phrasing its ruling in this way, the circuit court clearly implied that, if evidence of resmelting were considered relevant to the *equitable* claim of constructive trust, it would be considered separately by the court after the jury's verdict was returned.

Similarly, the circuit court granted the plaintiffs-appellees' motion to alter the judgment to expressly reserve their equitable claims against Ferdinand, "so as to permit *further fact finding on the equitable issues* ...." (Emphasis added.)

jury's special verdict as to Imelda with regard to conversion foreclosed the possibility that Imelda could be liable for fraudulent conveyance. The parties failed at trial to provide the circuit court with any clear expression of Philippine law pertaining to the claim of "fraudulent conveyance." Accordingly, this court will apply Hawai'i law. *See supra* note 16.

HRS § 651C–4 (1993), a provision of Hawaii's version of the Uniform Fraudulent Transfer Act, provides in relevant part that

[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor whether the creditor's claim arose before or after the transfer was made or the obligation incurred, if the debtor made the transfer or incurred the obligation:

 (1) With actual intent to hinder, delay, or defraud any creditor of the debtor; or

 (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

 (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

 (B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

In the plaintiffs-appellees' complaint, GBC alleged, *inter alia,* that

in April of 1971 and on repeated occasions thereafter up to the present time the Defendants, and each of them, in an effort to hide the Yamashita Treasure from the Plaintiff and others, conveyed, hypothecated and otherwise disposed of portions of the Yamashita Treasure to third parties including relatives, friends, and corporations owned and or controlled by the Defendants, all for inadequate consideration and *all for the purpose of permanently depriving the owner of the Yamashita Treasure of his property.*

(Emphasis added.) As the highlighted language in the complaint emphasizes, GBC was alleging that Imelda transferred Roxas's property for inadequate consideration with the intent to "permantly depriv[e]" Roxas and his assigns of the property. The issue, then, is whether this alleged conduct was subsumed within the jury instruction pertaining to conversion. *See supra* section III.K.1.

■ The instructions, as they were actually given to the jury, did not include the legal definitions of "defraud" or "deceit." Accordingly, we presume that the jury applied the commonly understood meaning of those terms. *Cf.* HRS § 1–14 (1993) ("The words of a law are generally to be understood in their most known and usual signification[.]"). *Webster's New World Dictionary* (3d college ed.1988) defines "deceit," *inter alia,* as "a dishonest action or trick." *Id.* at 357. The same dictionary defines "defraud" as "to take away or hold back property, rights, etc. from by fraud; cheat." *Id.* at 362. Clearly, GBC's allegation that Imelda attempted to conceal the Yamashita treasure through surreptitious transfers entailed a "dishonest action or trick" designed to "cheat" her creditors.

Accordingly, the circuit court was correct in ruling that the jury's special verdict with regard to conversion, premised, as it was, on an instruction that erroneously required the jury to determine whether Imelda had engaged in "deceit," and therefore entailing an implicit finding that Imelda had *not* engaged in such conduct, precluded GBC from prevailing on its claim of fraudulent conveyance against Imelda in her individual capacity.

L. *The Proper Measure Of Damages In Connection With GBC's Conversion Claim Was The Value Of The Golden Buddha And The Seventeen Gold Bars Within A Reasonable Time After Roxas Learned Of The Conversion.*

The plaintiffs-appellees argue that the circuit court erred in instructing the jury that the correct measure of damages in connection with GBC's claim for relief arising out of the conversion of Roxas's gold was the value of the gold on the date of conversion. They assert, instead, that the proper measure

should have been the highest value of the gold between the time of its taking and the entry of the circuit court's amended judgment.

■ Like most of the issues on appeal in this matter, it would be appropriate to apply Philippine law to the measure of damages. Unfortunately, once again, none of the parties have cited any Philippine authority. Accordingly, this court will apply Hawai'i law. *See supra* note 16.

■ Imelda cites to this court's opinion in *Tsuru v. Bayer*, 25 Haw. 693, 699–700 (1920), for the proposition that the measure of damages for conversion is "the fair reasonable value of the property at the time of the conversion." However, in that case, the conversion at issue was of the personal effects of the lessee of a building, which were taken and sold by the building's owner. *Id.* at 694. Accordingly, the *Tsuru* court was not concerned with the valuation of a commodity of fluctuating value, such as the gold involved in the instant case. Indeed, it appears that the issue has never been directly addressed by the Hawai'i appellate courts.

In *Brougham v. Swarva*, 34 Wash.App. 68, 661 P.2d 138, 143–44 (Wash.Ct.App.1983), a case involving the conversion of silver coins, the Washington Court of Appeals summa-

rized the approaches adopted by the various jurisdictions toward the valuation of fluctuating commodities as follows:

> Prior [Washington state] cases have applied the standard measure of damages for conversion of stock, *i.e.*, the fair market value at the date of conversion, *Rogich v. Dressel*, 45 Wash.2d 829, 278 P.2d 367 (1954)[;] *Elliott v. Seattle Co.*, 178 Wash. 94, 34 P.2d 442 (1934)[;] *Hetrick v. Smith*, 67 Wash. 664, 122 P. 363 (1912) [40], but recent decisions in other jurisdictions have held otherwise.

> Some decisions have awarded damages based on the highest value reached by the stock or personal property between the time of conversion and trial. *Ott v. Fox*, 362 So.2d 836 (Ala.1978); *Chattanooga Discount Corp. v. West*, 219 F.Supp. 140, 146 (N.D.Ala.1963) (security conversion); *Royal–Liverpool Ins. Group v. McCarthy*, 229 S.C. 72, 91 S.E.2d 881 (1956) (automobile conversion).[41] Other jurisdictions have awarded the highest price between the date of conversion and a reasonable time after learning thereof. *Fletcher v. Cobuzzi*, 510 F.Supp. 263 (W.D.Pa.1981) (stock conversion); *Reed v. White, Weld & Co.*, 571 S.W.2d 395 (Tex.Civ.App.1978) (conversion of securities).[42] Still other

---

**40.** *See also George v. Coolidge Bank & Trust Co.*, 360 Mass. 635, 277 N.E.2d 278, 283 (Mass.1971); *National Sur. Corp. v. Hochman*, 313 S.W.2d 776, 782 (Mo.Ct.App.1958).

**41.** *See also Nelson*, 889 F.2d at 148 (stock conversion); *Imperial Sugar Co., Inc. v. Torrans*, 602 S.W.2d 275, 276–77 (Tex.Ct.App.1979) (conversion of sugar).

**42.** The plaintiffs-appellees also note that the Restatement (Second) of Torts § 927 (1977) provides in relevant part that, "in the case of commodities of fluctuating value customarily traded on an exchange to which traders customarily resort, [damages for conversion should be measured by] the hig[h]est replacement value of the commodity within a reasonable period during which he might have replaced it[.]" Comment (e) to that section explains that "[t]he purpose of the exceptional rule is to prevent defendants from appropriating and realizing the speculative possibilities of a rise in market value without any compensation to the plaintiff who is deprived of them." Comment (e) further explains that the duration of the "reasonable period" is "normally a question for the jury, subject to the control of the court as in the case of other questions of

fact." As examples of courts following this rule, the plaintiffs-appellees cite *Quest Medical Inc. v. Apprill*, 90 F.3d 1080, 1086 n. 6 (5th Cir.) (applying Texas law to a stock conversion), *reh'g denied*, 99 F.3d 1137 (5th Cir.1996); *Nelson v. All Am. Life & Fin. Corp.*, 889 F.2d 141, 148 (8th Cir.1989) (applying Iowa law to a stock conversion and holding that the value is the highest price within a reasonable time, or until the time of bringing the action, if not unreasonably delayed); and *In re New York*, 64 F.Supp. 487, 491 (D.Conn.1945).

The plaintiffs-appellees cite further to the Restatement of Restitution § 151 (1937), which provides that

> [w]here a person is entitled to a money judgment against another because by fraud, duress or other consciously tortious conduct the other has acquired, retained or disposed of his property, the measure of recovery for the benefit received by the other is the value of the property at the time of its improper acquisition, retention or disposition, *or a higher value if this is required to avoid injustice where the property has fluctuated in value or additions have been made to it.*

courts have applied the "New York rule[,]" which awards the highest price within a reasonable time after learning of the conversion[,] disregarding the period between conversion and learning thereof. *Klein v. Newburger Loeb & Co.*, 151 So.2d 879 (Fla. App.1963) (stock conversion);[43] *Schug v. Michael*, 310 Minn. 22, 245 N.W.2d 587 (1976) (stock conversion); *Hoffman v. Dorner*, 86 A.D.2d 651, 447 N.Y.S.2d 20 (1982) (conversion of gold and silver coins).[44] Finally, some courts have awarded damages based on their highest value between the time of conversion and judgment. *Kaplan v. Cavicchia*, 107 N.J.Super. 201, 257 A.2d 739 (1969) (conversion of securities); *U.S. Cities Corp. v. Sautbine*, 126 Okl. 172, 259 P. 253 (1927) (stock conversion).[45]

(Emphasis added.)

In line with the first approach described by the *Brougham* court, Imelda cites *Charles Selon & Assocs., Inc. v. Aisenberg*, 103 Ill. App.3d 797, 59 Ill.Dec. 457, 431 N.E.2d 1214 (Ill.Ct.App.1981). In *Aisenberg*, the Illinois Court of Appeals declined to adopt an exception to the general rule that "damages are set at the date of conversion" for converted gold. The *Aisenberg* court noted that the Illinois Supreme Court had similarly declined to make an exception for converted stock, arguing that such an exception "was based on the premises that the plaintiff originally obtained the stock for a permanent investment and would have kept it until the time of trial" and that such premises were "arbitrary and speculative." *Id.*, 59 Ill.Dec. 457, 431 N.E.2d at 1217 (citing *Sturges v. Keith*, 57 Ill. 451 (1870)). *See also Gerstle v. Gamble–*

*Skogmo, Inc.*, 478 F.2d 1281, 1305 (2d Cir. 1973) (holding that the assumption that the plaintiffs would have sold stocks at their highest value was "too untenable and speculative to support an award of damages" (citation and internal quotation marks omitted)).

We agree that some subjectivity inheres in any measure of damages that assumes that the victim of a conversion would have sold the commodity at the highest price during a particular period of time. However,

> [t]he hallmark of conversion cases is the interference with the plaintiff's ability to transfer [commodities] he owns or to which he is entitled. The injury that the plaintiff suffers is the deprivation of his range of elective action, and by applying the conversion measure of damages a court endeavors to restore that range of elective action. To require the plaintiff to show that he would have sold his securities, had he been able, is to require him to prove that he would have taken the very steps that defendant's wrongful act ... precluded him from taking. . . .
>
> The defendant's acts prevent a court from determining with any degree of certainty what the plaintiff would have done with his [commodities] had they been freely alienable. Because it is the defendant who creates this uncertainty, fundamental justice requires that, as between [the plaintiff] and [the defendant], the perils of such uncertainty should be laid at defendant's door.

*American Gen. Corp. v. Continental Airlines Corp.*, 622 A.2d 1, 10 (Del.Ch.), *aff'd*, 620 A.2d 856 (Del.1992) (citations and internal quotation signals omitted) (some brackets added and some in original).

(Emphasis added.) However, as Imelda points out, comment (c) to section 151 explains that the higher value should be allowed "if [the plaintiff] can prove that he probably would have made a sale while the subject matter was at its highest point in value." *See also General Ins. Co. of Am. v. Commodity Credit Corp.*, 430 F.2d 916 (10th Cir.1970) (adopting this rule).

43. We note that although the *Klein* court described the "New York rule" as articulated by *Brougham, supra*, it did not adopt that rule, applying instead the "Florida rule," which assigns the value of a fluctuating commodity at a "reasonable time after conversion." *Klein*, 151 So.2d at 880.

44. *See also Galigher v. Jones*, 129 U.S. 193, 9 S.Ct. 335, 32 L.Ed. 658 (1889) (adopting the New York rule as first articulated by the New York Court of Appeals in *Baker v. Drake*, 53 N.Y. 211 (1873)); *Schultz v. Commodity Futures Trading Comm'n*, 716 F.2d 136 (2d Cir.1983) (following *Galigher*). *See generally*, Annot., *Measure of Damages for Conversion of Corporate Stock or Certificate*, 31 A.L.R.3d 1286 § 5(d) (1970) (collecting cases applying the New York rule).

45. *See also American Gen. Corp. v. American Airlines Corp.*, 622 A.2d 1, 8 (Del.Ch.), *aff'd*, 620 A.2d 856 (Del.1992).

On the other hand, we believe that the approach advocated by GBC and adopted in some jurisdictions—*i.e.*, that the measure of damages must be the highest value of the converted property between the time of the conversion and the time of judgment or the filing of the complaint—tips the balance too far to the other side. There is no persuasive punitive or compensatory rationale for penalizing the defendant (absent bad faith delay) or rewarding the plaintiff for the time required for the plaintiff to file a complaint or obtain a judgment. "[T]o adopt the highest value between the time of actual conversion and the trial would be to encourage the owner to delay and speculate upon the chances of higher markets, without assuming the chances of lower markets." *Newburger Cotton Co. v. Stevens,* 167 Ark. 257, 267 S.W. 777, 778 (Ark.1925). However readily ascertainable the relevant time period might be pursuant to this rule, we deem the rule's unfairness to outweigh its predictability.

On balance, we agree with the resolution at which the *Brougham* court arrived. After considering the options available to it, the *Brougham* court adopted the "New York rule," holding that "the measure of damages is the highest value of the property wrongfully and knowingly converted between the time of conversion and a reasonable time after the person learns of such conversion." *Id.* at 144. "Such a rule," declared the *Brougham* court,

> protects the victim who has invested in property for speculative purposes when the market either rises or falls subsequent to the conversion. The innocent victim should not suffer a loss because of a wrongful taking and withholding of his property. Neither should he be granted the windfall of complete umbrella protection by being awarded the highest possible valuation of the property from the time of its taking to the entry of judgment or its return.

*Id.* at 144 (citation omitted).[46]

The "New York rule" errs on the side of granting the unforeseen benefit of a fluctuat-

ing commodity's increase in value to the innocent victim of conversion rather than to the converter, but it does not do so to the extent of conferring an unreasonable windfall. It also avoids the foreseeable possibility that, because of a sudden and infelicitous dip in the market for a particular commodity on the date of conversion, the victim of conversion would be inadequately compensated for his or her loss by operation of the general rule. Moreover, the New York rule tempers the speculative nature of such a measurement of damages by disregarding the market prices of the converted commodity between the time of conversion and the time the plaintiff discovers the conversion. We can be relatively certain that the plaintiff would not have sold the commodity during that time period absent the defendant's wrongdoing because " 'if he had desired to dispose of [his property] in that interval, he would have learned of the conversion.' " *Schultz v. Commodity Futures Trading Comm'n,* 716 F.2d 136, 141 (2d Cir.1983) (quoting *In re Salmon Weed & Co.,* 53 F.2d 335, 341 (2d Cir.1931)) (brackets in original). We therefore expressly adopt the New York rule with respect to the valuation of fluctuating commodities.

With regard to how the trier of fact is to arrive at its determination of a "reasonable time," the courts applying the "New York rule" have described the object of that inquiry as the time necessary to replace the converted commodity. *See Schultz,* 716 F.2d at 140 ("The 'true and just measure of damages in these cases' is 'the highest intermediate value of the [commodity] between the time of its conversion and a reasonable time after the owner has received notice of it to enable him to replace the [commodity].' " (Quoting *Galigher v. Jones,* 129 U.S. 193, 201, 9 S.Ct. 335, 32 L.Ed. 658 (1889).); *Mayer v. Monzo,* 221 N.Y. 442, 117 N.E. 948, 950 (N.Y.1917) (the value of the converted commodity is the highest value within "a reasonable time after notice of the conversion within which to determine whether he will purchase other

---

**46.** We note that the "reasonable time" includes the date of the conversion itself. *See Schultz,* 716 F.2d at 141.

[commodities] in the place thereof"); *Gelb v. Zimet Brothers, Inc.*, 34 Misc.2d 401, 228 N.Y.S.2d 111, 113 (N.Y.Sup.Ct.1962), *aff'd*, 18 A.D.2d 967, 237 N.Y.S.2d 989 (N.Y.1963) (following *Mayer*); *American General Corp.*, 622 A.2d at 13 ("[T]he date should be established by resort to a 'constructive replacement' purchase by the plaintiff, *i.e.*, how long it would have taken the plaintiff to replace the [commodity] on the open market."); *Hornblower & Weeks–Hemphill Noyes v. Lazere*, 301 Minn. 462, 222 N.W.2d 799, 807 (Minn.1974) (following *Gelb*). In other words, the rule sets as an outside boundary for the determination of the value of the converted commodity the latest date upon which a "reasonable investor" with adequate funds would have reentered the market by purchasing a replacement for his or her converted commodity to "cover" the damages from the conversion. *See Mitchell v. Texas Gulf Sulphur Co.*, 446 F.2d 90, 105 (10th Cir.1971), *cert. denied*, 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558 (1972). The rule's underlying premise is that any increase in value of the commodity after that cut-off date would have been enjoyed by the reasonable investor and should therefore not be awarded to the plaintiff who (presumably) missed his or her chance to be exposed to the market. Thus, applying the New York rule to the present case, the date of close of the evidence at trial would, as a matter of law, be the absolute end-point beyond which the "reasonable time" cannot extend, inasmuch as the market values of the converted Buddha statue and gold bars beyond that date would be unknowable to the trier of fact.

Accordingly, the circuit court's jury instruction regarding the valuation of the converted gold was erroneous. Likewise, the special verdict form erroneously required the jury to value the gold as of the date of conversion. Because we have already held that there was insufficient evidence to support an award of damages for such gold bullion as may have been contained in the unopened boxes allegedly found by Roxas, inasmuch as the record was speculative regarding the gold's quantity and purity, *see supra* section III.I, there is no need to remand for a recalculation of the value of that gold. However, with respect to the golden buddha statue and the seventeen gold bars taken from Roxas's home, a new trial on the issue of value is necessary, and we therefore vacate that portion of the circuit court's judgment regarding the damages attributable to the golden buddha statue and the seventeen golden bars and remand for further proceedings. On retrial, the circuit court should instruct the jury that the measure of damages for the conversion of the golden buddha and the seventeen gold bars is the highest value of the gold between—and including—the date of conversion and a reasonable time thereafter.[47] The reasonable time is bounded by the latest date on which a reasonable investor with adequate funds would have replaced the converted gold. The reasonable time cannot extend beyond the date of the close of evidence at trial. Moreover, the circuit court should require the jury to make special finding of the date corresponding to the highest value of the gold within the reasonable time for purposes of calculating an award of prejudgment interest. *See infra* section III.M.2.

M. *The Circuit Court Did Not Abuse Its Discretion In Failing To Award Prejudgment Interest With Regard To The Roxas Estate's Claims Of Battery And False Imprisonment; It Did, However, Commit An Abuse Of Discretion By Awarding Prejudgment Interest Regarding GBC's Claim Of Conversion Merely From The Commencement Of The Lawsuit.*

As a final matter, the plaintiffs-appellees contend that the circuit court committed abuses of discretion in ruling on their motion for prejudgment interest. They urge that the Roxas Estate should have been awarded

---

**47.** As described *supra*, the New York rule excludes the period between the time of conversion and the plaintiff's notice of the conversion, and the "reasonable time" extends after the plaintiff has notice. On the present record, it would be unnecessary to instruct as to these distinctions, inasmuch as it was uncontroverted that Roxas was present during the conversion of the golden buddha and the gold bars, and, therefore, the moment of the conversion and Roxas's notice of it were the same.

prejudgment interest from April 5, 1971, the date of Roxas's first detention and torture, with respect to its claims of battery and false imprisonment, whereas the circuit court granted none at all. They also argue that GBC should have been awarded prejudgment interest from January 1, 1975, rather than from the date of the filing of the complaint.

1. *In connection with Roxas's battery and false imprisonment claims, the circuit court acted within the scope of its discretion in denying prejudgment interest from the date of Roxas's first arrest, inasmuch as the jury may have tailored its award to account for the passage of time.*

Prejudgment interest is awardable at the discretion of the court pursuant to HRS § 636–16 (1993). *Eastman,* 86 Hawai'i at 26–27, 946 P.2d at 1322–23. HRS § 636–16 provides that,

[i]n awarding interest in civil cases, the judge is authorized to designate the commencement date to conform with the circumstances of each case, provided that the earliest commencement date in cases arising in tort, may be the date when the injury first occurred and in cases arising by breach of contract, it may be the date when the breach first occurred.

■ Prejudgment interest is "essentially compensatory in nature" and is "given on money demands as damages for delay in payment, being just compensation to the plaintiff for a default on the part of his debtor." *Sussel v. Civil Serv. Comm'n,* 74 Haw. 599, 618–19, 851 P.2d 311, 321, *reconsideration denied,* 74 Haw. 650, 857 P.2d 600 (1993) (quoting *Lucas v. Liggett & Myers Tobacco Co.,* 51 Haw. 346, 349, 461 P.2d 140, 143 (1969)). *See also Amfac, Inc.,* 74 Haw. at 137, 839 P.2d at 36 ("The purpose of [HRS § 636–16 is] to allow the court to designate the commencement date of interest in order to correct the injustice when a judgment is delayed for a long period of time for any reason, including litigation delays." (Citations and internal quotation marks omitted.)).

■ The plaintiffs-appellees maintain, somewhat hyperbolically, that prejudgment interest is "virtually mandatory" and is a "right" recognized at common law. More moderately, the plaintiffs-appellees acknowledge that this court has stated that "prejudgment interest is to be allowed wherever it is properly proved." *Sussel,* 74 Haw. at 618, 851 P.2d at 313 (citing *City and County of Honolulu v. Caetano,* 30 Haw. 1 (1927)). However, it is clearly within the discretion of the circuit court to deny prejudgment interest where appropriate, for example, where: (1) the defendant's conduct did not cause any delay in the proceedings, *see Amfac, Inc.,* 74 Haw. at 137, 839 P.2d at 36; (2) the plaintiff himself has caused or contributed to the delay in bringing the action to trial, *see Schmidt v. Board of Directors of the Association of Apartment Owners of the Marco Polo Apartments,* 73 Haw. 526, 534–35, 836 P.2d 479, 484 (1992); or (3) an extraordinary damage award has already adequately compensated the plaintiff, *see Leibert v. Finance Factors, Ltd.,* 71 Haw. 285, 293, 788 P.2d 833, 838 (holding that it was an abuse of discretion for the circuit court to award prejudgment interest to a treble damages award), *reconsideration denied,* 71 Haw. 664, 833 P.2d 899 (1990).

■ In this case, the circuit court declined to grant prejudgment interest to the Roxas Estate because (1) the jury might have incorporated the value of Roxas's general damages from the date of his initial arrest and torture to the date of his death in its damage award in connection with the battery and false imprisonment claims and (2) the jury's damage award was sufficient to compensate the estate for any loss of interest.

The plaintiffs-appellees are correct that it was Marcos's own actions in engineering a new constitutional provision, which conferred immunity from suit on himself, that caused the protracted delay in commencing the present action. Imelda, however, counters that the plaintiffs-appellees contributed to the delay as well—reiterating her arguments that Roxas was under no duress and could freely have sued in the Philippines. As discussed *supra,* section III.B, Imelda's arguments are without merit. The "delay" factor, therefore, militates in the plaintiffs-appellees' favor.

As noted above, however, in *Amfac, Inc.*, this court reiterated that there may be reasons separate and apart from whether the defendant was responsible for delay that may enter into the calculus relating to the allowance of prejudgment interest. In the present case, the circuit court premised its ruling on its determination that the jury may already have compensated the Roxas Estate for litigation delay. The plaintiffs-appellees argue that the circuit court's basis constituted improper speculation into the jury's intentions. The jurors were not instructed to factor interest into their damage award, the plaintiffs-appellees note, and, therefore, it would be improper to impute an unknown intention to them. As Imelda observes, however, the plaintiffs-appellees themselves implicitly invited the jury to tailor its damages award to include any delay in compensation. In his closing argument, Cathcart urged that:

> the issue is what is reasonable compensation for the pain, the suffering and the anxiety and the fears which [Roxas] endured from January 25th, 1971, a period of time when, as Felix Dacanay described it, he was hunted like an animal. Where his life with his family was interrupted. Where he feared for his family's life and where ultimately he went down to Viscayan to get away from the possible danger and all that for a period January 25, 1971 until he died on May 24th, 1993. That's 22 years, if my math is correct.

> Obviously the pain, the suffering and the anxiety was more intense while he was being threatened and tortured. When General Ver came up to him and said: Roger, don't make any trouble. The threat's clear. When he lived in fear for the rest of his life and had to hide much of his life or go to remote or distant places much of his life. What's it worth? It's worth what you say it's worth.

Imelda further notes that the special verdict form directed the jury to "state the amount of actual damages, if any, to be awarded to the plaintiff Estate of Roger Roxas to compensate it for *any injuries or damages suffered during his lifetime* as a result of his false imprisonment and/or battery." (Emphasis added.)

In light of the foregoing, it was not unreasonable for the circuit court to infer that the jury actually compensated Roxas for his post-imprisonment suffering. Thus, although Ferdinand was clearly responsible for causing the delay in the adjudication of the plaintiffs-appellees' claims, given the wording of the special verdict form, Cathcart's legitimate exhortation of the jury to factor Roxas's post-imprisonment years of suffering into its damage award, and the magnitude of the sum—$6,000,000.00—actually awarded to the Roxas Estate in damages, we cannot say that the circuit court "exceeded the bounds of reason" in declining to award prejudgment interest to the Roxas Estate. Accordingly, we hold that the circuit court did not abuse its discretion by denying the plaintiffs-appellees' motion for prejudgment interest with respect to the Roxas Estate. That portion of the circuit court's October 18, 1996 order is affirmed.

2. *The circuit court committed an abuse of discretion by failing to award GBC prejudgment interest with respect to GBC's damages resulting from the conversion.*

 Without articulating any reasons for doing so, the circuit court allowed GBC prejudgment interest commencing from the date the plaintiffs-appellees' lawsuit was filed, rather than from January 1, 1975 (the approximate date on which Ferdinand allegedly began converting most of the treasure from the tunnels at Baguio City, *see supra* section I.B.7), as requested. The plaintiffs-appellees argue that this unfairly accorded the Marcoses the opportunity to realize the investment profit from Roxas's gold during the period of its conversion and continuing to the date of the complaint.

Because the special verdict form specifically limited the jury's award to the value of the gold actually converted, it cannot be said that the plaintiffs-appellees' damages were of such an extraordinary nature as to fall within the *Leibert* exception. *See supra* section III. M.1. Moreover, the rationale underlying the awarding of prejudgment interest in conversion actions is clear and intuitive:

We begin with the proposition that interest is compensatory in nature, not punitive, and it is for this reason that interest is properly given to a plaintiff from the date of conversion of his property by a defendant until the date judgment is satisfied. There is no sound reason why a plaintiff should not be able to recover a loss in earnings of an asset which defendant converted.

*Lucas*, 51 Haw. at 348, 461 P.2d at 142 (citations omitted). Finally, as noted above, the responsibility for the delay in commencing the present action lies overwhelmingly with Ferdinand. Therefore, it would appear that there is little justification for the circuit court's ruling.

Imelda argues that (1) the purpose of prejudgment interest is not to force the defendant to disgorge profit, but, rather, to discourage delay in adjudication, and (2) pursuant to *McKeague v. Talbert*, 3 Haw. App. 646, 658 P.2d 898 (1983), the circuit court lacked the discretion, in any case, to award prejudgment interest for any period prior to May 8, 1979, the effective date of HRS § 636–16.

Imelda's first argument amounts to little more than a semantic dispute with the plaintiffs-appellees. Clearly, the implication in this court's oft-repeated characterization of prejudgment interest as "compensatory" is that the award is meant to make the plaintiff whole with respect to delay in receiving damages to which he or she is entitled. The foregoing proposition is the functional equivalent of the notion that prejudgment interest is designed to afford the plaintiff the approximate investment value of the damage award, which the law presumes the defendant has acquired as a windfall.

Imelda's second argument is more substantial than her first, but, in the end, also fails. In *McKeague, supra*, the ICA construed HRS § 636–16, noting that, prior to the enactment of that statute, this court had expressly approved of the award of prejudgment interest, where properly proved, in *City and County of Honolulu v. Caetano*, 30 Haw. 1 (1927), and *Lucas, supra. McKeague*, 3 Haw.App. at 660–61, 658 P.2d at 909.

The ICA also quoted from the language of the conference committee report on 1979 Haw. Sess. L. Act 78, which promulgated HRS § 636–16, as follows:

The purpose of this bill is to more clearly define the trial judge's descretion [sic] in awarding interest in civil cases.

Your Committee understands that at the present time interest is generally awarded commencing on the day the judgment is rendered. Where the issuance of a judgment is greatly delayed for any reason, such fixed commencement date can result in substantial injustice. Allowing the trial judge to designate the commencement date will permit more equitable results. Also, it is expected that party litigants will give serious regard to this discretion on the part of the trial judge so that those who may have had an unfair leverage by the arbitrariness of the prior rule will arrive at the realization that recalcitrance or unwarranted delays in cases which should be more speedily resolved will not enhance their position or assure them of a favorable award.

*Id.* at 662, 658 P.2d at 909 (quoting Conf. Comm. Rep. No. 67, in 1979 Senate Journal, at 984) (brackets in original) (footnote omitted). The ICA surmised that

the situation that gave rise to the statute was that, notwithstanding *Caetano* and *Lucas*, plaintiffs in this jurisdiction have not pleaded and proved interest as an element of damages except in contract actions or actions for liquidated damages. Also, notwithstanding that in *Lucas* the court said § 478–2 does not preclude prejudgment interest, the courts in this jurisdiction have not been asked to award it.

*Id.* at 662, 658 P.2d at 910 (footnote omitted). The *McKeague* court then held: (1) that HRS § 636–16 had "replaced" the *Lucas* rule; (2) that the legislature had expressed no intent that HRS § 636–16 should have retroactive effect; and, therefore, (3) that, by dint of the new statute, circuit courts had no discretion to award prejudgment interest for any period prior to its enactment on May 18, 1979. *Id.* at 663, 658 P.2d at 910.

Notwithstanding the *McKeague* court's analysis, the history underlying HRS § 636–

16 establishes that the legislature intended retroactive effect to be given to the statute's provisions. *See* HRS § 1–3 (1993) (providing that "[n]o law has any retrospective operation unless otherwise expressed or obviously intended"). The clear spirit of HRS § 636–16, as unambiguously expressed in the conference committee report quoted by the *McKeague* court itself was to codify the courts' preexisting discretion to award prejudgment interest. The ICA thus misapprehended the spirit underlying HRS § 636–16 by construing the statute to restrain the courts from awarding prejudgment interest for periods prior to its enactment—in effect, according the courts *less* discretion on the issue than before.

The unfairness thus engendered is especially apparent in cases like the one at bar, in which the plaintiffs-appellees expressly prayed for prejudgment interest in their complaint and actually adduced the requisite proof at trial; yet because the ICA held that HRS § 636–16 replaced the common law rule on prejudgment interest, they ostensibly do not enjoy the same access to prejudgment interest as plaintiffs whose judgments were entered before 1979. Moreover, the ICA's interpretation in *McKeague* effectively delayed the implementation of the new statute (itself designed to end delays) by years, inasmuch as the statute could not affect any action involving a compensable injury occurring before May 18, 1979. Finally, the *McKeague* interpretation allowed tortfeasors to benefit from the investment potential of damage awards that, but for the tortfeasors' own attempts to delay judgment, would have been in the possession of plaintiffs. *Cf. Hawaiian Beaches, Inc. v. Kondo*, 52 Haw. 279, 281, 474 P.2d 538, 540 (1970) (holding that the "ordinary meaning" of the term "interest" is "payment made for the privilege of using another's money" (citations omitted)).

Contrary to the ICA's analysis in *McKeague*, we believe that HRS § 636–16 should be afforded retroactive effect because it is a remedial statute designed to clarify and encourage the exercise of judicial discretion in the award of prejudgment interest. *Cf. State v. Von Geldern*, 64 Haw. 210, 638 P.2d 319 (1981) (holding that the legislative history of the penal code evinced a desire by the legislature to provide flexibility in sentencing and that sentencing provisions could therefore be applied retroactively); *Palea v. Rice*, 34 Haw. 150, 158 (1937) ("[W]here a remedial statute is clearly intended to cure a defect in an earlier statute so as to make it operative in the bestowal of accruing benefits to persons from the date of the earlier statute, and is without ambiguity in meaning and intent in that respect, the legislative intent as to retroaction must be given effect, for the spirit or reason of the law is the life of the law."). We therefore overrule *McKeague* insofar as it holds that HRS § 636–16 restricts the circuit court's discretion in awarding prejudgment interest to periods subsequent to May 18, 1979.

We have already held that the issue of damages must be remanded to the circuit court in order to afford the jury the opportunity to determine the highest value of the golden buddha statue and the seventeen gold bars converted from Roxas between the date of conversion and a reasonable time after Roxas had notice of the conversion, excluding any time between the conversion and Roxas's discovery of it. *See supra* section III.L. Pursuant to the New York rule, the jury, on remand, might find that the value of the gold corresponds to its market value on a date subsequent to the date of conversion. In such an event, the jury will already have compensated GBC for Roxas's loss of market appreciation between the date of conversion and the date of the value chosen. Just as it would be unfair to compensate the Roxas Estate doubly for the "time value" of the damages arising out of its claims of battery and false imprisonment damages by awarding prejudgment interest when the jury has already factored the passage of time into its award, *see* supra section III.M.1, it would be unfair to award GBH prejudgment interest for the period between the date of conversion and the date corresponding to the value of the gold chosen by the jury. *Cf. American General Corp.*, 622 A.2d at 13–14 (holding, in a breach of contract case, that prejudgment interest started to accrue from the date the plaintiff's damages actually began to accrue rather than from the date of the breach). Accordingly, we hold that, upon retrial of the

issue, the circuit court should award prejudgment interest on the damages arising out of the conversion of the golden buddha and the seventeen gold bars from the date corresponding to the value of the gold chosen by the jury.

## IV. *CONCLUSION*

Based on the foregoing analysis, we (1) reverse that portion of the circuit court's amended judgment awarding GBC $22,000,000,000.00 for "one storage area" of gold bullion, (2) vacate those portions of the amended judgment (a) entering judgment in favor of the plaintiffs-appellees and against Imelda, in her capacity *as personal representative of the Marcos Estate*, (b) awarding GBC $1,400,000.00 in damages for conversion of the golden buddha statue and the seventeen gold bars, and (c) entering judgment in favor of Imelda and against the plaintiffs-appellees on GBC's claim for constructive trust, and (3) remand the matter to the circuit court for (a) the entry of judgment against Imelda in her *personal* capacity, to the extent of her interest in the Marcos Estate, on the Roxas Estate's claims of battery and false imprisonment, and GBC's claim of conversion against Ferdinand, (b) a new trial on the value of the converted golden buddha statue and seventeen gold bars, (c) an award of prejudgment interest on the damages awarded as a consequence of the conversion of the golden buddha and seventeen gold bars, commencing from the date corresponding to the value of the gold assigned by the jury, and (d) further proceedings, to the extent necessary, on GBC's equitable claim against Imelda, in her personal capacity, for constructive trust. In all other respects, the circuit court's amended judgment is affirmed.